UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| CITY OF SIOUX FALLS,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>AZZURO, INC., SHORT-ELLIOTT-<br>HENDRICKSON, INC.,<br><br>　　　　　　Defendants.<br>_____<br><br>SHORT ELLIOT HENDRICKSON, INC.,<br><br>　　　　　　Third-Party Plaintiff,<br><br>v.<br><br>UNISON SOLUTIONS, INC.,<br><br>　　　　　　Third-Party Defendant.<br>_____<br><br>AZZURO, INC.,<br><br>　　　　　　Counterclaimant,<br><br>v.<br><br>CITY OF SIOUX FALLS,<br><br>　　　　　　Counterclaim Defendant. | **4:22-CV-04052-LLP**<br><br><br>**MEMORANDUM OPINION AND ORDER<br>GRANTING IN PART AND DENYING IN<br>PART AZZURO'S MOTION FOR<br>SUMMARY JUDGMENT AND CITY OF<br>SIOUX FALLS'S PARTIAL MOTION<br>FOR SUMMARY JUDGMENT** |

Pending before the Court is a Motion for Summary Judgment by Defendant Azzuro, Inc. (Doc. 49) and a Partial Motion for Summary Judgment filed by City of Sioux Falls (Doc. 64). For the following reasons, both Motions are granted in part and denied in part.

## BACKGROUND

### I.     Facts

In 2015, City of Sioux Falls ("the City") hired Short-Elliot-Hendrickson, Inc. ("SEH") to provide services as the City's professional engineering representative for the Sioux Falls Water Reclamation Facility Gas Conditioning System Project ("Project") and to give professional engineering and advice to the City regarding bid design and specifications for the Project. (Docs. 56, ¶ 3; 70, ¶ 3). The City of Sioux Falls wanted to remove hydrogen sulfide ("$H_2S$") from the biogas at the City's water reclamation plant so that they could use the gas for electricity in its Jenbacher combustion engine system. (Doc. 62-1, Koers Dep. 34:2-10). The City was interested in removing the hydrogen sulfide because, if burned, it creates sulfur dioxide which is a regulated emission and corrodes the engine. (Doc. 62-1, Koers Dep. 34:11-23).

On or about May 2015, SEH and Kennedy Jenks contacted Azzuro concerning a biogas system ("the System or the Azzuro System") for the removal of hydrogen sulfide at the City's water reclamation plant ("the Project"). (Docs. 56, ¶ 4; 70, ¶ 4). Azzuro designs, engineers and supplies biological air pollution control systems to treat a variety of emissions. (Docs. 56, ¶ 2; 70, ¶ 2). Prior to 2015, Azzuro did not have any municipal wastewater biogas digester systems in place. (Doc. 62-1, Koers Dep. 35:24-36:3).

SEH requested that Azzuro and other vendors provide a proposal for the Project. (Docs. 56, ¶ 6; 70, ¶ 6; 60-1, Craddock Dep. 55:23-56:6). Azzuro, by document dated June 22, 2015, updated by documents dated September 16, 2015, and December 22, 2015, presented an Offer Package for a Gas Conditioning Facility to SEH ("Offer Package"). (Docs. 56, ¶ 8; 70, ¶ 8; 61-1 at 906, Maas Dep. 133:1-8). The Offer Package listed the components of the Azzuro System, a performance guarantee, full engineering package, and spec sheets. (Doc. 61-1 at 922, 934). The Offer Package also provided that "after treatment, the biogas needs to be suitable to generate energy." (Doc. 61-1 at 919).

In July 2015, SEH prepared for the City of Sioux Falls a Technical Memorandum-Gas Conditioning Equipment Evaluation and Recommendation for the City's water reclamation facility. (Doc. 60-2 at 827). It detailed three different systems, one from Tiopaq, one from BiogasClean, and one from Azzuro that could meet the City's performance specifications. (Doc. 60-2 at 827-880). Given the lower cost of the Azzuro system and its lower operations and maintenance costs, it was the City's preferred supplier for the hydrogen removal system. (Doc. 63-3, Hierholzer Dep. 156:1-19).

SEH prepared the Project Specifications portion of the City's Bid Request with input from Unison and Azzuro. (Doc. 56, ¶ 6; 70, ¶ 6; 74, ¶ 6; 61-1 at 907-08, Maas Dep. 137:19-138:8; 61-1 at 1116). In September 2015, SEH emailed Bonno Koers the City's gas testing results dated April 20, 2015. (Doc. 62-1 at 1167; Doc. 61-1 at 901, Maas Dep. 61:7-62:25; 75-3, Koers Dep. 58:6-24). In his email, he indicated that peak hydrogen sulfur concentrations were higher than thought, in the range of 9,000-12,000 ppm. (Doc. 62-1 at 1167). SEH asked Koers to look at the data and let them know if they should revise the average hydrogen sulfur design condition to make sure they were properly sizing the system. (Doc. 62-1 at 1167). The April 20, 2015, gas testing results forwarded by SEH showed that the oxygen level in April 2015, was 0.887 in Digester 1 and 0.418 percent in Digester 3. (Doc. 62-1 at 1168, 1177; 60-1 at 791-802).

On March 11, 2016, SEH sent the Project Specifications to Unison which Unison forwarded to Azzuro stating that the project would go out for competitive bid in approximately a week and asking for any last-minute changes. (Doc. 62-1 at 1166, Koers Dep. 226:17-227:15).

On March 14, 2016, the City issued a Bid Request for Digester Gas Conditioning Equipment for the City of Sioux Falls, South Dakota (Bid Request No. 16-0077), which included the Digester Gas Conditioning Equipment Specification Section 43 32 59 ("Bid Specifications"). (Docs. 74, ¶ 7; 53-3). Section 1.01 of the Bid Specifications defined the scope of work as "design[ing], manufactur[ing], and deliver[ing] materials, equipment and incidentals required for a Digester Gas Conditioning System." (Doc. 53-3 at 440). Section 1.01 provided that the Gas Conditioning System shall include the following Equipment/Sub-systems: 1) a hydrogen sulfide removal system (AZZURO); 2) a gas compression system; 3) moisture removal system; 4) glycol chiller; 5) siloxane removal system; and 6) control system. (Doc. 53-3 at 440). Section 1.01 further provided that the Gas Conditioning System was to be installed by an installation contractor

retained by the City. (Doc. 53-3 at 440). Section 2.01 provided that Unison Solutions, Inc. or an approved equal[1] would be the designated supplier for the hydrogen sulfide removal system, gas compression, drying and siloxane removal equipment and accessories. (Doc. 53-3 at 444).

Section 2.02 of the Bid Specifications provided the following description of the Gas Conditioning System:

> . . .
>
> B. From the Digester the gas will first enter the Hydrogen Sulfide Removal System: The system uses two different phases (i.e. anaerobic and aerobic) of biological activity to remove hydrogen sulfide from the digester and oxidize the hydrogen sulfide into sulfur acid. First digester gas is introduced into an Anaerobic Chamber where hydrogen sulfide is absorbed into a biological slurry and further treated with clean water in a polishing chamber. Biological slurry from the Anaerobic Chamber is subsequently pumped into an Aerobic Biotrickling Filter that oxidizes the hydrogen sulfide into sulfuric acid. Drainage from the Aerobic Biotrickling Filter is irrigated in the Anaerobic Chamber.
>
> C. The gas will enter through a Gas Compressor Inlet Moister/Particulate Filter prior to entering the Gas Compressor. After Compression the gas will go through a series of two heat exchangers. The first heat exchanger is a Gas to Gas Heat Exchanger which will use the hot gas from compression to re-heat the cold gas from the Gas to Glycol Heat Exchanger. The Gas to Glycol Heat Exchanger uses glycol supplied by the Glycol Chiller to cool the gas. After the gas is cooled, it goes through a Moister Separator before entering the opposite side of the Gas to Gas Heat Exchanger to be re-heated. After the re-heat the gas travels to the Siloxane Removal System.
>
> D. The gas will then enter the Siloxane Removal Vessels, which are fixed bed media filters, designed to remove siloxanes from the gas. After the siloxanes are removed, the gas will be sent back to the Siloxane Removal Final Particulate Filter located on the Gas Compression/Moisture Removal Skid. After passing through the Final Particulate Filter, the gas will be ready for delivery to the end use equipment.

(Doc. 53-3 at 444).

Section 2.03 of the Bid Specifications details the Performance/Design Criteria. (Doc. 53-3 at 444). Section 2.03A provides that "the Gas Conditioning System shall be designed for

---

[1]    Although the Project Specifications were written strongly around the Unison and Azzuro systems, the bid went out as a competitive bid, not as a sole process procurement. (Doc. 60-1 at 763, Craddock Dep. at 251:6-15).

continuous operation in an indoor/outdoor environment and shall conform to the following requirements":

1. Site Information
   a. Minimum Ambient Temperature    -20F
   b. Maximum Ambient Temperature    100F
   c. Site Elevation    1,336 Average 'AMSL
2. System Requirements
   a. Minimum Gas Flow    100 scfm
   b. Maximum Gas Flow    450 scfm
3. Inlet Gas Conditions
   a. Minimum Inlet Gas Pressure    6"WC
   b. Maximum Inlet Gas Pressure    12"WC
   c. Minimum Inlet Gas Temperature    80°F
   d. Maximum Inlet Gas Temperature    95°F
   e. Relative Humidity    100%
   f. Methane (CH4)    60%
   g. Carbon Dioxide (CO2)    37%
   h. Nitrogen (N2)    2%
   i. Oxygen (O2)    1%
   j. Average Hydrogen Sulfide (H2S)    5,700 ppmv
   k. Maximum Hydrogen Sulfide (H2S)    11,400 ppmv
   l. Siloxanes (L2, L3, L4, L5, D3, D4, D5, D6)    500ppbv
4. Hydrogen Sulfide Removal System Discharge Requirement
   a. Hydrogen Sulfide    100ppmv
5. Compression, Moisture Removal, and Siloxane Removal Discharge Requirements
   a. Gas Pressure    30 psig
   b. Temperature    80°F
   c. Dew Point Temperature    40°F
   d. Maximum Hydrogen Sulfide    5 ppmv
   e. Maximum Siloxane    100 ppbv
   f. Particulate Removal    99% removal of >1 micron

(Doc. 53-3 at 444-445).

Section 2.04 of the Bid Specifications detailed the Hydrogen Sulfide Removal System. Subsection A specified Azzuro, or an approved equal,[2] as the acceptable manufacturer of the hydrogen sulfide removal system. (Doc. 53-3 at 446). Section 2.04 listed the parts of the hydrogen sulfide removal system as: 1) anaerobic reactor; 2) aerobic reactor; 3) reactor media; 4) reactor irrigation systems; 5) aerobic reactor aeration system; 6) buffer tank; 7) recirculation tank; 8)

---

[2]    Although the Project Specifications were written strongly around the Unison and Azzuro systems, the bid went out as a competitive bid, not as a sole process procurement. (Doc. 60-1 at 763, Craddock Dep. at 251:6-15). However, there were no known competitors manufacturing systems comparable to that of the Azzuro System. (Doc. 61-1, Maas Dep. 155:2-12).

anaerobic reactor; 9) nutrient feed systems; 10) all electrical controls and instrumentation required for the system; 11) all PVC pipes between system components. (Doc. 53-3 at 447). Other sections of the Bid Specifications detailed the components of the other equipment/subsystems. (Doc. 53-3).

Section 3.03, subsections B and C of the Bid Specifications[3] provided that:

B.    Initial Functional Test: Manufacturer shall perform following field tests and inspections and prepare test reports. Test shall include:

1. Full load test of entire system, using available digester gas, for 24 hours with no shutdowns.

2.    Gas flow test of system shall include pressure, temperature, and volumetric output pursuant to the Manufacturer's performance specification.

3.    An analysis of the inlet and treated gas shall be completed and shall certify quantitatively the following constraints:

| Test Location | Major Gas Constituents Total Btu | Hydrogen Sulfide | VOCs | Siloxane Series |
|---|---|---|---|---|
| Upstream of H2S Removal Vessel | X | X | X | X |
| Downstream of H2S Removal Vessel | | X | | |
| Downstream of Siloxane Removal System | X | X | X | X |

4.    Samples shall be taken by Owner and sent to lab for analysis of Major Gas Constituents, VOCs, and Siloxane Series.  All expenses for sampling containers, analysis, shipping, and reporting are paid by Gas Conditioning System Manufacturer.

5. Hydrogen sulfide shall be analyzed with the supplied Biogas Analyzer.

C. A performance test shall be conducted two months following beneficial use of the Gas Conditioning System and again six months after beneficial use of the Gas Conditioning System to determine the level of the digester gas treatment.

1. Tests shall be duplicates of the Initial Function Test.

2.    Performance Tests shall be conducted using the original siloxane scrubber media supplied as part of the original contract. Chemical analysis shall be provided by the Gas Conditioning System Manufacturer and Biogas Analyzer (constituents measured during initial function test).

---

[3] These subsections were added to Bid Specifications via Addendum No. 2 dated Monday, April 4, 2016. (Doc. 62-1 at 1223).

3. Owner may independently sample and analyze gas. If the Owner's sample analysis and the Gas Conditioning System Manufacturer's analysis differ, a subsequent sample shall be taken and sent to an independent laboratory for verification. If the subsequent analysis shows that the Gas Conditioning System is meeting the performance specification of this section, then the Owner will pay for the subsequent sampling and gas analysis. If the subsequent analysis shows that the Gas Conditioning System fails to meet the performance requirements of this specification, the Gas Conditioning System Manufacturer shall pay for the subsequent sampling and gas analysis, this shall include fouled samples.

4. Failure of the Gas Conditioning System to meet the performance requirements listed in Paragraphs 2.03A.4 and 2.03A.5, given influent digester composition and characteristics listed in Paragraphs 2.03A.1, 2.03A.2, and 2.03A.3 shall be cause for replacement or repair of the Gas Conditioning System at the Manufacturer's expense.

a. Manufacturer shall review gas testing analysis and perform additional gas testing as necessary to recommend an optimized siloxane removal media blend. Replacement of media resulting from the system not meeting the performance requirements listed in Paragraph 2.03A.5 at the six month performance test shall be at the Owner's expense.

5. The Gas Conditioning System Manufacturer may request monthly samples and gas analysis of the digester gas prior to treatment to verify that the digester gas is in compliance with the Design Requirements and Operating Conditions of this Section. All equipment and gas analysis required for the monthly testing shall be paid by the Gas Conditioning System Manufacturer.

(Doc. 53-3 at 467).

Section 3.04 of the Bid Specifications detailed the Hydrogen Sulfide Removal System Maintenance Contract as follows:

A. Hydrogen Sulfide Removal System Manufacturer shall provide a one year maintenance contract facilitated by the overall Gas Conditioning System Manufacturer.

B. Maintenance contract commits the Manufacturer to analyzing and advising regarding its reactors' operational processes. This is to help the system to work under normal conditions—as per the design criteria. All this is to ensure a quick and adequate response to the Owner to ensure smooth operation and performance of the Hydrogen Sulfide Removal System as designed by the Manufacturer.

C. Owner will provide bi-weekly data. The data that is required will be discussed during start-up of the system as well as the way the Manufacturer will advise and report back to the Owner.

D. Manufacturer will analyze the provided data, remarks and questions on a quarterly basis, which results will be documented in an Advisory Report;

7

. . .

K. Owner is responsible to run the System within the design criteria, provided by the Manufacturer. Any deviations must be specified in detail and brought to the attention of Manufacturer as soon as possible.

. . .

N. Support Contract shall be in effect after initial start-up and hand-over of the system to the Owner.

(Doc. 53-3 at 462-63).

On April 6, 2016, Azzuro submitted to Unison its "Bid Package for Specification 16-0077, Section 43 32 59 for a Digester Gas Conditioning Facility at a Sioux Falls WRF in South Dakota," reference no. M16E0865-Rev.1 ("Azzuro's Bid Package"). (Doc. 62-1 at 1164-65, Koers Dep. 216:9-217:14; 62-1 at 1204). In Azzuro's Bid Package, its "Design Starting Points" provided for biogas desulfurization of an average daily flow starting at approximately 200 cfm, reaching 450 cfm after two years and containing an average of 5,700 ppm of $H_2S$ (with peaks up to 11,400 ppm) and about 70% methane. (Doc. 62-1 at 1206). The minimum daily flow specified in the Design Starting Points was 150 cfm. (Doc. 62-1 at 1206). The Design Starting Points in Azzuro's Bid Package provided a guaranteed biogas outlet concentration of < 100 ppm of $H_2S$. (Doc. 62-1 at 1206). The "site information" and the "inlet gas conditions," including the inlet gas condition providing for 1% oxygen, detailed in the Design Starting Points met the specifications provided for in the City's Bid Specifications. Included in the "System Details" portion of Azzuro's Bid Package was a "performance guarantee" and a "full engineering package[4]." (Doc. 62-1 at 1207). Azzuro's Bid Package provided that irrigation water was required to support the operations of the system and specified certain water quality standards that must be met by the customer "or the guaranteed performance of the biotower cannot be met." (Doc. 62-1 at 1213). The Bid Package further provided for a Monitoring Contract. Specifically, it provided that "[i]ncluded in the Bid Package is the first year of Azzuro's Annual Monitoring Contract," and that "([t]he value of the monitoring contract for 2016 is US$10,000.00, which is included in the bid price)." (Doc. 62-1 at 1209).

---

[4]     The engineering package details the Azzuro System's equipment/components, equipment specifications, and includes equipment cutsheets that are sent to the engineering firm to determine compliance with any specific zoning requirements (e.g. earthquake) and wind loadings, as well as manuals containing as-built documentation and operational manuals. (Doc. 62-1 at 1165, Koerner Dep. 219:12-220:10).

On April 7, 2016, Unison delivered its bid for the Gas Conditioning Equipment: Bid Request No. 16-0077. (Docs. 62-1 at 1188; 52-1, Klaas Dep. 26:18-28:3). Included with the proposal was, among other things, a Scope of Supply which included all of the CAD design services and fabrication and materials to construct the gas conditioning system Unison was supplying, and technician labor for the assembly of the system. (Doc. 62-1 at 1190; Doc. 52-1, Klaas Dep. 29:7-13). Unison's Scope of Supply included the following equipment/sub-systems: a gas compression/moisture removal system; a glycol chiller; a siloxane removal system; a control system; and a gas analysis panel. (Doc. 62-1 at 1192). Unison's Scope of Supply also included Azzuro's hydrogen sulfide removal system and incorporated Azzuro's Bid Package. (Doc. 62-1 at 1192; Doc. 52-1, Klaas Dep. 30:9:24).    Unison's Scope of Supply incorporated the "design conditions" specified in the City's Bid Specifications, including the inlet gas conditions providing for 1% oxygen. (Doc. 62-1 at 1192-93). Unison's Scope of Supply also included "site requirements" regarding electrical classification and equipment mounting and detailed the components of the equipment/sub-systems to be provided. (Doc. 62-1 at 1192-93).

Unison's Bid included a pricing summary which listed a price of $1,650,158.38 for the Section 43 92 59 Digester Gas Conditioning Equipment. (Doc. 62-1 at 1220). The payment schedule provided "85% upon delivery and 15% upon site acceptance not to exceed 180 days from shipment." (Doc. 62-1 at 1220).

On April 14, 2016, the City issued a Bid Award Recommendation and Bid Award to accept the Unison Bid. (Doc. 62-1 at 1187). The Bid Award Recommendation included Unison's Bid which incorporated the Azzuro's Bid Package. (Docs. 61-1 at 910, Maas Dep. 155:17-156:10; 62-1 at 1187-1226).

On April 25, 2016, the City of Sioux Falls entered a purchase order (contract no. 16-0077) for the purchase of one "Digester Gas Conditioning Equipment Per Bid Specifications of City of Sioux Falls Bid Request No. 16-0077" in the amount of $1,650,158.38. (Doc. 63-1 at 1277; 62-1 at 1187).

On April 28, 2016, the Unison entered a purchase order with Azzuro for $718,500 for a "Bio Gas Desulfurization System for Digester Gas Conditioning Facility in Sioux Falls Bid Specification 16-0077, Section 43 32 59" ("Unison-Azzuro Purchase Order"). (Doc. 62-1 at 1265). The Unison-Azzuro Purchase Order states, among other things:

9

- "[E]quipment in accordance to City specifications and per bid package M16E0865-Rev1[5]"

- "Payment Terms: 85% upon Delivery / 15% upon Performance Testing"

- "All payment subject to City Acceptance"

- "Unison will pay each progress payment no later than 7 days after receipt of payment from City"

- "Warranty in Accordance to M16E0865-Rev1"

- "Re: 242 Sioux Falls Approval of the submittal package is required prior to release to production"

- "All terms and conditions per Unison's terms and conditions, City of Sioux Falls, SD, terms and condition for "16-0077 Digester Gas Conditioning Equipment" and the instructions to bidders for "16-0077 Digester Gas Conditioning Equipment" are incorporated as part of this specific purchase order. Vendor specific terms and conditions will not be accepted nor will they be incorporated into this purchase order. Attachment 1: Unison Solutions Inc. Terms and Conditions, Attachment 2: City of Sioux Falls, SD Terms and Conditions for 16-0077 Digester Gas Conditioning Equipment, Attachment 3: Instructions to bidders for 16-0077 Digester Gas Conditioning Equipment."

(Docs. 62-1 at 1265; 74, ¶¶ 23-25).

On August 24, 2016, SEH entered an agreement with the City for professional services to conduct construction administration. (Doc. 61-1 at 911, Maas Dep. 163:17-23). SEH subcontracted services to Kennedy Jenks to help with the construction administration. (Doc. 61-1 at 911, Maas Dep. 164:13-24). HR Green was the construction administration engineer on the project and AB Contracting was the general contractor for the installation contract. (Doc. 60-2, Friel Dep. 228:10-12; 231:11-14).

Unison's gas conditioning system was fabricated and assembled before being shipped to the City. (Doc. 52-1, Klaas Dep. 29:8-29:1). The Azzuro System was delivered from the Azzuro plant directly to the City's Water Reclamation Facility. (Doc. 63-1, Klaas Dep. 26:2-8).

### A. Initial Start-Up

Some time prior to start-up, Azzuro visited the site and reviewed and went over the Azzuro System after it has been installed. (Doc. 61-1 at 915, Maas Dep. 179:22-25). The initial start-up of the Azzuro System was in May 2017. (Doc. 61-1 at 913, Maas Dep. 172:16-19). On May 4,

---

[5]     M16E0865-Rev.1 refers to Azzuro's Bid Package. (Doc. 62-1 at 1205).

2017, gas testing was performed. (Doc. 61-1 at 913, Maas Dep. 173:10-13). The report showed the oxygen level to be 0.564 percent. (Doc. 61-1 at 914, Maas Dep. 174:5-7; 62-1 at 1227). Dustin Maas from SEH testified that he did not recall anyone from Azzuro expressing any concerns to him or anyone at SEH about the oxygen levels being less than 1% in this report. (Doc. 61-1 at 914, Maas Dep. 174:12-15).

Azzuro's Operation & Maintenance Manual indicated that during the first 4-6 weeks, the biology would grow to its natural limits. (Doc. 61-1 at 914, Maas Dep. 176:1-180:14). Dustin Maas with SEH testified that he never expected that the Azzuro System would be meet its performance guarantee within this time because it was his expectation that a lot of adjustments would need to be made after the initial start-up, but he testified that he thought it would take the Azzuro System "one to three months, two months," to reach the performance guarantee of reducing hydrogen sulfide levels to less than 100 ppmv. (Doc. 61-1 at 915, Maas Dep. 180:20-181:9).

Testing after the initial start-up was not showing a significant reduction in hydrogen sulfide. (Doc. 61-1 at 915, Maas Dep. 181:16-182:5; 60-2 at 825, Friel Dep. 230:17-22). By July 6, 2017, the Azzuro System was still not meeting the performance guarantee. (Doc. 61-1 at 916, Maas Dep. 184:25-185:6). The biology in the Azzuro System was not engaging and it was having mechanical issues. (Doc. 63-3, Hierholzer Dep. 122:4-11). After doing troubleshooting and maintenance, the parties decided to shut the Azzuro System down to address the mechanical issues, reconfigure materials in the system, and to try and figure out why the system was not performing. (Docs. 63-3, Hierholzer Dep. 122:12-123:17; 61-1 at 917, Maas Dep. 186:17-23).

On August 29, 2017, the City issued to Unison a Notice of Nonperformance and request for a completion plan. (Doc. 59-22 at 736). Therein, the City stated:

> This is a Notice of Nonperformance that the gas conditioning equipment supplied to date has not provided beneficial use and subsequently has not met performance requirements. The delay in achieving beneficial use and in meeting performance requirements has precluded the City from using the GE Jenbacher engine generator, and has resulted in increasing electrical costs to the City. Additionally, the City has used considerable consultant and staff time to address the nonperformance issues. Therefore, the City needs a solution in place by September 8, 2017.
>
> The City is requesting that you provide a completion plan for the remaining punch list items. The Azzuro Gas Scrubbing system was originally started up in May 2017. Once issues began arising, parties of the procurement contract relied heavily on City staff to analyze the issues and implement solutions. The City staff is

11

available to provide a support role, but no longer is able to expend the resources requested by Azzuro without the proper training, operational knowledge and an operational plan led by Azzuro. The manufacturer must lead the effort to get the Azzuro Gas Scrubbing system to meet the beneficial use gas performance requirements as stated in the contract and design specifications. To date, this system has shown no performance in biogas hydrogen sulfide reduction for nearly four months. The City of Sioux Falls Water Reclamation Division Management is formally requesting Unison and Azzuro to get appropriate and skilled staff to the site as needed to address outstanding items. The City is formally noting, the remaining punch list items as stated in the list below, have not been appropriately addressed or completed and have impacted the operation of the digester gas conditioning system, whereby the Azzuro Gas Scrubbing system has not achieved the performance testing procedures as required in the contract.

Startup and performance testing of the system needs to occur on or before September 27, 2017, otherwise other options will be considered, by the City of Sioux Falls. The City cannot continue to accrue additional electrical costs, consulting expenses and staff time. Furthermore, the lack of biological activity in the system will allow it to freeze when temperatures remain below freezing. Please note Addendum 2 of the equipment procurement contract, page 2, item 11, added paragraph C.4., which stated "*Failure of the Gas Conditioning System to meet the performance requirements listed. . .shall be cause for replacement or repair of the Gas Conditioning System at the Manufacturer's expense.*"

Included with this letter is a copy of the wrap up notes and the proposed action timeline discussed on July 13, 2017, along with the current Unison/Azzuro punch list. These items need to be completed without delay. There has been little to no communication or a formal response to the outstanding items and no schedule presented for their resolution.

. . .

These remaining issues must be addressed with the manufacturer's staff onsite immediately. Please respond to this letter with updates and a plan before Friday, September 8, 2017.

(Doc. 59-22 at 736-38). Of the action items listed from the July 13, 2017, meeting, it was noted that Unison/Azzuro would provide dates for anticipated performance testing once lead times had been identified in one week. (Doc. 59-22 at 741).

In response to the City's August 29, 2017, notice of nonperformance letter, Azzuro, by letter dated September 1, 2017, indicated that they had not proposed an additional schedule because all of the open items were a work in progress. (Doc. 59-23 at 746). Azzuro stated that:

. . .

12

> All-in all the start-up process normally takes between 4-6 weeks, assuming there are no external toxic/inhibiting factors.
>
> If no toxic or other inhibiting factors are found, we are confident that the system will be operational on September 27, 2017. We would like to schedule the Performance Testing as soon as we feel that the process is stable.

(Doc. 59-23 at 746).

In response to Azzuro's September 1, 2017, letter, the City indicated in a September 20, 2017, letter to Unison that it needs to, on its own, or through Azzuro, "provide support for testing, training and operational information to meet the performance requirements for beneficial use of the Azzuro system (continuously less than 100 ppm of hydrogen sulfide in the Azzuro effluent by September 27, 2017)." (Doc. 63-4 at 1355). The City indicated that it had asked for a completion plan by September 27, 2017, and "had yet to receive a substantive response on the support needed to get the biological process fully working." (Doc. 63-4 at 1355).

On September 21, 2017, Rik Winters emailed Bonno Koers expressing that it was his opinion that 1% oxygen was sufficient to make the Azzuro System operational and they only needed enough biology to catalyze the reaction. Specifically, he wrote:

> B[onno],
>
> Christine forwarded me these principles. That does explain a lot. The specs say there is 1% oxygen in the biogas with an average of 5700 ppm H2S, max 11400. Now I assume that 1% is to be interpreted broadly. But if you take it strictly (1.0%), then you have 10,000 oxygen to every ppm h2s. Just using rough teps (ppm = pppmv), to oxidize H2S you need 1 ppm oxygen to every ppm h2s. In other words, if you bring in 1% oxygen, that's enough (stoechiometically) to oxidize 20,000 ppm H2 with it to S. You'd need a system with very good dust transfer, but basically you have enough oxygen to convert all H2S with it (roughly 2 to 4 times as much).
>
> In this light, I understand better your initial enthusiasm (I just attribute it to this). With this initial situation, you only need enough biology to catalyze the reaction; you have enough oxygen. It explains a lot!
>
> How would you like to proceed?
>
> Rik

(Doc. 62-1 at 1232, at 1145 Koers Dep. 73:13-19). Bonno responded to Rik Winters, writing:

> Rik,

We assumed 0.5% oxygen in our calculation (did mention that 1% would be available).

I explained that we have two bioconversions, the standard and the step with SO2 and H2SO3.

I suggest we show that in the calculation as well.

Based on the starting points 0.5% we had enough to make the conversion to S. But also explain that we are working with two different conversions and based on that we have a back-up in the system.

. . . .

(Doc. 62-1 at 1234).

In a September 2017 meeting with the City of Sioux Falls, Jim Postiglione, the process engineer with HR Green, pointed out that actual oxygen levels may be too low. (Doc. 62-1 at 1238, at 1157 Koers Dep. 154:3-24; 63-3, Hierholzer Dep. 129:10-15). In a September 25, 2017, letter to Unison, Mark Perry, the City Wastewater Superintendent, wrote that "Jim Postiglione followed up with Azzuro's biologist Rik Winters and determined that oxygen injection is recommended for optimal performance. As such Unison has provided plans and is obtaining parts to supply a temporary air injection into the raw digester gas entering the Azzuro system. Once the Azzuro system reaches performance and air injection is proven necessary, permanent interconnection piping and analysis can be added to make the system permanent." (Doc. 62-1 at 1237). In a September 25, 2017, letter from Bonno Koers to Unison Solutions, Koers recommended that in addition to fixing the outstanding mechanical and electrical issues, the oxygen injection system be installed prior to a second start-up. (Doc. 62-1 at 1238-39). Koers asked for an extension of the start-up and performance testing which was originally set for September 27th and proposed a revised start-up plan. Koers stated in the letter that he expected to be able to conduct the performance testing approximately six weeks after the initial start-up week. (Doc. 62-1 at 1239).

In a September 27, 2017, email to SEH, Rik Winters stated that he had discussed the oxygen injection with Jim Postiglione the week prior, but did not discuss the actual oxygen concentration that should be in the biogas. (Doc. 59-1 at 649). He wrote that "[o]ur preliminary calculation value was 0.5%, but the specs stated 1%. It would be good if the installation would be constructed such, that we can start at 0.5%, but allows to increase to 1% if necessary (so no alarms should be set at 1%). (Doc. 59-1 at 649). In a subsequent email to SEH, Winters wrote that he "agree[s] that

the oxygen injection system provided should be constructed to allow for adjustment of the amount of oxygen to be injection, ie. 0.5%, 0.6%, 1%, etc. . . .based on the Azzuro system biological needs and Jim P's input. I believe the 1% oxygen concentration listed in the specification was a rounded number based on preliminary sampling of digester gas in 2015 and not a specific required number." (Doc. 59-1 at 649).

By letter to Unison dated September 25, 2017, Azzuro requested an "Extension for Start-Up and Performance Testing on Azzuro's Sulfatech System." (Doc. 62-1 at 1238). Therein, Azzuro described 3 phases of the start-up plan. (Doc. 62-1 at 1238-1243). During the "mechanical start-up and stabilization" phase, the system is set up and water and gas flows run continuously and water levels are stabilized. (Doc. 62-1 at 1241). During the start-up, the system is run in "basic" mode and the main objective is to get the biological processes running. (Doc. 62-1 at 1241). Koers indicated that the biological process in the aerobic reactors was expected to develop within about a week and that the biological process in the anerobic reactor was expected to develop within about two weeks. (Doc. 62-1 at 1241). During the optimization phase, the system is adjusted to achieve maximum hydrogen sulfide removal. (Doc. 62-1 at 1241). Planned optimizations denoted in the start-up plan include refreshment rate of the water and circulation speed of the water. (Doc. 62-1 at 1241). Azzuro proposed the following dates for the start-up plan:

**October 9 – Begin mechanical start-up and stabilization:**

By this time, a majority of the punch list items will be complete assuming parts and labor are readily available. An O2 sensor will not have been installed, but air injection can still be safely performed with the aid of manual adjustment and a solenoid valve that will shut off the air upon loss of gas flow.

**October 9 through 22 – Start-up:**

The blower and exhaust stack relocation is planned during this timeframe but it should not impact stabilization or the biology if done proficiently.

**October 23 through November 19:**

Further maturing of the biology and performance optimization.

**After November 20:**

Performance testing.

(Doc. 62-1 at 1239).

The City responded to Azzuro's Request for Start-Up and Performance Testing Extension and Start-Up Plan in a letter dated September 26, 2017. (Doc. 59-2). The City indicated that:

> For the City to agree to the proposed plan, additional information is requested. A Start-Up and Performance Testing Scheduled is attached as Exhibit 1 based upon the items and dates identified in your letter and includes the Contract specified Initial Function Test. If the System is not meeting performance, the City may direct Unison to replace the System at the manufacturer's expense. Furthermore, subsequent 2-month and 6-month Performance Tests will be performed pursuant to the Contract. Please provide a revised schedule and respond with respect to the following [questions and concerns posed below].

(Doc. 59-2 at 653). With regard to the proposed initial function test November 20, 2017 through November 30, 2017, the City indicated that "upon receipt of the Initial Function Test results, the City will review the results to determine if the System is meeting performance. If the System is not meeting performance, the City may direct Unison to replace the System at the manufacturer's expense." (Doc. 59-2 at 655). The City requested that Unison respond to the letter with more detailed information related to the start-up plan and performance testing on or before Friday, September 29, 2017. (Doc. 59-2 at 655).

Azzuro provided Unison and the City of Sioux Falls with an October 4, 2017, start-up plan. (Doc. 59-3). It indicated that phase 1, the start-up or batch circulation phase during which the microbiology is introduced into the system and starts growing, will take up to one week. (Doc. 59-3 at 658). The plan indicated that phase 2, the growth phase, the removal of hydrogen sulfur will steadily increase as the microbiology becomes established and the duration of this phase would be 1-2 weeks. (Doc. 59-3 at 658). Phase 3, the stabilization phase, follows the growth phase and is when the microbiological process is fully developed, the removal of hydrogen sulfur is at a maximum, and start-up is completed. (Doc. 59-3 at 658). There was no prescribed duration in the plan for the duration of the stabilization phase, only that "stable operation" would occur after the growth phase. (Doc. 59-3 at 658). The October 4, 2017, start-up plan stated that the scrubber inlet oxygen concentration should be "> 0.5% and that if it falls below the set process value, air flow rate should be increased manually, until set point level is reached." (Doc. 59-3 at 660).

**B. Second Start-Up**

16

On October 17, 2017, the Azzuro System was back online after having installed the oxygen injection system to the anerobic vessel. (Doc. 62-1, Koers Dep. 170:2-8). The City was directed by Azzuro to add about 0.5% oxygen, but noted that it may need to increase oxygen levels a bit to compensate for the typical gas output fluctuations that it typically experiences throughout the day. (Doc. 63-3 at 1331). On October 24, 2017, and continuing for several days, approximately 1,000 ppm of the 5,500-6,000 ppm of hydrogen sulfur in the inlet gas had been removed. (Doc. 62-1 at 1159, Koers Dep. 172:15-19, at 1251).

On November 7, 2017, performance had not continued to improve and Rik Winters sent an email to the City and Azzuro providing his observations about the lack of removal:

> The sulphate analysis has shown a rapid increase in the first week, indicating the biology in the aerobic reactor developed quickly and well, and has been stable since. The anaerobic reactor is the one that is not performing as it should.
>
> One relevant observation is the persistent presence of an odor like burnt matches. . . .This is a very strong indication that sulfur dioxide is being formed, which dissolves to form sulfurous acid ($H_2SO_3$), which protonates to form bisulfite and—at low pH—sulfite. Both $SO_2$ [sulfur dioxide] and sulfite are known to interfere with enzymatic reactions or have a sterilizing effect.
>
> The formation of sulfur dioxide may thus prevent the biology from developing in the anaerobic reactor. On the other hand, the chemical conversion from hydrogen sulfide to sulfur dioxide takes care of removing part of the hydrogen sulfide. This is what we have seen from the first hour the biogas was put on the system with little change since, indicating a chemical rather than biological removal.
>
> Chemical sulfur oxidation is relatively slow. This explains the partial removal. Biological oxidation is (much) faster, but seems to be hampered by the formation of sulfur dioxide.
>
> What we will do now, is trying to prevent the sulfur dioxide from forming. We believe this can be done by reducing the oxygen input in the biogas to the amount needed to oxidize all hydrogen sulfur to elemental sulfur. Elemental sulfur is not toxic, and is 'good food' for the bacteria. This should take away the toxicity, and make way for the biology to get a foothold in the anaerobic reactor.

(Doc. 62-1 at 1244). Once the biology thickened, Winters stated that they would be able to gradually increase the oxygen levels again allowing the complete removal of hydrogen sulfide. (Docs. 62-1 at 1161, Koers Dep. 182:9-11, at 1244). Winters stated that the plan was to reduce the oxygen addition the next day. (Doc. 62-1 at 1244).

On November 8, 2017, Rik Winters recommended that the City reduce the oxygen level for the Azzuro System to 0.3 percent. (Doc. 62-1 at 1161, Koers Dep. 183:19-24; 62-1 at 1249). That same day, the operations supervisor for the City advised his team to adjust the oxygen to 0.3 percent as recommended by Winters. (Doc. 62-1 at 1249). On the morning of November 20, 2017, Winters informed the City in an email that "[f]ollowing the apparent disappearance of sulfite, and the appearance of sulfur, it may now be a good time to increase the addition of oxygen. If I'm correct, we're currently running at 0.3 percent. Could you increase this to 0.4%?" (Doc. 59-5 at 663). The City increased the oxygen supply from 0.3 to 0.4% that day. (Doc. 59-8 at 670). On Wednesday, November 22, 2017, the City increased the oxygen supply from 0.4 to 0.5% at the request of Azzuro. (Doc. 59-8 at 670).

On the morning of November 24, 2017, per Azzuro's request, the City increased the oxygen supply from 0.4% to 0.7%. (Doc. 63-3 at 1334; 59-8 at 671). That same day, per Azzuro's request, the City increased the oxygen supply from 0.7% to 1.0%. (Doc. 63-3 at 1334, 1335, at 1322, Hierholzer Dep. 140:6-142:3; 59-8 at 671). Mark Hierholzer with the City reported that the hydrogen sulfide removal trend line since the increase in oxygen supply was slightly sloping downwards. (Doc. 59-8 at 671). He relayed that testing showed approximately 5,000 ppm of hydrogen sulfide after treatment, and only about 950 ppm of gas removal. (Doc. 63-3 at 1334). Hierholzer also noted a substantial amount of foam working its way out of the recirculation tank, indicating another toxic event for the biology. (Doc. 63-3 at 1334). On Saturday, November 25, 2017, Hierholzer noted that the hydrogen sulfide removal trend line since the previous afternoon was running rather horizontal with no further improvement. (Doc. 59-8 at 671).

On November 27, 2017, Bonno Koers sent an email to Unison which was forwarded to the City that the Azzuro System was not expected to be at performance level by the end of the week. (Doc. 63-3 at 1337-38). Koers indicated that as in the past, the biology was making sulfuric acid, not the elemental sulfur as expected, and that Azzuro was still trying to understand the cause of the issue. (Doc. 63-3 at 1338). Koers indicated that in the meantime, they had observed that increasing the oxygen level increased performance of the system. (Doc. 63-3 at 1338). Koers indicated that to allow Azzuro more time to get the system to performance, Azzuro was willing to rent a sulfa treat system for a temporary solution. (Doc. 63-3 at 1338).

In response to the November 27, 2017, email from Koers, Mark Hierholzer indicated in an internal email to Mark Perry "Azzuro's response show they don't fully understand their own technology and I don't support their next proposed steps. . . Hoping for the best, but expecting this is going to be long and difficult to get a proven technology." (Doc. 63-3 at 1337). By letter to Unison dated November 29, 2017, the City of Sioux Falls wrote:

> Unison indicated that the Azzuro System would be ready to perform the "Initial Functional Test" between November 20th and 30th. To date, as shown in the Azzuro log sheet, the Azzuro System has greatly underperformed and has not been able to meet the hydrogen sulfide system discharge requirement of 100ppmv as part of the performance criteria under specification paragraph 2.03.A.4.a. Furthermore, due to the minimal hydrogen sulfide removal, the siloxane removal system that follows the hydrogen sulfide removal system has not been operated or tested. The City has diligently worked with Unison for over 6 months to assist in the start-up operation of the Azzuro System without a successful start-up. The Azzuro System does not appear to be viable technology for removing hydrogen sulfide.
>
> As stated previously in the City's September 26, 2017 letter, the delay in achieving beneficial use and in meeting performance requirements has precluded the City from using the GE Jenbacher engine generator, and has resulted in increasing electrical costs to the City. . . .
>
> . . .
>
> The City is requesting Unison replace the non-performing Azzuro System and provide a new System that will meet all specified performance requirements. Information about a proposed replacement System should be provided as soon as possible to allow reasonable time for review and for questions and comments prior to approval and acceptance. . . .
>
> The City requests a project schedule and information on a proven System by December 7, 2017. The City is also requesting that Unison either operate or winterize the Azzuro System.

(Doc. 53-9 at 541-42).

> In a December 1, 2017, email from Unison to Azzuro, Unison relayed:
>
> We have received direction from the City of Sioux Falls to either fully operate the Azzuro system or shut down and winterize the system. Either of these tasks are to be performed by Azzuro. As the system has yet to perform the city is claiming the technology unfit and seeking replacement options from . . . Azzuro. We do not see value in continued operation of the system and recommend Azzuro performs the later option of shut down while replacement plans are presented, evaluated, and approved. We are requesting immediate update on your replacement options and short term plan for the existing system and on-site presence of Azzuro.

19

(Doc. 59-9 at 672). In a December 7, 2017, letter to the City, Unison responded to the City's November 29, 2017, letter. (Doc. 53-10 at 544). Therein, it stated that:

> Unfortunately, as pointed out the [hyrodgen sulfide] system has fallen short of meeting performance in the designed time frame per the Extension and Start-Up Plan.
>
> . . .
>
> Regarding the current system the City of Sioux Falls has granted Azzuro the opportunity to run the system for an additional week for further evaluation. The system is scheduled to be shut down, drained, and winterized December 13th through 15th by Azzuro with assistance from Sioux Falls Water Reclamation.

(Doc. 53-10 at 544). Unison provided the following preliminary schedule for development: 1) initial design (December 3, 2017 through December 22, 2017) during which Azzuro will develop and provide a written proposal outlining more precisely how the current technology will be replaced by a new technology that will meet the specified performance requirements; 2) initial design review (December 24, 2017 through January 7, 2018); 3) finalized submittal development (January 8, 2018 through February 4, 2018); 4) submittal review (February 5, 2018 through February 25, 2018); 5) final planning (February 26, 2018 through _____)[6] during which installation plans and schedules are established, proposed, and accepted by the City of Sioux Falls. (Doc. 53-10 at 545). Unison iterated that it was cognizant of the City's goals to have a replacement technology in place and operational mid to late summer of 2018. (Doc. 53-10 at 546).

In the December 5, 2017, presentation, Azzuro provided an update on the Sioux Falls Project. (Doc. 59-10 at 673). Therein, it noted that "[s]ince mid-October the system has been in start-up (7 weeks) without reaching the design removal efficiency" and indicated that the "cause of performance issues is not 100% clear." (Doc. 59-10 at 678-80). Azzuro indicated that "[e]xtrapolating data so far indicate 5% oxygen would be sufficient for 100% removal. Likely some saturation will occur (lower than linear relationship), suggesting 6% oxygen is more likely." (Doc. 59-10 at 686). Azzuro noted that increasing oxygen addition increases hydrogen sulfide removal. (Doc. 59-10 at 688). Azzuro proposed the following way forward: (1) reaching agreement amongst parties involved this is the way to go forward; (2) all parties to get familiar

---

[6]    The end date was left blank.

with the new process: visit a working installation; (3) redesign system for new process; (4) reconstruct installation; (5) start-up with new process. (Doc. 59-10 at 690).

On December 12, 2017, Mark Hierholzer indicated in an email that:

Friday evening [December 8] around 3:30 pm, the gas line in the basement that feeds the gas scrubbing system developed another leak from the acidic water that was flowing back from the bio-gas line feeding scrubbing system. We had to shut the gas scrubbing system down, to stop the water from flowing back into the failed weld on the bi-gas line in the digester basement, to allow the installation of a temporary repair to the gas line. To prevent any damage to the temporary repairs, I assigned an operator to shut down and drain the Azzuro system at approximately 4 pm Friday evening.

So far the temporary repairs are holding and we are working with Pat from A&B contracting to get a welder on site to properly weld the pipe fitting and seal the gas leak. At this point in time, since this is the second time we have experienced issues with this weld getting damaged from the low pH water flowing back from the gas scrubber system, I don't see any reason to restart the Azzuro system, as it would cause the acidic water to redevelop and flow back into the gas line and start corroding/deteriorating the same pipe weld.

(Docs. 59-11 at 691; 56, ¶ 49). The Azzuro System never reached less than 1,000 parts per million of hydrogen sulfide at any time during operation. (Doc. 63-2, Huerner Dep. 86:6-15; 75-3, Koers Dep. 96:19-97:9).

In Azzuro's December 22, 2017, refurbishment plan, it stated that:

In the meeting of December 5, 2017, it has been decided that every parties' interest will be best served by shutting down the system and taking the time to change the current system into a more commonly operated biological desulfurization technology. This oxygen-added biogas desulfurization technology (OABT) to which oxygen is added to the biogas (to allow direct oxidation in the gas flow) has been in operation for several years and has been proven to be effective.

This technology is sold by (amongst others) DMT, Biogas Holland, Biorem and VAREC (biogas clean). The technology is in operation at several locations in the USA.

It has been agreed that Azzuro will present a plan on how to change the current system to this OABT system. In the first quarter of 2018 Unison and Azzuro will organize site visits to these OABT-type of installations that are running in the USA. . . .

(Doc. 59-16 at 707).

Azzuro proposed several times throughout late March, April and May 2018 that while they are planning and preparing for the system refurbishment into a Thiopaq-like unit, they restart the Azzuro System.  (Doc. 63-3 at 1316, Hierholzer Dep. 100:4-8; 59-12 at 692-93).  In a May 16, 2018, letter to the City, Azzuro stated that:

> It has been five months since we had our December meeting in Sioux Falls and we faced some delays as the weather has proven not to be our friend.  It therefore seems fair to expect that we have some time before the Aerobic process can be started-up.
>
> Luckily by now, the weather has improved and the Sioux Falls-Team has had their first visit to see a reference plant for Biogas desulfurization by an Aerobic biotechnology.  We hope the visit was helpful and gave you some insights for us to discuss soon.
>
> As suggested before, we would like to make good use of the time and wish to restart the current system.  Not because we want to pull out of the understanding the December meeting but to make sure that we find the cause that limited the performance of the Sulfatech system.  This to avoid that we will run into the same problems with any aerobic solution.
>
> The Azzuro system never reached any of the key performance indicators that would demonstrate an overload or a design limitation.  As such we are suspecting another cause for the performance issue we have seen.  We would like to understand these issues and make sure they will not stand in the way for the performance of any aerobic solution.
>
> . . .
>
> All the data and analyses that we have looked at for possible causes of the low performance at Sioux Falls have not resulted in an explanation.
>
> We believe it will be a missed opportunity to not operate the current system.  Therefore we would like to start-up the current Sulfatech system and drive it to performance as far as we can and establish the cause of limitation and perhaps prevent them or even overcome them.  We can do this whilst the preparations for refurbishing the system to fully Aerobic solution is ongoing.
>
> We suggest we wash the system and do an update check to make sure all is right before starting it with fresh biology.  (This surely includes repairing the water leakage into the gas line).  Once all boxes check positive we can inoculate and start running the system.  We will do active measurements and side research to make sure to find what is causing the problem.  We recognize the City has other projects to deal with an we will try to limit the inconvenience.
>
> This all can be done starting by the end of May.  It will not interfere with any preparation work for the refurbishment of the system into an Aerobic process.  And given the time of year, we will not have to run the heater.

22

The outcome can be any of the following:

1. We do not find anything and still do not know what the cause is. (Which is basically where we are at now);

2. We do find the cause but it cannot be repaired. This excludes a biological solution. (Which you definitely would want to know before starting with the refurbishment);

3. We do find the cause and are able to resolve this. (We can then see what the Sulfatech is and is not capable of).

Should the Sulfatech system be capable of meeting the required removal efficiency, the City can decide to either continue and refurbish to an Aerobic system or work through the original Sulfatech system.

The biology in the Sulfatech has been hampered by an unknown cause. The effects caused have not been observed in other installations. The unknown cause seems to inhibit the biology to the effect that the biology does not meet its normal removal KPI's. This while there is sufficient substrate ($H_2S$), nutrients, and oxygen. The other conditions seem to be within the limit right perimeter also. Symptoms found are a low overall removal of $H_2S$, an apparent pH limit and dying of biology.

To find the cause of the inhibition of the biology Azzuro wants to do several analysis and tests combined with some side research. As long as the cause is not known, it will be unclear if it is system specific or a cause that will affect any biological system including a full Aerobic system. Especially since the Sulfatech has these issues in the Aerobic phase also.

. . .

In addition to this we would like to optimize some set points to sharpen the effect of potential inhibiting factors. Like minimizing the oxygen levels and nutrient levels in the system.

(Doc. 59-13 at 695-97).

Mark Hierholzer with the City was reluctant to restart the Azzuro System because he got the impression that Azzuro did not understand why its system was not working and had gone so far off the design parameters during Phase 2 of the second start-up to try and make it operational. (Doc. 63-3, Hierholzer Dep. 100:4-14-101:9, 166:1-14). Hierholzer expressed to Mark Perry with the City that he did not want to restart the system so that Azzuro could do research and development work to iron out the problems with what appeared to Hierholzer to be a pilot test program for the Azzuro Sulfatech System, especially given that it was the primary treatment system in the plant. (Doc. 63-3, Hierholzer Dep. 101:4-9; 152:11-153:17; 166:1-14). Hierholzer testified that in order to restart the System, it would take the City about 6 hours of staff time each day shift and

23

approximately 2 hours of staff time each night shift to monitor the System. (Doc. 63-3, Hierholzder Dep. 170:6-18). Hierholzer testified that he did not believe Azzuro could get the Azzuro System to restart and function because it did not appear that it knew the cause of the dysfunction and had not been able to get the system functional thus far. (Doc. 63-3, Hierholzer Dep. 169:16-19).

> In a May 24, 2018 letter to Unison, the City wrote:
>
> Azzuro has again requested further trial of the Azzuro Sulfatech System. The City has now worked with Unison and Azzuro for over a year after construction to get the Azzuro Sulfatech System operational. The Azzuro Sulfatech System has never worked. The City has not seen any evidence that indicates Unison and Azzuro have any reasonable expectations of getting the Azzuro System to work.
>
> . . .
>
> Azzuro needs to provide the City with additional information to fully explain the approach and purpose of yet another trial, detail the information to be gathered and the basis for review of the information along with the detailed start-up plan. The City also needs data regarding any Azzuro Sulfatech System that is actually functioning for a municipality.

(Doc. 59-14 at 698). The City proceeded to outline the things it would need from Azzuro before it began to consider restarting the Azzuro System. (Doc. 59-14 at 698-99). The City continued:

> However, we believe time and resources would be better utilized in pursuing a replacement system that meets the City's digester gas conditioning needs.
>
> The City has been looking at alternative technologies that could meet the City's performance criteria for hydrogen sulfide removal since the Azzuro Sulfatech System has not worked at our facility.
>
> We have reviewed the proposed technology and operational requirements of the proposed aerobic hydrogen sulfide removal system with City staff and our consulting engineer and have determined that a system, similar to a Biogasclean system, is not an acceptable replacement system.
>
> . . .
>
> Based on the difficulties observed with these aerobic hydrogen sulfide removal systems, it is the City's opinion[7] that a caustic hydrogen sulfide scrubber system

---

[7]    The City had toured a Thiopaq facility in South Dakota that was performing well in reducing hydrogen sulfide gas at the same levels the City of Sioux Falls and wanted to transition to a Thiopaq system. (Doc. 63-3, Hierholzer Dep. 162:22-163:6).

similar to the Thiopaq or Sulfothane by Veolia is the best choice to meet the City's hydrogen sulfide removal needs.

We would request that a revised Replacement Plan be submitted for our consideration as soon as possible.

(Doc. 59-14 at 698-700).

In response to the City's May 24, 2018, letter, Azzuro responded by letter dated July 9, 2018. (Doc. 59-15 at 701). Therein, Azzuro stated that it was sorry to learn that the City's visit to the installations of Biogas Clean was not satisfactory and indicated that "[w]e understand that you want a design for a chemical/biological solution like the Thiopaq or Sulfothane. We trust you are aware that this is a completely different system compared to a full biological solution." (Doc. 59-15 at 701). Azzuro indicated that "as per your request we have looked into the caustic option and are working on a plan that will provide you with a Thiopaq like system. We expect to have a first draft ready by the end of the next month." (Doc. 59-15 at 701). Azzuro requested once again to restart the Azzuro System saying that "we strongly believe that we should be allowed to restart the system, find the issue, solve the problem and demonstrate what the system is capable of. This can be done whilst engineering, planning and preparing for a system refurbishment into a Thiopaq-like unit." (Doc. 59-15 at 702).

The City was open to Koers redesigning the System into a Thiopag-like system, but after some time it was the opinion of Mark Hierholzer, Operations Manager of the City of Sioux Falls, that Koers was not familiar with a Thiopaq system and how to design it properly. (Doc. 63-3, Hierholzer Dep. 95:20-96:25, 164:8-14). Eventually, the City ceased all communications with Azzuro. (Docs. 56, ¶ 52; 70, ¶ 52).

## II.    Procedural History

On April 14, 2022, City of Sioux Falls filed a complaint in this Court against Azzuro, Inc., Short-Elliott-Hendrickson, Inc., and Bonno Koers. (Doc. 1). In its Complaint, the City alleges the following claims: 1) Count I - breach of guarantee against Azzuro; 2) Count II - breach of contract against Azzuro and SEH; 3) Count III - breach of express warranty against Azzuro; 4) Count IV - breach of implied warranty of fitness for a particular purpose against Azzuro; 5) Count V - breach of implied warranty of merchantability against Azzuro; 6) Count VI - negligent misrepresentation

25

against all Defendants; 7) Count VII - negligence against Azzuro and SEH; and 8) Count VIII - fraud/deceit against Azzuro and Koers. (Doc. 1).

Azzuro filed the following counterclaims against City of Sioux Falls: 1) negligence; and 2) breach of contract. (Doc. 45).

On May 26, 2022, SEH filed a Third-Party Complaint against Unison Solutions, Inc. (Doc. 8). The Third-Party Complaint alleges that Unison, not SEH, is liable for any damages sustained by the City. (Doc. 8). On May 26, 2022, the City executed a release—consistent with a settlement entered before the City brought suit—forever discharging Unison from any and all liability with respect to the Sioux Falls Water Reclamation Facility at issue in the City's Complaint. (Doc. 14, ¶ 4).

On June 15, 2022, Unison moved for an order dismissing SEH's Third-Party Complaint with prejudice and a reduction of the City's claim consistent with the release it entered with Unison. (Doc. 14, ¶ 8). SEH objected on the basis that in the event a jury finds that it is liable to the City as a joint tortfeasor, the jury must allocate liability to Unison under South Dakota law and that the best way for that to be accomplished is if Unison remains a named party in the lawsuit. (Doc. 19). The Court denied Unison's Motion to Dismiss on the basis that SEH's claims in its Third-Party Complaint are not limited to the liability SEH has to the City. (Doc. 27).

On September 24, 2024, the Court entered an order approving a stipulation dismissing the City's claims against Bonno Koers in his individual capacity. (Doc. 44).

Azzurro has filed a motion for summary judgment on Counts I through V of the City's Complaint which are all based on the City's claim that Azzuro's System failed to reach the performance level of < 100 ppm of hydrogen sulfur. (Doc. 49). In its Motion for Summary Judgment, Azzuro argues that the Court should dismiss the City's breach of guarantee, breach of contract, breach of implied warrant of fitness, and breach of implied warranty of merchantability claims because such claims require the existence of a contract and no contract existed between the City and Azzuro. Azzuro contends that the City entered into a contract with Unison to supply a digester gas conditioning system, who, in turn, entered into a contract with Azzruo to supply the Azzuro System. (Doc. 50 at 283). In the alternative, should the Court find a contract arrangement exists between the City and Azzuro, Azzuro argues that the Court should find as a matter of law

that the City breached the contract, failed to perform a condition precedent, and rendered Azzuro's performance impossible. (Doc. 50 at 284).

In response, the City argues that even though there is no direct contract between Azzuro and the City, the City may enforce Azzuro's contractual obligations as an express intended third-party beneficiary of the contract between Unison and Azzuro. (Doc. 55 at 553). The City argues, however, that although it may enforce Azzuro's contractual obligations as a third-party beneficiary of the Unison-Azzuro Contract, it does not have any reciprocal obligations to Azzuro under that contract. (Doc. 55 at 559). Accordingly, the City argues that the Court must reject Azzuro's argument that it is entitled to summary judgment on the City's contract-based claims on the basis that the City breached the contract, failed to perform a condition precedent, and rendered Azzuro's performance impossible. (Doc. 55 at 559). The City argues in the alternative that if the Court finds that a contract existed between the City and Azzuro, the Court should conclude as a matter of law that the City was not obligated under the contract to provide 1% oxygen and that failure to do so did not render performance impossible. (Doc. 55 at 560).

Defendant Azzuro has also moved for summary judgment on the City's tort claims (Counts VI-VIII) alleging negligence, negligent misrepresentation, and fraud/deceit, arguing that they are barred by the economic loss doctrine. (Doc. 50 at 288). The City argues in response that under South Dakota law, the economic loss doctrine does not apply because the contract at issue in this case is not governed by the Uniform Commercial Code ("UCC") and because under South Dakota law, the economic loss doctrine does not apply to its claims for negligent and fraudulent misrepresentation and professional negligence. (Doc. 55 at 569).

The City of Sioux Falls has moved for partial summary judgment on Azzuro's counterclaims against it for negligence and breach of contract. (Doc. 64). Specifically, the City argues that Azzuro's negligence counterclaim must be dismissed for failure to provide the required notice under SDCL § 3-21-2. (Doc. 68 at 1383). In addition, the City argues that Azzuro cannot establish its counterclaim for breach of contract against the City in the absence of any contractual obligation by the City to Azzuro. (Doc. 68 at 1384).

The pending motions have been fully briefed and the Court held oral argument on the motions on June 3, 2025.

## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273–74 (8th Cir. 1988). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (internal quotation marks omitted).

## DISCUSSION

"Federal courts sitting in diversity, as the district court in this case, must apply the forum states' substantive law." *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008). Thus, South Dakota substantive law applies to this action.

### I.    Azzuro's Motion for Summary Judgment

### A. The City's Contract Claims

28

#### 1. *Is the City of Sioux Falls entitled to enforce Azzuro's contractual obligations to Unison as a third-party beneficiary of the contract between Azzuro and Unison?*

In Counts I and II of its Complaint, the City alleges that Azzuro breached its contract performance requirement and performance guarantee of "Guaranteed Biogas Outlet Concentration: < 100 ppm of $H_2S$." (Doc. 1, ¶¶ 39, 47). In Count III, the City alleges that Azzuro breached its express warranty that the Azzuro System will achieve the contract performance requirement and performance guarantee of "Guaranteed Biogas Outlet Concentration: < 100 ppm of $H_2S$." (Doc. 1, ¶ 55). In Count IV, the City alleges that Azzuro was told, and therefore knew, that the City was purchasing the Azzuro System for the particular purpose of reducing the hydrogen sulfide effluent below 100 ppmv and siloxane effluent below 100 ppbv so that the City could utilize its GE Jenbacher engine generator and that Azzuro failed to deliver an Azzuro System that was fit for the particular purpose for which it was intended. (Doc. 1, ¶¶ 64, 67). In Count V, the City alleges that Azzuro breached an implied warranty of merchantability to reduce the hydrogen sulfide effluent below 100 ppmv and siloxane effluent below 100 ppbv. (Doc. 1, ¶ 74).

At the outset, the Court notes that the Contract in this case is comprised of the Unison-Azzuro Purchase Order and the following documents incorporated by reference into the Unison-Azzuro Purchase Order: the City's Bid Specifications, Azzuro's Bid Package, Unison's terms and conditions, City of Sioux Falls terms and conditions for 16-0777 Digester Gas Conditioning Equipment, and instructions to bidders for 16-0077 Digester Gas Conditioning Equipment.

Azzuro argues that the Court should grant summary judgment on these contract-based claims because Azzuro owes no performance requirements or guarantees to the City because the Azzuro did not enter a contract with the City. Rather, Azzuro entered into a contract with Unison to supply the Azzuro System.

There is no dispute that Azzuro and the City did not directly contract with each other. (Doc. 74, ¶ 26). However, the City argues that it is entitled to enforce Azzuro's contractual obligations under Azzuro's contract with Unison as the express intended third-party beneficiary of the Unison-Azzuro Contract. (Doc. 55 at 553).

South Dakota law provides that "[a] contract made expressly for the benefit of a third person may be enforced by him at any time before the parties thereto rescind it." SDCL § 53-2-6.

The determination of third-party beneficiary status is a question of law. *Jennings v. Rapid City Regional Hosp., Inc.*, 802 N.W.2d 918, 921 n.3 (S.D. 2011). To determine a parties' intent, a court must first look at the language of the contract. *Jennings*, 802 N.W.2d at 921-22. "The terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member...." *Id.* at 922 (citing *Sisney v. Reisch*, 754 N.W.2d 813, 817-18 (S.D. 2008)). "[I]ncidental beneficiaries are not entitled to third-party beneficiary status." *Sisney v. State*, 754 N.W.2d 639, 643 (S.D. 2008). "[E]ven the mention of one's name in an agreement does not give rise to a right to sue for enforcement of the agreement where that person is only incidentally benefited." *Id.* A third party seeking to enforce the contract must show "that the contract was entered into by the parties directly and primarily for his benefit." *Estes v. Hughes County, South Dakota*, Civ. No. 3:20-3013, 2021 WL 2043070, at \*5 (D.S.D. May 21, 2021) (citing *Sisney v. State*, 754 N.W.2d at 643-44).

It is clear that under South Dakota law, the City is a third-party beneficiary of the Unison-Azzuro Contract. Azzuro's Bid Package, incorporated by reference into the Contract, explicitly provides that the ultimate recipient of the Azzuro System is the City of Sioux Falls and provides that the Azzuro System is in full compliance with the City's Bid Specification 16-0077, Section 43 32 49. (Doc. 62-1 at 1203-04). In addition, the Unison-Azzuro Purchase Order specifies that the Azzuro System is for the "Digester Gas Conditioning Facility in Sioux Falls," and that Sioux Falls approval of the Azzuro's submittals is required prior to release to production. (Doc. 62-1 at 1265). Accordingly, the City of Sioux Falls, as third-party beneficiary of the Unison-Azzuro Contract is entitled to enforce the Azzuro's performance guaranteed biogas outlet concentration of < 100 ppmv of hydrogen sulfide.

### 2. Given that the City has a right to enforce Azzuro's contract obligations as a third-party beneficiary to the Unison-Azzuro Contract, does the City have reciprocal obligations to Azzuro under that Contract?

In the event that the Court finds that a contract arrangement exists between the City and Azzuro, Azzuro argues in the alternative that the City breached the contract, failed to perform a condition precedent, and rendered Azzuro's performance impossible. (Doc. 50 at 284). In response, the City argues that although the City has rights as a third-party beneficiary of the Unison-Azzuro contract, the City does not have reciprocal obligations to Azzuro under South

Dakota law. (Doc. 55 at 560). In the absence of a contract or any contractual obligation owed by the City to Azzuro, the City argues that Azzuro's contention that the City's claims should be dismissed because the City breached the contract, failed to perform a condition precedent, and rendered Azzuro's performance impossible is without merit. (Doc. 55 at 560).

   a. *First Dakota Nat'l Bank Performance Engineering & Mfg., Inc.*, 676 N.W.2d 395 (S.D. 2004)

In support of its argument that it owes no contractual obligation to Azzuro as the third-party beneficiary of the Unison-Azzuro Contract, City of Sioux Falls cites to *First Dakota Nat'l Bank v. Performance Engineering & Mfg., Inc.*, 676 N.W.2d 395 (S.D. 2004). There, CorTrust Bank, First Dakota, and State Steel had perfected security interests in assets, including accounts receivables of Performance Engineering & Manufacturing (PEM). 676 N.W.2d at 396. When PEM experienced financial difficulties, State Steel agreed to advance funds to PEM and in exchange, First Dakota agreed to subordinate its prior perfected security interests in PEM's accounts receivables in favor of State Steel for a determined period of time ending on May 23, 2001. *Id.* at 397.

On April 3, 2001, PEM filed for Chapter 11 bankruptcy. *Id.* The bankruptcy court approved a stipulation agreement between State Steel and CorTrust Bank providing that in exchange for post-petition advancements by State Steel to PEM of up to $64,500, CorTrust would receive the first $5,552 of accounts receivables and that thereafter, State Steel would receive the lesser of $64,500 or the amount of post-petition advancements made to PEM. *Id.*

State Steel advanced at least $64,500 after the bankruptcy stipulation was approved. *Id.*

The bankruptcy court entered an order abandoning various properties from the bankruptcy estate, including accounts receivable funds. *Id.* Both State Steel and First Dakota claimed entitlement to the funds. *Id.* State Steel argued that as a secured creditor, First Dakota was an intended beneficiary of its stipulation with CorTrust Bank because the stipulation provided that secured creditors were to be paid "upon accounts receivables generated as a result of pending orders." *Id.* at 398. State Steel argued that under *Haakinson & Beaty Co. v. Inland Ins. Co.*, 344 N.W.2d 454, 459 (Neb. 1984), First Dakota was bound by the terms of the stipulation because as a third-party beneficiary, in addition to receiving the benefits of the agreement, it was subject to

the burdens of the agreement (subordinating its priority rights to State Steel up to the $64,500). *Id.*

In *Haakinson*, a materialman sued to collect on a bond executed between the principal contractor and the insurance company as surety after the contractor failed to pay for the materials. 344 N.W.2d at 456. The insurance company filed a motion to dismiss, seeking to enforce the forum selection clause in the indemnity bond. *Id.* at 457. The materialman argued that as a third-party beneficiary, it was not bound by the terms of the bond, including the forum selection clause. *Id.* at 458. On review, the South Dakota Supreme Court in *Haakinson* stated that "the promisor is never bound to more than his promise, and the stranger to the contract can have no better nor higher rights in the contract than the parties to it." *Id.* The court held that the materialman "as a third-party beneficiary under this bond, received the benefits from the bond and, likewise, was subject to all of its burdens, including the forum selection clause." *Id.*

In *First Dakota National Bank*, the South Dakota Supreme Court found the *Haakinson* case to be distinguishable. 344 N.W.2d at 399. The Court stated that *Haakinson* "merely ruled that as [a] beneficiar[y] exerting [its] rights under the contract[], [it] was bound by the provisions under which [it] claimed those rights," including the forum selection clause. *Id.* The Court noted that the beneficiary in *Haakinson* was seeking to enforce its rights under the agreement and no additional liabilities or risks were placed upon it. *Id.* By contrast, First Dakota was not claiming any rights under the stipulation agreement, and the agreement imposed liability upon First Dakota (subordinating its priority). *Id.* The Court held that First Dakota's priority could not have been subordinated without it being a party to the agreement. *Id.* at 400.

As stated by the Nebraska Supreme Court in *Haakinson*, a "stranger to the contract can have no better nor higher rights in the contract than the parties to it." 344 N.W.2d at 431; *accord Robbins v. Prosser's Moving and Storage Co.*, 700 F.2d 433, 436 (8th Cir. 1983) ("[B]ased on traditional notions of third-party-beneficiary contract law: The third party seeking to enforce the agreement is bound by the terms of the contract. . .[and] 'the promisor may . . . usually assert against the beneficiary any defense which he could assert against the promisee if the promisee were suing on the contract.'"). This principle can also be found in the Restatement (Second) of Contracts. Section 309 of the Restatement provides that "[w]here there is a contract, the right of a beneficiary is subject to any limitations imposed by the terms of the contract." Restatement

32

(Second) of Contracts § 309, cmt. b. "If a contract ceases to be binding in whole or in part because of impracticability, public policy, non-occurrence of a condition, or present or prospective failure of performance, the right of any beneficiary is to that extent discharged or modified." § 309(2).

The Court finds *Kaiser Trucking, Inc. v. Liberty Mutual Fire Insurance Company*, 981 N.W.2d 645 (S.D. 2022) to be instructive as well. In this case, Kaiser Trucking, a party injured by the insured, sued the insurance company under SDCL § 58-23-1 to recover on unsatisfied default judgment against the insured tortfeasor. SDCL § 58-23-1 permits a direct action against an insurer under the terms of the insurance policy even though the injured party is not a party to the insurance contract. Because Kaiser Trucking was seeking to enforce the benefits of the insurance contract, the South Dakota Supreme Court stated that it would also be subject "to any conditions precedent or other defenses to coverage" the insurance company may raise at trial. *Id.*

Similar to the plaintiffs in the *Haakinson* and *Kaiser Trucking* cases, the City is a beneficiary exerting its rights under a contract to which it is not a party. Accordingly, it may not receive any greater rights under the Contract than the parties thereto —Unison and Azzuro. If in fact providing 1% oxygen in the inlet gas is a condition precedent to Azzuro's performance obligations under the Contract, then Azzuro, as promisor can raise this condition precedent in defense of the City's breach of contract claims.

b. *CW Enterprises, Inc. v. City of Sioux Falls*, 635 N.W.2d 752 (S.D. 2001)

The Court also adopts the argument put forth by Azzuro that under *CW Enterprises, Inc. v. City of Sioux Falls*, 635 N.W.2d 752, 757 (S.D. 2001), the City and Azzuro are in privity and the City is bound by any reciprocal obligations under the Contract, including any obligation to provide 1% oxygen in the inlet gas. (Doc. 72 at 1731-32).

In *CW Enterprises*, the City of Sioux Falls entered into a general contract for the construction of an overpass and ramp at the intersection of I229 and Louise Ave. *Id.* at 754. Problems with project specifications resulted in necessary repairs, the cost of which was born by C & W. *Id.* C & W sued the City for breach of contract and damages. *Id.* At trial, a jury awarded C & W damages on the breach of contract claim. *Id.*

On appeal, the South Dakota Supreme Court stated that the trial court did not err in holding that C & W, as a subcontractor, may proceed in a breach of contract action against the City of

Sioux Falls because the parties were in privity with one another due to a general contract. *Id.* at 757. Privity of contract occurs when: (1) the subcontractor is specifically approved by the first party; and (2) the two parties owe reciprocal duties to one another under the contract. *See id.* The court found that C & W and the City were in privity because the City expressly approved C & W for its work on the project and because the parties owed reciprocal duties to one another under the contract. *Id.* Specifically, the court noted that C & W was obliged to complete the work in compliance with the City's specifications and was subject to daily inspections by the City inspector and the City was obligated to specify the method and materials used for the project and to pay C & W for its work when the project was completed. *Id.*

Here, Azurro is subcontractor to a general contract between Unison and City of Sioux Falls. (Doc. 63-4 at 1347, Klaas Dep. 176:17-18). Azzuro's Bid Package was included as part of Unison's general contract bid for the Project and the City expressly approved of Azzuro as subcontractor when it accepted Unison's Bid. Additionally, the City and Azzuro owed reciprocal duties to one other under the Unison-Azzuro Contract. Specifically, under the terms of the Contract, Azurro was obligated to produce a biogas desulfurization system in compliance with the City's specifications, to conduct performance testing, provide technical and support services, and to satisfy a performance guarantee. (Doc. 62-1 at 1207). In return, the City was obligated to pay $10,000 for Azzuro's monitoring services the first year[8], to ensure that the City's irrigation water met the certain quality parameters[9] (Doc. 62-1 at 1213), and was obligated to take samples and send them to the lab for analysis during the Initial Function Test (Doc. 62-1 at 1224). Based on the foregoing, the Court finds that the City and Azzuro are in privity and that Azzuro may seek to enforce any reciprocal obligation by the City to provide 1% oxygen in the inlet gas.

### 3. *Is Azzuro entitled to summary judgment on the City's contract claims on the basis that the City failed to perform a condition precedent?*

---

[8] Azzuro's Bid Package provides that included in its Bid Package was the first year of Azzuro's Annual Monitoring Contract, value of which ($10,000) was included in the bid price. (Doc. 62-1 at 1209).

[9] The water quality parameters the City was obligated to meet were specified in Azzuro's Bid Package as follows: $COD < 100$ mg $O_2$/l; $BOD < 30$ mg $O_2$/l; $N_{tot} = 2$-$20$ mg N/l; $P_{tot} = 1$-$5$ mg P/l; Chlorine $< 5$ ppm (total Chlorine; e.g. $Cl_2$, Ocl); $TSS < 10$ mg/l; Salts $< 2,000$ ppm (e.g. NaCl, KCl); Hardness $< 400$ mg $CaCo_3$ (when operated at pH = 2). (Doc. 62-1 at 1213).

Azzuro argues in its Motion for Summary Judgment that if the Court finds that a contract arrangement existed between the City and Azzuro, that its performance is excused by the City's failure to provide 1% oxygen in the inlet gas which Azzuro argues was a condition precedent to the performance guarantee of the Azzuro System.

Unison's purchase order with Azzuro for the biogas desulfurization system provided that Azzuro's equipment was to be "in accordance with City specifications," specifically, Sioux Falls Bid Specification 16-0077, Section 43 32 59, and "per [Azzuro's] bid package M16E0865-Rev1." (Doc. 62-1 at 1265). Article 3.03C of the City's Bid Specifications provides that "a performance test shall be conducted two months following beneficial use of the Gas Conditioning System and again six months after beneficial use of the Gas Conditioning System to determine the level of the digester gas treatment." (Doc. 62-1 at 1224). Article 3.03C.4 provides that following the performance tests, "[f]ailure of the Gas Conditioning System to meet the performance requirements listed in Paragraphs 2.03A.4 and 2.03A.5, given influent digester composition and characteristics listed in Paragraphs 2.03A.1, 2.03A.2, and 2.03A.3, shall be cause for replacement or repair of the Gas Conditioning System at the Manufacturer's expense." (Doc. 62-1 at 1224). Article 2.03A.3 of the Bid Specifications details the "inlet gas conditions" which includes, among other things, "Oxygen ($O_2$) 1%." (Doc. 53-3 at 444-45). Azzuro argues that under Article 3.03C.4 and 2.03A.3 of the Bid Specifications, the City's failure to provide 1% oxygen in the inlet gas was a condition precedent to Azzuro's contractual performance obligations, specifically, its obligation to reduce hydrogen sulfide levels to less than 100 ppmv.

Under South Dakota law, a contract may be unenforceable when it contains a condition precedent that fails to occur and may be unenforceable until the condition precedent occurs. *Dziadek v. Charter Oak Fire Ins. Co.*, 213 F.Supp.3d 1150, 1163 (D.S.D. Sept. 30, 2016) (citing *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 896 (S.D. 2006); *Johnson v. Coss*, 667 N.W.2d 701, 705-06 (S.D. 2003) ("A condition precedent is a contract term distinguishable from a normal contractual promise in that it does not create a right or duty, but instead is a limitation on the contractual obligations of the parties.")).

> A condition precedent is a fact or event which [sic] the parties intend must exist or take place before there is a right to performance. . . .A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a

35

> limiting or modifying factor….If the condition is not fulfilled, the right to enforce
> the contract does not come into existence.

*Johnson*, 667 N.W.2d at 705-06 (13 Richard A. Lord, Williston on Contracts § 38:1 (4th ed. 2000)).
A court must look to the document as a whole in determining whether the parties intended to create
a condition precedent to performance. *See Weitzel*, 714 N.W.2d at 896.

The City argues that the 1% oxygen level in the inlet gas is not a condition precedent to
Azzuro's performance. It reasons that Unison-Azzuro Contract did not specify a minimum or
maximum 1% inlet oxygen content for the biogas inlet conditions, but rather simply stated under
inlet gas conditions, "Oxygen ($O_2$) 1%." (Doc. 55 at 562). In addition, the City highlights several
pieces of extrinsic evidence which, it argues, show that Azzuro never intended 1% oxygen content
to be a condition precedent to performance but that the parties had agreed and understood that the
1% oxygen value specified was an approximation or rounded value.

###### a.    *Contract Interpretation*

Under South Dakota law, interpretation of a contract is a question of law for the court.
*Ziegler Furniture & Funeral Home, Inc. v. Cicmanec*, 709 N.W.2d 350, 354 (S.D. 2006). When
determining the meaning of a contract, 'effect will be given to the plain meaning of its words.' "
*Lilligbridge v. Meade Sch. Dist. #L46-1*, 746 N.W.2d 428, 432 (S.D. 2008) (citing *In re Dissolution
of Midnight Star*, 724 N.W.2d 334, 337 (S.D. 2006)). A court must "give effect to the language of
the entire contract and particular words and phrases are not interpreted in isolation." *Id.* (citing *In
re Dissolution of Midnight Star*, 724 N.W.2d at 337). "If a contract's language is clear and
unambiguous, 'it is the duty of [the] Court to declare and enforce it.' " *Bell v. Young*, Civ. No.
4:21-4134-LLP, 2024 WL 4182575, at *3 (D.S.D. Sept. 13, 2024) (quoting *Pauley v. Simonson*,
720 N.W.2d 665, 668 (S.D. 2006)). "If a contract is ambiguous, evidence must be introduced to
determine what the intentions of the parties were and such evidence creates a question of fact
which must be resolved by a jury." *Butterfield v. Citibank of S.D., N.A.*, 437 N.W.2d 857, 858
(S.D. 1989); *see also Farley v. Benefit Tr. Life Ins. Co.*, 979 F.2d 653, 660 (8th Cir. 1992) (quoting
Restatement (Second) of Contracts § 212(2) at 125, comment e at 128 (1981)) ("Where
interpretation of a contract requires 'a choice among reasonable inferences to be drawn from
extrinsic evidence,' the question is one of fact."). While parol evidence is admissible to explain
the contract, it is inadmissible to vary or add terms of the contract. *Couch v. Lyon*, Civ. No. 12-

3029-RAL, 2013 WL 5942607, at *4 (D.S.D. Nov. 5, 2013) (citing *Roseth v. Roseth*, 829 N.W.2d 136, 142 (S.D. 2013)).

"[A] contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement." *Dakota Energy Coop., Inc. v. E. River Elec. Power Coop., Inc.*, Civ. No. 4:20-4192, 2022 WL 1775687, at *3 (D.S.D. Apr. 11, 2022), *aff'd,* 75 F.4th 870 (8th Cir. 2023) (citing *Dowling v. Family P'ship v. Midland Farms*, 865 N.W.2d 854, 860 (S.D, 2015)); *see also Rahm v. TCF Nat'l Bank*, Civ. No. 17-4018, 2017 WL 3605359, at *5 (D.S.D. Aug. 21, 2017) (citing *North River Ins. Co. v. Golden Rule Constr., Inc.*, 296 N.W.2d 910 (S.D. 1980)) ("Language is ambiguous when a genuine uncertainty exists as to which of two or more meanings is correct.").   However, courts are barred from using extrinsic evidence to create an ambiguity to rewrite a contractual provision. *See Dakota Energy Coop., Inc.*, 2022 WL 17755687, at *3 (citing *LaMore Restaurant Group, LLC v. Akers*, 748 N.W.2d 756, 764-65 (S.D. 2008)); *Wimmer v. Top Gun Guide Service, Inc.*, 421 F.Supp.3d 849, 854 (D.S.D. Oct. 28, 2019) (citations omitted) ("When a contract is found to be ambiguous, however, 'parol evidence is admissible to explain the contract but inadmissible to vary or add terms to the contract.'").

The City argues that the inlet gas conditions in the Bid Specifications, including the 1% oxygen value, is an approximation or rounded value.  Azzuro argues that under the plain and unambiguous meaning of the Contract, the City was required to maintain a 1% oxygen value in the inlet gas as a condition precedent to Azzuro's performance obligation of reducing hydrogen sulfide to less than 100 ppmv.  (Doc. 72 at 1727-29).  Examining the language of the Contract as a whole, the Court concludes that it is ambiguous and that there is genuine uncertainty as to which to interpretation is correct.

On the first page of Azzuro's Bid Package, is the "Design Starting Points."  (Doc. 62-1 at 1206).  The "site information" in the Design Starting Points, indicates minimum and maximum outdoor ambient temperatures.  (Doc. 62-1 at 1206).  The "inlet gas conditions" in the Design Starting Points includes minimum and maximum inlet gas pressures and temperatures.  (Doc. 62-1 at 1206).  The "inlet gas conditions" lists specific values for methane, carbon dioxide, nitrogen,

oxygen, average hydrogen sulfide, maximum hydrogen sulfide, and siloxances.[10] (Doc. 62-1 at 1206). These specific values are not designated as a minimums or maximums. Article 3.04K of the Bid Specifications states that "the Owner is responsible to run the System within the design criteria, provided by the Manufacturer. Any deviations must be specified in detail and brought to the attention of Manufacturer as soon as possible." (Doc. 53-3 at 463). Reading Article 3.04K, Article 2.03 (Design Criteria in the Bid Specification specifying an inlet oxygen gas concentration of 1%) and the Design Starting Points in the Azzuro Bid (specifying an inlet oxygen gas concentration of 1%) together, the Court could conclude, as Azzuro urges it to do, that it was the City's responsibility to provide 1% oxygen in the inlet gas. Accordingly, under Article 3.03C.4,[11] Azzuro's contractual obligation to provide a replacement or repair of the gas conditioning system for failure to meet performance requirements could be read, as Azzuro urges, as conditioned on the City's obligation to provide 1% oxygen in the inlet gas.

However, adopting Azzuro's logic, the City would also have to ensure that inlet gas concentrations for methane, carbon dioxide, and nitrogen met the specified concentrations of 60%, 37% and 2% respectively or Azzuro would likewise be excused from its contractual obligation to replace or repair the Azzuro System for failure to meet its performance guarantee. If the Court was to interpret the Contract as requiring the City to provide 1% oxygen in the inlet gas, and the City instead provided an oxygen concentration of 0.89% or 1.04%, then Azzuro would be excused from performance. If the methane concentration in the inlet gas was 56% or 64%, rather than the specified 60% concentration, then Azzuro would also be excused from performance. In reading Azzuro's Bid Package, which was incorporated by reference into the Contract, the Court finds ambiguity in the language as to whether this was the parties' intent. In Azzuro's Bid Package, point one of the Design Starting Points suggests that 60% daily methane concentration is an approximation or rounded number, not an absolute, and that the Azzuro System was designed to perform with an inlet gas concentration of "*about* 70%[12] methane." (Doc. 62-1 at 1206). If the

---

[10]     Methane - 60%; carbon dioxide – 37%; nitrogen – 2%; oxygen – 1%; average hydrogen sulfide – 5,700 ppmv; maximum hydrogen sulfide – 11,400 ppmv; siloxances – 600 ppbv. (Doc. 62-1 at 1206).

[11]     Article 3.03C.4 provides that following the performance tests, "[f]ailure of the Gas Conditioning System to meet the performance requirements listed in Paragraphs 2.03A.4 and 2.03A.5, given influent digester composition and characteristics listed in Paragraphs 2.03A.1, 2.03A.2, and 2.03A.3, shall be cause for replacement or repair of the Gas Conditioning System at the Manufacturer's expense." (Doc. 62-1 at 1224).

[12]     It is unclear whether the 70% methane concentration in point one of the Design Starting Points is a typo given that a 60% methane concentration is designated in the inlet gas conditions.

methane concentration is an approximation or rounded value, so too could be the values for the other inlet gas concentrations. The inlet gas conditions also specify an average daily hydrogen sulfide level of 5,700 ppmv. If it really was the intention that the City ensure inlet gas concentrations exactly as specified, then an average hydrogen sulfide level of 5,600 ppmv or 5,760 ppmv in the inlet gas, rather than the designated 5,700 ppmv, would excuse Azzuro from its performance guarantee. Such a conclusion seems inconsistent with the parties' intent considering the main objective of the Azzuro System was to reduce hydrogen sulfide levels. Accordingly, the Court finds that an equally plausible reading of the contract language suggests that the parties intended the specific inlet gas conditions values for oxygen, as well as for methane, carbon dioxide, nitrogen, oxygen, average hydrogen sulfide, maximum hydrogen sulfide, and siloxances to be approximations or rounded values.

At trial, the parties will be permitted to present extrinsic evidence to explain the parties' intentions.

### b. *Time for Performance*

Presuming for the sake of argument, that it is determined at trial that 1% oxygen in the inlet gas is a condition precedent to Azzurro's performance under the contract, the City eventually met this condition. During the parties' attempts to make the Azzuro System operational, on November 24, 2017, per Azzuro's request, the City provided 1% oxygen in the inlet gas. Under Article 3.03C.4 of the Bid Specifications, the City's compliance with the inlet gas conditions would obligate Azzuro to meet its performance guarantee. *See Dziadek v. Charter Oak Fire Ins. Co.*, 213 F.Supp.3d 1150, 1163 (D.S.D. Sept. 30, 2016) (citing *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 896 (S.D. 2006)) (stating that a contract may be unenforceable until the condition precedent occurs); *see also Johnson v. Coss*, 667 N.W.2d 701, 706 (S.D. 2003) (citation omitted) (stating that one generally has no duty to perform under a contract containing a condition precedent until the condition occurs). Azzuro argues that it was not permitted enough time to meet its performance guarantee after the 1% oxygen was provided because the Azzuro System was shut down by the City on December 8, 2017, after a gas line feeding the gas scrubbing system developed a leak from the acidic water flowing back from the biogas feeding scrubbing system. (Doc. 50 at 286).

It is unclear from the Contract when the performance tests of the Azzuro System were to take place after the second start-up and thus, by which date the Azzuro System would be required to meet its performance guarantee. The Contract provided that on an unspecified date, there was to be an initial function test of the Azzuro System to determine hydrogen sulfide and siloxane removal. (Doc. 62-1 at 1224). The Contract also provided that a performance test shall be conducted two months and six months following "beneficial use" of the Gas Conditioning System and that failure of the gas conditioning system to meet the performance requirements "shall be cause for replacement or repair of the gas conditioning system at the manufacturer's expense." (Doc. 62-1 at 1224). "Beneficial use" is undefined and at oral argument, the parties acknowledged that the contract did not provide for a "beneficial use" deadline. Additionally, there is conflicting evidence in the record as to how long after start-up the Azzuro System would reduce hydrogen sulfide levels to less than 100 ppmv.

Because the Contract does not specify when Azzuro was obligated to meet its performance guarantees, the Court finds that a jury question exists on this issue. "If no time is specified for the performance of an act, a reasonable time is allowed." *Johnson v. Sellers*, 798 N.W.2d 690, 695 (S.D. 2011) (quoting SDCL § 53-10-2); *see also Maintenance Enterprises, LLC v. Orascom E&C USA, Inc.*, Civ. No. 3:16-00014, 2018 WL 11416668, at *9 (S.D. Iowa Aug. 13, 2018) (citing Iowa law) ("When a contract fails to specify a time when performance must be completed or the time for performance is indefinite, uncertain, or ambiguous, a reasonable time is implied."). What constitutes a reasonable time depends upon the circumstances of each particular case. *First Nat'l Bank v. Wagner*, 213 N.W.3, *6 (S.D. 1927); *Huffman v. Shevlin*, 72 N.W.2d 852, 856 (S.D. 1955).

### c. *Waiver*

Presuming once again that 1% oxygen in the inlet gas is a condition precedent to Azzuro's performance, the Court notes that based on the evidence in the record, there may be questions of fact relating to a possible waiver by Azzuro of this condition. *See Berry v. Time Ins. Co.*, 798 F.Supp.2d 1015, 1019 (D.S.D. Jun. 28, 2011) ("To prove waiver by estoppel one need only show that he or she was misled to his or her prejudice by the conduct of the other party into the honest and reasonable belief that the other party was not insisting upon some right."); *see also Johnson*, 667 N.W.2d at 706.

#### 4. Did the City's conduct render Azzuro's performance commercially impracticable as a matter of law thus entitling Azzuro to summary judgment?

Azzuro argues that the System's performance was dependent on sufficient biological media to reduce/remove hydrogen sulfide from the City's water reclamation plant. (Doc. 50 at 288). Azzuro argues that when the City finally provided the necessary oxygen, the City only allowed the System to run for 5 days[13] before shutting it down and refusing to allow the System to be restarted. (Doc. 50 at 288). Azzuro argues that "[i]n failing to provide the required oxygen, failing to provide sufficient time for the System to work, and then unilaterally terminating the Contract after five days, the City made performance by Azzuro not only impractical, but wholly impossible, thereby, excusing Azzuro's performance." (Doc. 50 at 288).

South Dakota recognizes the doctrine of commercial impracticability found in Restatement (Second) of Contracts, § 261 as an excuse from performance "due to extreme and unreasonable difficulty, expense, injury or loss involved." *Miller v. Mills Const., Inc.*, 352 F.3d 1166, 1172-73 (8th Cir. 2003) (quoting *Groseth Int'l, Inc. v. Genneco, Inc.*, 410 N.W.2d 159, 167 (S.D. 1987)) ("Impracticability focuses on occurrences which greatly increase the costs, difficulty, or risk of the party's performance."). The South Dakota Supreme Court has stated that "[a]s a general rule, unexpected difficulty, expense, or hardship involved in performance will not excuse performance where performance has not become objectively impossible." *Miller*, 352 F.3d at 1173 (quoting *Groseth Int'l*, 410 N.W.2d at 167). However, it also has recognized that performance may be excused "where very greatly increased difficulty is caused by facts not only unanticipated, but inconsistent, with the facts that the parties obviously assumed would likely continue to exist." *Id.* (citing *Groseth Int'l*, 410 N.W.2d at 167). The question of whether performance has become commercially impracticable is generally considered a question of law. *Id.* (citing *Cent. Kansas Credit Union v. Mut. Guar. Corp.*, 102 F.3d 1097, 1102 (10th Cir. 1996)).

The Court does not find the Azzuro System was rendered commercially impracticable as a matter of law. In advance of preparing the Azzuro System for the City, Azzuro was provided with the City's historical gas testing results in 2015 which confirmed that the City's biogas included oxygen, but that it was less than 1%. (Doc. 62-1 at 1167). Gas testing was also performed on May

---

[13]     The Court notes that while the City sent Unison a letter terminating the Contract on November 29, 2017—5 days after the System was restarted, the System was not shut down until December 8, 2017.

4, 2017, at the time of the first start-up attempt of the Azzuro System, which showed that before any treatment, the City's biogas contained 0.564% oxygen. (Doc. 62-1 at 1227). The Court finds that the less than 1% oxygen level in the inlet gas is not an unanticipated circumstance vitally different from what the parties contemplated when they entered the Contract nor did it render performance "objectively impossible" because the parties later installed an oxygen injection system which could inject up to 1% oxygen in the inlet gas. *See Groseth Int'l*, 410 N.W.2d at 167; *Miller*, 352 F.3d at 1173. Additionally, shutting down the System for failure to meet the performance guarantee is certainly something the parties contemplated in the Contract.

### B. The City's Tort Claims

In Counts VI, VII, VII of the Complaint, the City alleges claims for negligent and fraudulent misrepresentation and a claim for professional negligence. Azzuro argues that all of City's claimed damages relating to these torts derive from the City's complaint that the Azzuro System failed to perform to the level the City expected and are thus barred under the economic loss doctrine.

Under South Dakota law, in Uniform Commercial Code ("UCC") cases, "economic losses are not recoverable under tort theories; rather, they are limited to the commercial theories found in the UCC." *City of Lennox v. Mitek Indus., Inc.*, 519 N.W.2d 330, 332 (S.D. 1994); *see also May v. First Rate Excavate, Inc.*, 19 N.W.3d 1, *4-5 (S.D. 2025) (citation omitted). "The doctrine was judicially created to protect the integrity of the UCC bargaining process; it prevents tort law from altering the allocation of costs and risks negotiated by the parties." *Dannix Painting, LLC v. Sherwin-Williams Co.*, 732 F.3d 902, 906 (8th Cir. 2013) ("Contract law, and the law of warranty in particular, is better suited for dealing with purely economic loss in the commercial arena than tort law, because it permits the parties to specify the terms of their bargain and to thereby protect themselves from commercial risk."); *Northwestern Pub. Serv. v. Union Carbine Corp.*, 115 F.Supp.2d 1164, 1167 (D.S.D. 2000) (citing *East Reiver Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866 (1986)) (stating that the economic loss doctrine was developed and designed to protect contract law from "drown[ing] in a sea of tort.").

### *1. Does the Uniform Commercial Code govern this dispute?*

As the South Dakota Supreme Court has made clear, the economic loss doctrine only applies to torts "arising from a transaction predominantly involving the sale of defective goods under the UCC." *May v. First Rate Excavate*, 19 N.W.3d at *6. The City argues that its tort claims are not barred by the economic loss doctrine because they are not governed by the Uniform Commercial Code. The City argues that the predominant purpose of the Contract is not for the sale of goods, but for Azzuro's design and engineering services for a biological hydrogen sulfide removal system, thus rendering inapplicable the UCC. (Doc. 55 at 570). In support of its argument, the City argues:

> [D]espite being presented as 'standard,' the Azzuro Sulfatech hydrogen sulfide removal system was Azzuro's first-ever, custom engineered system designed and engineered for the City's unique biogas conditions and volumes, to achieve the City's specified outlet concentration of < 100 ppm of $H_2S$." The Azzuro system design required civil engineering, biological engineering, and chemical engineering by Azzuro. Importantly, Azzuro's Bid Package included a "Full Engineering Package," performance testing, system process condition monitoring, and "Spec Sheets of all applied System Components and Specifications, O&I and O&M manuals, General Arrangements of Reactors, P&ID of the System."

(Doc. 55 at 570-71).

The UCC applies to "transactions in goods." SDCL § 57A-2-102. "Goods" is defined to mean "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale. . . ." SDCL § 57A-2-105. The UCC does not apply to transactions involving services. *Am. Litho, Inc. v. Imation Corp.*, Civ. No. 08-5892, 2010 WL 681298, at *4 (D. Minn. Feb. 23, 2010). When an agreement involves both goods and services, South Dakota courts use the predominant purpose test applied in *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974) to determine whether the hybrid transaction is governed by the UCC as a contract for the sale of goods. *See Jandreau v. Sheesley Plumbing & Heating Co.*, 324 N.W.2d 266, 268 (S.D. 1982); *see also* SDCL § 57A-2-102(2). Under the predominant purpose test,

> The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g. installation of a water heater in a bathroom). . . .

*Jandreau*, 324 N.W.2d at 268 (quoting *Bonebrake*, 499 F.2d at 960). The fact that services are used to transform raw materials into some usable product or are used to distribute the usable

product to consumers should not be used to deny the application of the UCC. *See Jandreau*, 324 N.W.2d at 268. "[T]he fact that the contract 'involve[s] substantial amounts of labor' does not remove it from inclusion under the [UCC]." *Id.* (quoting *Bonebrake*, 499 F.2d at 958-59). The predominant purpose of a sale may be evidenced by "the language of the contract, the business of the supplier, and the 'intrinsic worth' of the goods involved." *S. Minn. Beet Sugard Coop. v. Agri Sys.*, 427 F.Supp.3d 1026, 1030-31 (D. Minn. 2019) (citing *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 386 (Minn. Ct. App. 2004)).

The fact that Azzuro had to employ its design and engineering capabilities to manufacture the Azzuro System for the City, or that the Contract provided for annual technical and support, does not necessarily mean that the thrust of the Contract is one for services. In *Aluminum Company of Am. v. Electro Flo Corp.*, 451 F.2d 1115 (10th Cir. 1971), which was discussed at length by the Eighth Circuit Court of Appeals in the *Bonebrake* case, plaintiff Electric Flo was incorporated to commercialize an "electrified floor and Whirly Dodge vehicles operating on it." *Id.* at 1116. As part of this venture, Defendant Alcoa undertook to design and produce the flooring materials. *Id.* at 1116-17. In an action on the contract, Alcoa argued that the UCC did not apply because the transaction between Alcoa and Electric Flo was one for professional services, not the sale of goods. *Id.* at 1118. On appeal, the Eighth Circuit disagreed. The court reasoned that:

> While it is true that Alcoa utilized design engineers on the project, these services were for the purpose of enabling Alcoa to fulfill Electro Flo's requirements for goods. Electro Flo did not order or contract for engineering. Alcoa's full charge was for materials furnished; its offer was by price quotation for the products only, and it did not bill for engineering services or seek compensation therefor save as the cost of such services entered into the price for the materials delivered.

*Id.* In another case, *Dynamic Air, Inc. v. Reichhold, Inc.*, the court found that the contract at issue involved the sale of goods (pneumatic conveying equipment) to the defendant. Civ. No. 05-955, 2006 WL 399418, at *4 (D. Minn. Feb. 16, 2006). In so concluding, the court stated that "while the contract involved the incidental services of [the plaintiff] to appropriately fabricate the goods for [the defendant's] purpose and site, the focus of the contract was the supply of goods, not the provision of engineering services." *Id.* at *4. In *City of Lennox v. Mitek Indust., Inc.*, 519 N.W.2d 330 (S.D. 1994), the South Dakota Supreme Court found while the defendant provided some design services, the contract between the parties was one primarily for component parts (truss plates) to the roof trusses being sold by the plaintiff. *Id.* at 332. The court found that the transaction

in all likelihood would not have taken place but for the necessary addition of the component part to the trusses and concluded that it was predominately a contract for the sale of goods. *Id.* Also informative is *Jandreau v. Sheesley Plumbing, Co.*, in which the South Dakota Supreme Court found that the contract for the sale of an irrigation system was a contract for the sale of goods. 324 N.W.2d at 269-70. The court examined the "Order Form and Sales" contract which contained a detailed itemization of the goods to be sold which detailed more than $84,000 and an installation cost of $2,000. *Id.* at 269. The court concluded that the predominant purpose of the contract was for the sale of the enumerated items and that the installation of the items that comprised the irrigation system was secondary to the sale of those items. *Id.* at 269-70.

The Court finds that in the present case, the predominant thrust of the Contract was the sale of goods, not the sale of services. As in *Aluminum Company of America*, there is no indication that Azzuro was separately compensated for any engineering and design services that it employed to manufacture the Azzuro System in accordance with the City's specifications. The Unison-Azzuro Purchase Order provided that Azzuro would be paid 85% upon delivery of the Azzuro System and 15% upon Performance Testing. (Doc. 62-1 at 1265). Similar to the *Jandreau* case, the Azzuro Bid Package, incorporated by reference into the Contract, primarily details the component equipment to be provided and provides the technical specs for such components.[14] (Doc. 62-1 at 1207-1209). The Unison-Azzuro Purchase Order was for "*equipment* in accordance

---

[14] The Azzuro Bid lists the "Main Equipment" of the Azzuro System as:
  1 x Anaerobic SR 15-5, supplied with Azzuro's Spacious Wire Pac Color-coded Media, type XO
  1 x Aerobic TR 36-4, supplied with Azzuro's Spacious Wire Pac Color-coded Media, type SO;
  1 x. Recirculation Tank, including 2 (two) pumps (one (1) on duty and one (1) on hot stand-by);
  2 x. Nutrient Dosing System with each 2 x Nutrient Pump;
  1 x Blower to food the TR 36-4;
  1 Clean-In Place System;
  Full set of Sulfatech Instructions
  Azzuro's Sulfatech PLC Program
  First year of Azzuro's Annual Technical Consult & Support Contract;
  Performance Testing;
  Performance Guarantee;
  Full Engineering Package (in English);
  Including Spec Sheets of all applied System Components and Specifications, O&I and O&M
  manuals, General Arrangements of Reactors, P&ID of the System;
  Shipping to Sioux Falls job site.
(Doc. 62-1 at 1207).

to City specifications,[15]" specifically "1.00 Bio Gas Desulfurization System for Digester Gas Conditioning Facility in Sioux Falls Bid Specification 16-0077, Section 43 32 59." (Doc. 62-1 at 1265) (emphasis added). While Azzuro may have had to utilize its engineering and design capabilities to produce the Azzuro System, as in the *City of Lennox* case, the Court finds that the Contract would not have been entered into but for the necessary addition of the Azzuro System. Furthermore, any performance testing or technical and support services are incidental to the provision of the Azzuro System. For these reasons, the Court finds that the UCC governs this Contract.

## 2. Does the economic loss doctrine apply to bar the City's claims for negligent and fraudulent misrepresentation and professional negligence?

The City argues that even if the UCC governs this dispute, under South Dakota law, the economic loss doctrine does not bar its claims against Azzuro for negligent or fraudulent misrepresentation or for professional negligence. (Doc. 55 at 572-73) (citing *S.D. Wheat Growers Ass'n v. Chief Indus.*, 337 F.Supp.3d 891, 904-05 (D.S.D. Aug. 28, 2018)).

### i. Negligent and Fraudulent Misrepresentation Claims

The South Dakota Supreme Court has never directly addressed whether the economic loss rule bars recovery for fraudulent or negligent misrepresentation claims. *See, e.g., S.D. Wheat Growers Ass'n v. Chief Indus., Inc.*, 337 F.Supp.3d 891, 904 (D.S.D. 2008); *Northwestern Pub. Serv. v. Union Carbide Corp.*, 115 F.Supp.2d 1164, 1167 (D.S.D. 2000); *Sioux Falls SD II FGF, LLC v. Courthouse Square, LLP*, Civ. No. 21-4043, 2021 WL 5907875, at *7 (D.S.D. Dec. 14, 2021). Most courts that have addressed the issue "generally agree that fraud in the inducement, necessarily prior to the contract, is independent of the contract and therefore by the economic loss doctrine." *Marvin Lumber and Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 885 (8th Cir. 2000); *see also Shipporeit v. Khan*, 775 N.W.2d 503, 505 (S.D. 2009) ("Tort liability requires 'a breach of a legal duty independent of contract.' "). "The rationale that sophisticated, contracting parties can and should protect themselves [from risk of economic loss] is flawed where fraud in the

---

[15] It is important to note that under the UCC Goods" is defined to include specially manufactured goods. SDCL § 57A-2-105.

inducement exists. Due diligence cannot ensure against intentional dishonesty." *Budgetel Inns., Inc. v. Micros Systems, Inc.*, 8 F.Supp.2d 1137, 1148 (E.D. Wisc. 1998).

Federal courts within the District of South Dakota have predicted that the South Dakota Supreme Court would hold that the economic loss doctrine does not bar fraud or negligence claims which concern misrepresentations about the quality or characteristics of goods being sold under contract. *See S.D. Wheat Growers Ass'n v. Chief Indus., Inc.*, 337 F.Supp.3d 891, 904 (D.S.D. 2008); *Northwestern Pub. Serv. v. Union Carbide Corp.*, 115 F.Supp.2d 1164, 1167 (D.S.D. 2000); *Sioux Falls SD II FGF, LLC v. Courthouse Square, LLP*, Civ. No. 21-4043, 2021 WL 5907875, at *7 (D.S.D. Dec. 14, 2021). In order to be actionable, however, the misrepresentations must be as to past or existing facts concerning product quality or characteristics, and may not concern representations regarding future events or performance. *See Meyer v. Santema*, 559 N.W.2d 251, 255 (S.D. 1997) ("Generally, representations as to future events are not actionable and false representations must be of past or existing facts.");[16] *see also Bayer v. PAL Newcomb Partners*, 643 N.W.2d 409, 416 (S.D. 2002) (citing and discussing with approval *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8 (2d Cir. 2000) which held that energy output predictions from a proposed hydroelectric plan were mere promises of future output as opposed to present representations of existing fact and could not support a claim for negligent misrepresentation). For example, in *Engles v. Ranger Bar, Inc.*, 604 N.W.2d 241 (S.D. 2000), the South Dakota Supreme Court held that the economic loss doctrine did not bar a claim for fraud based on a tavern seller's misrepresentations about the present quality of the roof (that the roof had been fixed except for a leak in the skylight). *Id.* at 245. In *Northwestern Public Service*, the alleged intentional misrepresentation that this Court held was not barred by the economic loss doctrine related to an existing characteristic of the pipe being sold—specifically that a chemical compound in the pipe "complied with industry and regulatory requirements to be rated as a PE 2306 polyethylene pipe compound suitable for use in natural gas distribution systems." 115 F.Supp.2d at 1167-70.

---

[16]    "This standard, though generally recited in fraudulent misrepresentation cases, is equally applicable in a negligent misrepresentation case. A part cannot justifiably rely upon conjecture about future events." *Meyer v. Santema*, 559 N.W.2d 251, 255 n.5 (S.D. 1997).

Azzuro does not contest the merits of the City's negligent and fraudulent misrepresentation claims.[17] Instead, it argues that these claims all concern disappointed, future performance and are barred by the economic loss doctrine. (Doc. 50 at 289). In opposition, the City argues that its claims are based on representations made by Azzuro to the City and SEH that Azzuro designed, engineered and supplied biogas desulfurization systems and that it had done so before. (Doc. 55 at 574).

It is a bit unclear to the Court exactly what representations by Azzuro form the basis of the City's negligent and fraudulent misrepresentation claims. Based on citations to the record in the City's statement of facts, it appears that the City argues that Azzuro intentionally, recklessly, or without reasonable grounds for belief in its truth, misrepresented that it had two biogas installations worldwide[18] and that the Azzuro System specified in its bid was a "standard Azzuro system[19]."

---

[17]    Azzuro argues for the first time in its reply brief that the City cannot sustain a claim for fraud or negligent misrepresentation because it "relied upon the knowledge of [its] own employees and retained advisors to detect the information encompassing the fraud." (Doc. 72 at 1737) (citing *Lack Indus., Inc. v. Ralston Purina Co.*, 327 F.2d 266, 279 (8th Cir. 1964) (applying Minnesota law)); *Kreisers Inc. v. First Dakota Title Ltd. P'ship*, 852 N.W.2d 413, 419 (S.D. 2014)). Specifically, Azzuro argues that the City retained SEH to provide advice in the selection of a gas digester system for the project, that SEH recommended the Azzuro System, and the City followed SEH's advice and selected the Azzuro System. (Doc. 72 at 1737). This argument could have been raised by Azzuro in its opening brief and the Court will not consider the argument for purposes of this motion, having been first raised in Azzuro's reply brief. *See United States v. Carrillo*, 380 F.3d 411, 413 n.3 (8th Cir. 2004) ("Typically, absent some reason for failing to raise an argument in an opening brief, we do not consider an argument first raised in a reply brief."). The Court will confine its review to whether the City's tort claims are barred by the economic loss doctrine.

[18]    In a July 2015 Technical Memorandum that SEH prepared for the City of Sioux Falls detailed three different systems, one from Tiopaq, one from BiogasClean and one from Azzuro that could meet the City's performance specifications. (Doc. 60-2 at 827-891). SEH representative, Dustin Maas, testified that the information presented in the Technical Memorandum had been relayed to SEH by Azzuro. (Doc. 61-1 at 904-05, Maas Dep. 92:25-93:13, 99:20-100:23). The Technical Memorandum provided states that "Azzuro currently does not have a US installation of a biogas system. As a result, an installation was not contacted to discuss the operation and performance of the system. Azzuro has two installations worldwide for biogas conditioning systems." (Doc. 60-2 at 832). The City appears to be arguing that Azzuro negligently and fraudulently misrepresented in the Technical Memorandum that it had "two installations worldwide for biogas conditioning systems" and that the City relied on Azzuro's representations regarding this previous experience in selecting the Azzuro System for the Project. (Doc. 55 at 575).

[19]    In an April 6, 2016, cover letter to Unison accompanying its bid, Azzuro wrote that "the system described [in the bid] is recognized as a standard Azzuro system." (Doc. 62-1 at 1204). It is unclear to the Court whether the cover letter accompanied Azzuro's Bid Package that was forwarded to the City. However, viewing all facts in the light most favorable to the City, the nonmoving party, the Court will assume for purposes of this motion that the City received the cover letter.

        The City asserts that the Azzuro System supplied to the City "was not 'standard,' but was a pilot test or research and development project, as it was the first Sulfatech biogas desulfurization system ever designed, engineered and supplied to a customer by Azzuro." (Doc. 74, ¶ 33). The City argues that in describing the Azzuro System as a "standard Azzuro system," Azzuro falsely represented that the Azzuro System was a proven technology and that the City relied upon such misrepresentation in selecting the Azzuro System for the Project.

(Doc. 74, ¶ 2; 55 at 575). The City claims that Azzuro made these misrepresentations with intent to induce the City to select the Azzuro System and that the City actually and justifiably relied on these misrepresentations in accepting Unison's Bid incorporating the Azzuro System, and suffered damages as a result.[20]

The Court concludes that Azzuro's representations that the Azzuro System being supplied to the City was not the first installation, but that it had two biogas installations worldwide, and that the Azzuro System being provided to the City was "the standard Azzuro System," concern existing characteristics of the Azzuro System. As such, claims for fraud and negligence that are based on such alleged misrepresentations are not barred by the economic loss doctrine.

### ii. *Professional Negligence Claim*

In Count VII of the Complaint, the City asserts a claim for professional negligence against Azzuro. Specifically, the City alleges that: (1) Azzuro agreed to design, manufacture and provide the City with an Azzurro System that would reduce the hydrogen sulfide effluent below 100 ppmv and siloxane effluent below 100 ppbv; (2) the Azzurro System was negligently designed and manufactured, and as a result, it failed to reduce the hydrogen sulfide effluent below 100 ppmv and siloxane effluent below 100 ppbv; (3) Azzuro's engineering services on the Azzuro System fell below the standard of care and were negligent. (Doc. 1, ¶¶ 97-99).

Azzuro argues that because it did not enter a contract with the City for the provision of engineering services, Azzuro did not have legal duty of care to the City independent of the Contract. (*See* Doc. 72 at 1735). This Court agrees.

The South Dakota Supreme Court has explicitly declined to "extend[ ] the economic loss doctrine beyond claims in tort arising from a transaction predominantly involving the sale of

---

[20]    On a claim on negligent misrepresentation a plaintiff must prove: (1) the defendant made a misrepresentation as a statement of fact, (2) the representation was untrue; (3) the defendant did so without reasonable grounds for believing the representation to be true; (4) the defendant did so with the intent to induce a particular action by the plaintiff; (5) the plaintiff changed position with actual and justifiable reliance on the representation, and (6) the plaintiff suffered damage as a result. SD Pattern Jury Instructions (Civil) 20-110-10; *Fisher v. Kahler*, 641 N.W.2d 122, 127 (S.D. 2002). On a claim for fraudulent misrepresentation, a plaintiff must prove: (1) the defendant made a representation as a statement of fact; (2) the representation was untrue; (3) the defendant knew the representation was untrue or he made the representation recklessly; (4) the defendant made the representation with intent to deceive the plaintiff and for the purpose of inducing the plaintiff to act upon it; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered damage as a result. SD Pattern Jury Instructions (Civil) 20-110-20.

defective goods under the UCC. . . ." *May v. First Rate Excavate*, 19 N.W.3d at *6. As discussed above, although the City argues to the contrary, this Court has concluded that the predominant purpose of the Contract in this case involves the sale of goods—the Azzuro System— not the provision of professional services.

Moreover, the City's expert, Lowell E. Howard, PE, does not contend that Azzuro breached a duty of professional care independent of the Contract as is generally required in a professional negligence claim under South Dakota law. *Cengiz v. Huron Title Co.*, Civ. No. 4:22-4049, 2024 WL 1744297, at *3 (D.S.D. Apr. 23, 2024) (citing *Luther v. City of Winner*, 674 N.W.2d 339, 344 (S.D. 2004) (stating that "expert testimony is required to establish the standard of care for a professional unless the issue is within the common knowledge of the jury")); *Mid-Western Elec., Inc. v. DeWild Grant Reckert & Assocs. Co.*, 500 N.W.2d 250, 255 (S.D. 1993)). Mr. Howard opines only that providing 1% oxygen in the inlet gas would not have rendered the Azzuro System operational and that in his opinion, 10% oxygen in the inlet gas and changes to other design parameters would be required to reduce the hydrogen sulfide to less than 100 ppmv. (Doc. 58 at 623). The thrust of the City's professional negligence claim is that Azzuro System did not perform as expected due to flaws in its design. The Court concludes that contract law, rather than tort law, is better suited for dealing with economic loss resulting from such disappointed contractual or commercial expectations and this claim is barred by the economic loss rule. *See Dannix Painting, LLC v. Sherwin-Williams Co.*, 732 F.3d 902, 906 (8th Cir. 2013) ("[C]ontract law, and the law of warranty in particular, is better suited for dealing with purely economic loss in the commercial arena than tort law, because it permits the parties to specify the terms of their bargain and to thereby protect themselves from commercial risk.").

## II.    The City's Motion for Partial Summary Judgment

The City has moved for partial summary judgment on Azzuro's counterclaims for negligence and breach of contract. (Doc. 64). The City argues that Azzuro's negligence counterclaim fails because Azzuro did not provide the requisite notice to the City as required by SDCL § 3-21-2. (Doc. 68 at 1379). The City argues that Azzuro's breach of contract claim fails because the City did not enter into a direct contract with Azzuro and the City. (Doc. 68 at 1379).

### A.  Negligence Claim

The City of Sioux Falls is a municipality incorporated in the State of South Dakota. (Doc. 79, ¶ 1). Azzuro's claim for negligence against the City arises out of events that occurred and injuries that were allegedly incurred by Azzuro in 2017 and 2018. The City argues that the negligence claims fails because Azzuro did not provide the requisite notice to the City as required by SDCL § 3-21-2. (Doc. 68 at 1379).

SDCL § 3-21-2 provides:

> No action for the recovery of damages for personal injury, property damage, error, or omission or death caused by a public entity or its employees may be maintained against the public entity or its employees unless written notice of the time, place, and cause of the injury is given to the public entity as provided by this chapter within one hundred eighty days after the injury. . . .

SDCL § 3-21-1 defines "public entities," in pertinent part, as "all public entities established by law exercising any part of the sovereign power of the state, including, but not limited to municipalities[.]"

The South Dakota Supreme Court has "interpreted SDCL § 3-21-2 as requiring notice of injury for all causes of action sounding in tort." *Wolff v. Sec'y of S.D. Game, Fish & Parks Dep't*, 544 N.W.2d 531, 534 (S.D. 1996). The South Dakota Supreme Court has long held that "[i]n order to commence suit on [tort claims], the provision of statutory notice [is] mandatory." *Finck v. City of Tea*, 443 N.W.2d 632, 635 (S.D. 1989); *Wolff*, 544 N.W.2d at 535. The date of the injury is the triggering event for the 180-day notice period. *Yankton Cty. v. McAllister*, 977 N.W.2d 327, 338 (S.D. 2022). For claims against a municipality, SDCL § 3-21-3(3) requires the notice to be given to the mayor or city finance officer.

According to the allegations in Azzuro's Amended Counterclaim, Azzuro's claim for negligence arises out of events that occurred and injuries that were allegedly incurred by Azzuro in 2017 and 2018. (Doc. 45). Under SDCL § 3-21-2, Azzuro had 180 days from December 31, 2018, at the latest, to comply with the mandatory notice requirement. Azzuro did not provide written notice to the City's mayor or City finance officer within 180 days of the alleged injury, nor anytime thereafter before filing the present lawsuit.

Azzuro argues that it substantially complied with the notice requirements of SDCL § 3-31-2. (Doc. 77 at 2015) (citing *Yankton Cnty. v. McAllister*, 977 N.W.2d 327, 335 (S.D. 2022))

("Substantial compliance is sufficient to satisfy the notice requirements of SDCL § 3-21-2."). The South Dakota Supreme Court has "recognized substantial compliance as a stand-alone basis for meeting the requirements of SDCL § 3-21-2." *Anderson v. Keller*, 739 N.W.2d 35, 39 (S.D. 2007).

> "Substantial compliance" with a statute means actual compliance in respect to the substance essential to every reasonable objective of the statute. It means that a court should determine whether the statute has been followed sufficiently so as to carry out the intent for which it was adopted.

*Myears v. Charles Mix Cnty.*, 566 N.W.2d 470, 474 (S.D. 1997).

In considering whether a particular notice substantially complies with the statute, the South Dakota Supreme Court has discussed seven purposes for the notice statute in SDCL § 3-21-2. These purposes include:

> (1) To investigate evidence while fresh; (2) to prepare a defense in case litigation appears necessary; (3) to evaluate claims, allowing early settlement of meritorious ones; (4) to protect against unreasonable or nuisance claims; (5) to facilitate prompt repairs, avoiding further injuries; (6) to allow the [public entity] to budget for payment of claims; and (7) to insure that officials responsible for the above tasks are aware of their duty to act.

*McAllister*, 977 N.W.2d at 335-36. Additionally, "[s]ubstantial compliance requires that the person who receives the notice be someone who could take necessary action to ensure that the statutory objectives are met." *Id.* at 336 (citation omitted). It is ultimately a legal question for the Court as to whether the facts of a case constitute substantial compliance. *Myears*, 566 N.W.2d at 474; *McAllister*, 977 N.W.2d at 335.

Azzuro acknowledges that it did not provide any written notice of the time, place or cause of its alleged injury to the Mayor or City Finance Officer of the City of Sioux Falls within one hundred and eighty (180) days, or any time thereafter, after its alleged injury in 2017 and 2019. Azzuro argues that under *Yankton Cnty. v. McAllister*, 977 N.W.2d 327 (S.D. 2022), it substantially complied with the notice requirements when it filed a counterclaim against the City that arose out of the same facts as the complaint filed by the City. (Doc. 77 at 2015). In *McAllister*, the South Dakota Supreme Court reasoned that by filing a complaint, the public entity already had the opportunity to investigate and evaluate the facts of the counterclaim, prepare defenses and protect itself from additional claims, budget for the lawsuit, and put its officials on notice that they had a duty to act and that any risk of surprise to the public entity was minimal. 977 N.W.2d at 336.

However, as noted by the City in its brief, the barratry counterclaims in *McAllister* alleging that Yankton County's action against the defendants MTD and Luke were frivolous and meritless, were filed within the notice period provided for in SDCL § 3-21-2—within 180 days after the injury (in this case, when Yankton county commenced suit). (Doc. 82 at 2038). The third defendant to the County's lawsuit, B-Y, did not file similar counterclaims for barratry until after 180 days after the County had commenced its lawsuit. *Yankton Ctny.*, 977 N.W.2d at 333-34, 338. The South Dakota Supreme Court held that because "B-Y took no action to put Yankton County on notice of its barratry injury as required by the notice statutes within the 180 days after Yankton County commenced the alleged frivolous and malicious action," the circuit court did not err in granting summary judgment for Yankton County on B-Y's barratry claim. *Id.* In order to be substantially compliant with the notice requirement in SDCL § 3-21-2, notice must be given to the public entity within 180-day notice period. *See also Anderson v. Keller*, 739 N.W.2d 35, 41 (S.D. 2007) ("[F]or Anderson to claim there to has been *substantial compliance* on the basis of this record is a misnomer since it appears that *he did nothing* to comply with the statute during the 180-day notice period.").

In Azzuro's negligence counterclaim, it alleges that the City was negligent in failing to provide 1% oxygen in the inlet gas, in installing the Azzuro System and Electrical Control Panel upon which the System operated, and in preventing the Azzuro System from reaching operating performance of less than 100 ppmv hydrogen sulfide. (Doc. 45, ¶¶ 151-172). Each of these alleged injuries occurred in the 2017 and 2018 time-period. Azzuro did not file its counterclaims against the City until June 16, 2022—well after the 180-day notice period had expired. (Doc. 15). Accordingly, the Court grants summary judgment in favor of the City on Azzuro's counterclaim for negligence.

### B. Breach of Contract Claim

The elements of a breach of contract are (1) an enforceable promise; (2) a breach of that promise; and (3) resulting damages. *Bowes Constr., Inc. v. S.D. DOT*, 793 N.W.2d 36, 43 (S.D. 2010). A breach of contract is defined as "[a] violation of a contractual obligation, either by failing to perform one's own promise or by interfering with another party's performance." *Weitzel v. Sioux Valley Heart Partners*, 714 N.W.2d 884, 894 (S.D. 2006) (internal quotations and citation omitted).

Azzuro alleges a counterclaim against the City for breach of contract for failing to provide the required 1% oxygen in the inlet gas and by preventing Azzuro's performance by prematurely terminating Azzuro's participation under the Contract. (Doc. 45, ¶¶ 151-161, 178-79).

The City does not address the merits of Azzuro's breach of contract claim, specifically whether any obligation by the City to provide 1% oxygen in the inlet gas was a condition precedent, rather than a contractual promise by the City. *See Jennings v. Rapid City Reg'l Hosp., Inc.*, 802 N.W.2d 918, 921 (S.D. 2011) ("A condition precedent is a contract term distinguishable from a normal contractual promise in that it does not create a right or duty, but instead is a limitation on the contractual obligations of the parties."). Instead, the City argues that while it may enforce the Contract as a third-party beneficiary, it owes Azzuro no reciprocal obligations under the Contract. The Court has already concluded that Azzuro may enforce any of the City's reciprocal obligations under the Contract against the City and the Court will not repeat those arguments here. Accordingly, the court denies summary judgment for the City on Azzuro's counterclaim for breach of contract.

IT IS HEREBY ORDERED that:

1. Azzuro's Motion for Summary Judgment (Doc. 49) is GRANTED IN PART AND DENIED IN PART as follows:
   a. DENIED as to all of the City's breach of contract-related claims;
   b. DENIED as to the City's claims for negligent and fraudulent misrepresentation; and
   c. GRANTED as to the City's claim for professional negligence.
2. The City's Motion for Partial Summary Judgment (Doc. 64) is GRANTED IN PART AND DENIED IN PART as follows:
   a. GRANTED as to Azzuro's claim for negligence; and
   b. DENIED as to Azzuro's claim for breach of contract.

Dated this 29 day of July, 2025.

BY THE COURT:

Lawrence L. Piersol
United States District Judge