UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CITY OF SIOUX FALLS,<br><br>        Plaintiff,<br><br>vs.<br><br>AZZURO, INC.; SHORT-ELLIOTT-HENDRICKSON, INC.,<br><br>        Defendants,<br><br><br>SHORT ELLIOTT HENDRICKSON, INC.,<br><br>        Third-Party Plaintiff,<br><br>vs.<br><br>UNISON SOLUTIONS, INC.<br><br>        Third-Party Defendant,<br><br><br>AZZURO, INC.,<br><br>        Counterclaimant,<br><br>vs.<br><br>CITY OF SIOUX FALLS,<br><br>        Counterclaim Defendant. | 4:22-CV-04052-ECS<br><br><br><br>OPINION AND ORDER DENYING DEFENDANT AZZURO, INC.'S MOTION FOR RECONSIDERATION |

Pursuant to Federal Rule of Civil Procedure 60(b)(1) and (6), Defendant Azzuro, Inc. moves the Court to reconsider its conclusion that a portion of a contract is ambiguous. Doc. 122.

## I. Procedural Background

The contract at issue is a purchase order between Azzuro and Third-Party Defendant Unison Solutions, Inc. for the purchase of a "Bio Gas Desulfurization System for Digester Gas Conditioning Facility in Sioux Falls Bid Specification 16-0077, Section 43 32 59." City of Sioux Falls v. Azzuro, Inc., 798 F. Supp. 3d 963, 975 (D.S.D. 2025); see Doc. 62-1 at 130–31.

The contract incorporates the bid specification named in the title: Bid Specification 16-0077, Section 43 32 59.[1] City of Sioux Falls, 798 F. Supp. 3d at 975, 990. Azzuro does not contest this. In fact, that incorporation is pivotal to Azzuro's legal theory. Doc. 50 at 3, 10–14. In its brief in support of its first motion for summary judgment, Azzuro noted that "[t]he Azzuro System was designed to meet Specification 2.03 which required inlet gas to be provided by the city to contain 1% oxygen." Id. at 3.

Section 2.03A reads as follows:

1. Site Information

    a. Minimum Ambient Temperature         -20F
    b. Maximum Ambient Temperature         100F
    c. Site Elevation                      1,336 Average 'AMSL

2. System Requirements

    a. Minimum Gas Flow                    100 scfm
    b. Maximum Gas Flow                    450 scfm

3. Inlet Gas Conditions

    a. Minimum Inlet Gas Pressure          6"WC
    b. Maximum Inlet Gas Pressure          12"WC

---

[1] The contract states "[a]ll terms and conditions per Unison's terms and conditions, City of Sioux Falls, SD, terms and condition for '16-0077 Digester Gas Conditioning Equipment' and the instructions to bidders for '16-0077 Digester Gas Conditioning Equipment' are incorporated as part of this specific purchase order. Vendor specific terms and conditions will not be accepted nor will they be incorporated into this purchase order." Doc. 62-1 at 130. The contract also states "[e]quipment in accordance to City specifications and per bid package M16E0865-Rev1." Id.

|   |   |   |   |
|---|---|---|---|
|   | c. | Minimum Inlet Gas Temperature | 80°F |
|   | d. | Maximum Inlet Gas Temperature | 95°F |
|   | e. | Relative Humidity | 100% |
|   | f. | Methane (CH4) | 60% |
|   | g. | Carbon Dioxide (CO2) | 37% |
|   | h. | Nitrogen (N2) | 2% |
|   | **i.** | **Oxygen (O2)** | **1%** |
|   | j. | Average Hydrogen Sulfide (H2S) | 5,700 ppmv |
|   | k. | Maximum Hydrogen Sulfide (H2S) | 11,400 ppmv |
|   | l. | Siloxanes (L2, L3, L4, L5, D3, D4, D5, D6) | 500 ppbv |
| 4. | Hydrogen Sulfide Removal System Discharge Requirement | | |
|   | a. | Hydrogen Sulfide | 100 ppmv |
| 5. | Compression, Moisture Removal, and Siloxane Removal Discharge Requirements | | |
|   | a. | Gas Pressure | 30 psig |
|   | b. | Temperature | 80°F |
|   | c. | Dew Point Temperature | 40°F |
|   | d. | Maximum Hydrogen Sulfide | 5 ppmv |
|   | e. | Maximum Siloxane | 100 ppbv |
|   | f. | Particulate Removal | 99% removal of > 1 micron |

City of Sioux Falls, 798 F. Supp. 3d at 972 (quoting Doc. 53-3 at 6–7) (emphasis added).

Azzuro argued that if a contract existed between it and the City of Sioux Falls, the City breached the contract by failing to maintain a 1% oxygen level, a condition precedent to the contract, thereby "render[ing] Azzuro's continued performance impossible." Doc. 50 at 10–14, 17–18. In response, "[t]he City argue[d] that the inlet gas conditions in the Bid Specifications, including the 1% oxygen value, is an approximation or rounded value." City of Sioux Falls, 798 F. Supp. 3d at 995. The Court concluded the contract was "ambiguous and that there is genuine uncertainty as to which . . . interpretation is correct." Id. The Court reasoned:

3

On the first page of Azzuro's Bid Package, is the "Design Starting Points." The "site information" in the Design Starting Points, indicates minimum and maximum outdoor ambient temperatures. The "inlet gas conditions" in the Design Starting Points includes minimum and maximum inlet gas pressures and temperatures. The "inlet gas conditions" lists specific values for methane, carbon dioxide, nitrogen, oxygen, average hydrogen sulfide, maximum hydrogen sulfide, and siloxances. These specific values are not designated as . . . minimums or maximums. Article 3.04K of the Bid Specifications states that "the Owner is responsible to run the System within the design criteria, provided by the Manufacturer. Any deviations must be specified in detail and brought to the attention of Manufacturer as soon as possible." Reading Article 3.04K, Article 2.03 (Design Criteria in the Bid Specification specifying an inlet oxygen gas concentration of 1%) and the Design Starting Points in the Azzuro Bid (specifying an inlet oxygen gas concentration of 1%) together, the Court could conclude, as Azzuro urges it to do, that it was the City's responsibility to provide 1% oxygen in the inlet gas. Accordingly, under Article 3.03C.4, Azzuro's contractual obligation to provide a replacement or repair of the gas conditioning system for failure to meet performance requirements could be read, as Azzuro urges, as conditioned on the City's obligation to provide 1% oxygen in the inlet gas.

However, adopting Azzuro's logic, the City would also have to ensure that inlet gas concentrations for methane, carbon dioxide, and nitrogen met the specified concentrations of 60%, 37% and 2% respectively or Azzuro would likewise be excused from its contractual obligation to replace or repair the Azzuro System for failure to meet its performance guarantee. If the Court was to interpret the Contract as requiring the City to provide 1% oxygen in the inlet gas, and the City instead provided an oxygen concentration of 0.89% or 1.04%, then Azzuro would be excused from performance. If the methane concentration in the inlet gas was 56% or 64%, rather than the specified 60% concentration, then Azzuro would also be excused from performance. In reading Azzuro's Bid Package, which was incorporated by reference into the Contract, the Court finds ambiguity in the language as to whether this was the parties' intent. In Azzuro's Bid Package, point one of the Design Starting Points suggests that 60% daily methane concentration is an approximation or rounded number, not an absolute, and that the Azzuro System was designed to perform with an inlet gas concentration of "*about* 70%[2] methane." If the methane concentration is an approximation or rounded value, so too could be the values for the other inlet gas concentrations. The inlet gas conditions also specify an average daily hydrogen sulfide level of 5,700 ppmv. If it really was the intention that the City ensure inlet gas concentrations exactly as specified, then an average hydrogen sulfide level of 5,600 ppmv or 5,760 ppmv in the inlet gas, rather than the designated 5,700 ppmv, would excuse Azzuro from its performance guarantee. Such a conclusion seems inconsistent with the parties' intent considering the main objective of the Azzuro System was to reduce hydrogen

---

[2] The Court noted "[i]t is unclear whether the 70% methane concentration in point one of the Design Starting Points is a typo given that a 60% methane doncementation is designated in the inlet gas conditions." City of Sioux Falls, 798 F. Supp. 3d at 996 n.12.

4

> sulfide levels. Accordingly, the Court finds that an equally plausible reading of the contract language suggests that the parties intended the specific inlet gas conditions values for oxygen, as well as for methane, carbon dioxide, nitrogen, oxygen, average hydrogen sulfide, maximum hydrogen sulfide, and siloxances to be approximations or rounded values.
>
> At trial, the parties will be permitted to present extrinsic evidence to explain the parties' intentions.

Id. at 995–97 (citation modified).

## II. Discussion

### A. Standard for Motion for Reconsideration

Azzuro moves the Court to reconsider, suggesting "[t]he Court made a mistake of law in relying upon extrinsic evidence to vary the terms of a written contract in finding the term '1%' to be ambiguous." Doc. 123 at 1.

"The Federal Rules of Civil Procedure do not address a 'motion for reconsideration.'" Colombe v. United States, No. 5:24-CV-05069-ECS, 2025 WL 3063285, at *3 (D.S.D. Nov. 3, 2025). "These motions are typically construed under either Rule 59 or 60, depending on context." Id. (citing Spinar v. S.D. Bd. of Regents, 796 F.2d 1060, 1062 (8th Cir. 1986)). "But reconsideration of an interlocutory order may only be brought under Rule 54(b)." Id. (citing Julianello v. K-V Pharm. Co., 791 F.3d 915, 923 n.3 (8th Cir. 2015)). Azzuro brings its motion under Federal Rule of Civil Procedure 60(b)(1) and (6). Doc. 122 at 1. Rule 60(b) provides six grounds of relief from a "final judgment, order, or proceeding." The City argues that Azzuro's motion is not seeking reconsideration of "a judgment, order or proceeding," but rather "a finding by the Court," so Rule 60(b) is inapplicable. Doc. 124 at 2. Azzuro rejoins that it is seeking reconsideration of a mistake of law found within an order, and so "the relief Azzuro seeks falls squarely within Rule 60(b)(1)." Doc. 133 at 1–2.

5

The number of Eighth Circuit opinions construing a motion for reconsideration of a nonfinal order under Rule 60(b) are legion. See, e.g., Broadway v. Norris, 193 F.3d 987, 989 (8th Cir. 1999); Williams v. York, 891 F.3d 701, 706 (8th Cir. 2018). But last term, the Supreme Court explained that "the general purpose" of Rule 60(b) was "to make an exception to *finality*." Waetzig v. Halliburton Energy Servs., 604 U.S. ___, ___, 145 S. Ct. 690, 694 (2025) (quoting Gonzalez v. Crosby, 545 U.S. 524, 529 (2005) (emphasis added)). The Court made clear that the adjective "final" in Rule 60(b) modifies not only the word judgment, but all three nouns that follow it—judgment, order, and proceeding. See id. at ___, 145 S. Ct. at 696 (a final order "terminates the action itself") (quoting Black's Law Dictionary 1298 (3d ed. 1933)); id. at ___, 145 S. Ct. at 700 ("[A] Rule 41(a) voluntary dismissal without prejudice counts as a 'final proceeding' under Rule 60(b)."). The term "final" was added to Rule 60(b) in 1946 to clarify that "interlocutory judgments are not brought within the restrictions of the Rule, but rather they are left subject to the complete power of the court rendering them to afford such relief from them as justice requires." Id. at ___, 145 S. Ct. at 696–97 (quoting Advisory Committee's 1946 Note on subd. (b) of Fed. R. Civ. Proc. 60, 28 U.S.C. App., p. 289).

The Eighth Circuit similarly held a decade ago in Julianello, where it considered the proper rule under which to move "for reconsideration of the scope of leave to amend [a] complaint." 791 F.3d at 917, 923 & n.3. The appellee "argue[d] that the district court could have considered the motion under Federal Rule of Civil Procedure 60(b) rather than under Federal Rule of Civil Procedure 54(b)." Id. at 923 n.3. The court disagreed, noting that it is Rule 54(b) that "allows a district court to revise a decision that adjudicates, but does not enter final judgment on, fewer than all claims in an action with multiple claims." Id. In light of the Supreme Court's opinion in Waetzig, Julianello survives as identifying the proper procedure for

moving for reconsideration of an interlocutory decision. That Azzuro brought its motion under Rule 60(b) rather than 54(b) is unseemly justification for avoiding its consideration. The Court construes the motion under Rule 54(b).

In Colombe, this Court recognized its broad discretion to grant a motion for reconsideration—a discretion only reversible if abused through either "clearly erroneous factual findings or erroneous legal conclusions." 2025 WL 3063285, at *3 (quoting SPV-LS, LLC v. Transamerica Life Ins. Co., 912 F.3d 1106, 1111 (8th Cir. 2019)). Given that here, like in Colombe, the Court is being asked to reconsider a "ruling[] by a former judge in the same case on the same record,"[3] it is "inclined to give deference" to that former judge's ruling absent such error. Id. (quoting Van-S-Aviation v. Piper Aircraft Corp., 101 F.R.D. 759, 762 (W.D. Mo. 1984)).

### B.  Azzuro's Arguments

Azzuro assigns error to the Court for "finding the term '1%' [oxygen] to be ambiguous." Doc. 123 at 1. Azzuro argues "[t]he [c]ontract is clear on its face," and that the Court improperly "relied upon: i) the disagreement of the parties as to the meaning of 1%, and ii) additional extrinsic evidence provided by the City arguing the meaning of 1%." Id. at 5. In its reply brief, Azzuro states, "the Court relied upon unspecified extrinsic evidence and the City's interpretation." Doc. 133 at 2–3.

The Court disagrees. The Court located multiple, plausible interpretations of the 1% oxygen inlet gas condition in "Design Starting Points," where imprecise language—"about 70% methane"—existed simultaneously with the more specific inlet gas condition of 60% methane.

---

[3] The Honorable Lawrence L. Piersol issued the initial opinion granting in part and denying in part Azzuro's Motion for Summary Judgment and the City of Sioux Falls' Motion for Partial Summary Judgment. City of Sioux Falls, 798 F. Supp. 3d at 963. Thereafter, this matter was reassigned to the undersigned. See unnumbered entry before Doc. 93.

City of Sioux Falls, 798 F. Supp. 3d at 996 (quoting Doc. 62-1 at 71) (citation modified); see generally Doc. 124. The Court reasoned that if one inlet gas condition could be variable, it was plausible that others could be too, and it was better to leave the criticalness of 1% oxygen to the factfinder. City of Sioux Falls, 798 F. Supp. 3d at 996–97. Those Design Starting Points are part of the Bid Package expressly incorporated into the contract. See Doc. 62-1 at 68–71, 130. In other words, they are part of the contract—not extrinsic evidence. James River Equip. Co. v. Beadle Cnty. Equip. Inc., 646 N.W.2d 265, 269 (S.D. 2002).

In its opening brief, Azzuro does not engage with that logic. See generally Doc. 123. In its reply brief, Azzuro argues that the Court "conflated the first bullet point section of the Design Starting Points providing an estimate of **operating conditions after two years**, with the fifth bullet point section providing **starting conditions.**" Doc. 133 at 3 (footnote omitted). The Court again disagrees. The language the Court relied on to find ambiguity was on a page titled "Design *Starting* Points." See id. (emphasis added). It would be odd for the first bullet point on a page so titled to concern only predictions for conditions two years out. The entire bullet point reads: "Biogas Desulfurization of an avg. daily flow: starting at approx. 200 cfm, reaching 450 cfm after two years and containing an avg. of 5,700 ppm of $H_2S$ (with peaks up to 11,400 ppm) and about 70% Methane." Id. (emphasis removed). While that phrase contains a starting value and an expected value two years out for average daily flow, it does not contain a similar time lapse convention for the hydrogen sulfide or methane values. A proper reading, then, would be that the values for those gases qualify the input regardless of the flow or what year it occurs. That understanding is corroborated by the existence of the same average and maximum values for hydrogen sulfide under the fifth bullet point. The discrepancy between the values for methane in

those same bullet points, and the use of approximate language for methane in the first bullet point, are what led to the Court's finding of ambiguity.

### III.   Conclusion and Order

The Court remains unconvinced that the only plausible interpretation of the contract requires strict compliance with a 1% oxygen input. Azzuro can, if it wishes, introduce evidence at trial demonstrating the parties' intentions. Accord City of Sioux Falls, 798 F. Supp. 3d at 995 (citing Butterfield v. Citibank of S.D., N.A., 437 N.W.2d 857, 858 (S.D. 1989)). For the above reasons, and the record as it now exists before the Court, it is hereby

ORDERED that Defendant Azzuro, Inc.'s Motion for Reconsideration, Doc. 122, is denied.

DATED this 10th day of March, 2026.

BY THE COURT:

_____
ERIC C. SCHULTE
UNITED STATES DISTRICT JUDGE