UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CITY OF SIOUX FALLS,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>AZZURO, INC.; SHORT-ELLIOTT-HENDRICKSON, INC.,<br><br>　　　　　　　Defendants,<br><br>SHORT-ELLIOTT-HENDRICKSON, INC.,<br><br>　　　　　　　Third-Party Plaintiff,<br><br>vs.<br><br>UNISON SOLUTIONS, INC.,<br><br>　　　　　　　Third-Party Defendant,<br><br>AZZURO, INC.,<br><br>　　　　　　　Counterclaimant,<br><br>vs.<br><br>CITY OF SIOUX FALLS,<br><br>　　　　　　　Counterclaim Defendant. | 4:22-CV-04052-ECS<br><br><br>OPINION AND ORDER DENYING MOTION TO EXCLUDE IN PART TESTIMONY OF LOWELL E. HOWARD |

In 2015, the City of Sioux Falls (the "City") "commissioned the Sioux Falls Water Reclamation Facility Digester Gas Conditioning System Project (the 'Project') to add a new

digester gas conditioning system to its water reclamation facility that would remove high concentrations of hydrogen sulfide to concentrations below 100 parts per million volume (ppmv), and that would remove siloxane to concentrations below 100 parts per billion by volume (ppbv), which would then enable the City to operate its GE Jenbacher gas engine generator to create electricity for the benefit of the City." Doc. 1 ¶ 7. For reasons which are disputed by the various parties in this matter, the Project, particularly the Azzuro system meant to remove hydrogen sulfide, was unsuccessful. See generally id.

The City brought this litigation seeking damages against some parties involved with the Project. Id. One of those defendants, Azzuro, Inc., brought a counterclaim against the City. Doc. 15. Now before the Court is Azzuro's Motion to Exclude in Part Expert Testimony of Lowell E. Howard, Doc. 97.

## I.      Factual Background

"[T]he City disclosed Lowell Howard, PE, as a retained expert witness in this matter." Doc. 114 at 2. "On January 19, 2024, Howard provided his expert report and CV, opining that the City was damaged by [Short-Elliott-Hendrickson, Inc. ("SEH")] and Azzuro's failures as more fully set forth in his report." Id. at 2–3 (citation omitted). "Howard issued a rebuttal expert report on April 5, 2024, responding to the expert reports provided by Azzuro and SEH's retained experts." Id. at 3 (citation omitted). He also signed a declaration explaining certain opinions he holds in this matter. Doc. 104-3 at 74–76.

At deposition, Howard testified that he has "40 years of experience designing, manufacturing, and installing or supplying biogas treatment systems." Doc. 114 at 3 (citing Doc. 104-3 at 7, 9). He testified he "has been involved in 20–40 biogas treatment system projects

around the world, including several where the primary goal of the project was to remove hydrogen sulfide from biogas." Id. (citing Doc. 104-3 at 8, 10).

Foundational to Azzuro's motion are the following quotes from Howard's deposition:

Q.  I want to jump back to the beginning.

Way back at the beginning of your deposition we talked briefly about your experience, so I know I want to make sure that I'm clear on that.

You have designed desulfurization systems in your career. Is that correct?

A.  That's correct.

Q.  Those desulfurization systems you have designed, those are media-based? Am I saying that right?

A.  That's correct.

Q.  Have you ever designed or manufactured a biological system like the one at issue here?

A.  No.

Q.  Have you ever worked on a biological desulfurization system like the one at issue here?

A.  Not that I can remember.

Q.  Have you ever consulted any clients regarding the use of a biological system like the one at issue here?

A.  Not that I can remember.

. . .

Q.  Let me ask you a general question. What is the difference between a biological-chemical system, like the one at issue here, and the systems that you have worked on or you have designed or manufactured?

A.  Simply put, a non-biological system is what's called a fixed-bed media system where you bring in raw materials, load them into a big vessel, run the biogas through that big vessel that's loaded with this media.

3

You monitor the outlet gas. You monitor over a period of weeks or months, even a year maybe sometimes.

And when you get breakthrough, as they call it, of the in this case hydrogen sulfide, it's time to shut the system down, evacuate all the spent material out of the beds, and replace it with new materials, and off you go and repeat the same set of circumstances.

A biological system, by definition, even though it has maintenance requirements, is more typically oriented towards high levels of hydrogen sulfide, like we have here at Sioux Falls.

The fixed-bed media systems, I have almost always told my potential customers that we don't want to be using them any higher than 750 parts per million of hydrogen sulfide, because your operational costs would go through the ceiling, and you'll be changing the media out every month or every two months at the tune of a hundred to three hundred to five hundred thousand dollars. It's just not a practical way to go.

So your biological solution for high levels of hydrogen sulfide is a good way to go, you know, assuming you have a competent and reliable and well-established system.

. . .

Q.    So your companies, West Coast Energy Systems, and probably more importantly, but the ESC, Environmental Systems and Composites, those systems with regard to desulfurization that they develop, that you[ ] develop, are all fixed-bed media systems?

A.    That's correct.

. . .

Q.    Just briefly, I've got your CV in my hand here. Your degree is in mechanical engineering?

A.    That's correct.

Q.    What about any degrees in chemical engineering?

A.    None.

Q.    Biochemical engineering?

A.    None.

4

Q.    It mentions postgraduate studies. Do you have a postgraduate degree?

A.    I do not.

. . .

Q.    I'm sorry. I said 4, and I do mean 5, Paragraph 5. I'm going to be down almost to the bottom of the page.

I'm going to start a sentence, and I'll read it, and let me know if I don't read it correctly or if you don't see where I'm reading.

It starts, "It is my expert engineering opinion that oxygen contents up to 10 percent in the raw biogas would be required to reduce the hydrogen sulfide from 5700 ppmv to less than 100 ppmv."

Did I read that correctly?

A.    You did.

Q.    What is that opinion based on?

A.    Scientific studies that I've read and reviewed.

Q.    Which scientific studies?

A.    They were identified on that first report, I believe. Have you got that report?

Q.    I have the report. If you can point out which studies, that would be excellent.

A.    Give me a second here.

Q.    Take your time.

A.    Under the last paragraph it says, "Sulfide-oxidizing heterotrophic bacteria, August 2018."

Q.    Do you have a copy of that report, Dr. Howard?

A.    I do not.

Q.    Can you provide a copy of that report?

A.    If you want me to, I certainly can get that to you.

Q.    Yes. I'm requesting that you provide a copy of that report.

A.    Okay.

. . .

Q.    Mr. Howard, I don't have a copy of that report. It has not been disclosed. I haven't read it. But let me ask you a couple questions about something I haven't seen, which is probably unadvisable.

Is there a difference between the H2S biotreatment system in that report and the one that is at issue in this lawsuit?

A.    Well, the report was based on a laboratory test, and it's been over a year and a half since I read it. So it's hard for me to remember everything about it.

It was just suggesting that in a contact situation of hydrogen sulfide in a biogas would need higher concentrations than what's in this particular project in order to be successful to reduce that high of level of hydrogen sulfide.

That was my observation. If I recall, it didn't specifically state a level of hydrogen sulfide that's commensurate with what's going on here, and none of the other, flow rate parameters, that kind of thing.

But it's my expert opinion, based on what I've read, that it's a logical result of looking at this project, that the contact time and the flow rates and the high level of hydrogen sulfide, it would have been extremely difficult, and since Azzuro had never built one of these before, they had no idea of what the flow rates or the concentrations were and contact time and nutrients. I mean that goes without saying.

. . .

Q.    You keep saying your expert opinion with regard to 10 percent being necessary.

Again, you have never built, designed, or developed a biological system to remove sulfur, such as the system that is at issue in this lawsuit?

A.    Absolutely you're correct.

Q.    What else is your opinion based on?

A.    Just the practicality of a reasonable assessment of the design that was installed in Sioux Falls and this study.

It seems reasonable that if you have under one percent oxygen, and oxygen is required for this process, in a matter of seconds that they would require more oxygen, and there is no way to know whether that would even work.

Q.     What is your reasonable understanding? I guess I'm confused.

A.     I do not know what would be required.

All I know i[s] that the system didn't work at the .7 or .8 percent oxygen, and they tried to use additional oxygen contents and they never got it working.

So based on this report, and taking a look at the volume of hydrogen sulfide required to remove, it seems reasonable that there would have to be more development effort to figure out what the actual oxygen content requirements would be.

. . .

Q.     There are different types of biological desulfurization systems. Correct?

A.     To the best of my knowledge, there's at least two more, which is the Thiopaq and the Biogasclean.

Q.     Are you aware of any others besides –

A.     I do not know of any others.

Q.     Do you know if the Thiopaq and/or the Biogasclean systems require higher levels of oxygen than the Azzuro system?

A.     I do not know that.

Q.     I will submit to you that they do, in fact, require higher levels of oxygen. Well, actually let me take that back.

What is the difference between the Azzuro system, the Thiopaq clean system and the – I mean the Thiopaq system and the Biogasclean system?

A.     I do not have an understanding of their systems.

Q.     You have not studied the differences between the different biological systems?

A.     I have not.

Q.      Have you studied how the Azzuro system works?

A.      No.

Q.      So you can't tell me, as you sit here today, how the Azzuro system operates?

A.      I cannot.

Q.      Can you tell me the differences between the Azzuro system and the Thiopaq or the Biogasclean system?

A.      I cannot.

Q.      For example, does the Azzuro system use multiple tanks where those other systems might use a single tank?

A.      I do not know that.

Q.      Is it possible that the Azzuro system, a unique system unlike any other system, would require less oxygen and less oxygen that might be in this 2018 study?

A.      I would have no idea.

Q.      If you have no idea, then how can you offer an opinion that the Azzuro system would not operate on less than 10 percent oxygen?

A.      It didn't.

Q.      It didn't operate on less than 10 percent oxygen?

A.      It did not operate on less than one percent.

Q.      It did not operate on less than one percent.

        Did it operate on one percent?

A.      I have no idea. Did they ever get one percent.

Q.      You are the expert in this matter. Do you know?

A.      I do not know.

Q.      But as you sit here today, you can't say one way or the other whether or not the Azzuro system would have operated on one percent oxygen?

A.      Again, there's no way of knowing that.

Doc. 98 at 4–9 (citation modified).

Based on this testimony, Azzuro brings the instant motion, arguing:

> Mr. Howard is not qualified as an expert on biological gas digestion systems, as his testimony does not rest on reliable foundation as required by Rule 702, nor can be tested under the standards established under Daubert. His testimony will not assist the trier of fact. Azzuro respectfully requests the Court exclude Mr. Howard's testimony on the issues of the design specifications, operation and causes of the Azzuro biologic gas digestion system's inability to reach performance level.

Id. at 13.

## II.      Standard for Admissibility of Expert Testimony

"In a diversity case, questions about the admissibility of evidence are governed by the Federal Rules of Evidence." Valadez v. Watkins Motor Lines, Inc., 758 F.3d 975, 980 (8th Cir. 2014) (citing Bradshaw v. FFE Transp. Servs., Inc., 715 F.3d 1104, 1107 (8th Cir. 2013)). Federal Rule of Evidence 702 and the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc. govern the admissibility of expert testimony. Allstate Indem. Co. v. Dixon, 932 F.3d 696, 701 (8th Cir. 2019) (citing 509 U.S. 579 (1993)). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)      the testimony is based on sufficient facts or data;
>
> (c)      the testimony is the product of reliable principles and methods; and
>
> (d)      the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

9

The Eighth Circuit has winnowed down that rule into three criteria of admissibility: "(1) 'the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant'; (2) 'the expert must be qualified to assist the finder of fact'; and (3) 'the testimony must be reliable or trustworthy in an evidentiary sense.'" Crabar/GBF, Inc. v. Wright, 142 F.4th 576, 587 (8th Cir. 2025) (quoting In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig., 9 F.4th 768, 777 (8th Cir. 2021)). "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (citing Daubert, 509 U.S. at 592).

"Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." Fed. R. Evid. 401 (citation modified). An expert's specialized knowledge assists the trier of fact when his "testimony advances the trier of fact's understanding to any degree." United States v. Gutierrez-Ramirez, 930 F.3d 963, 969 (8th Cir. 2019) (per curiam) (quoting United States v. King, 898 F.3d 797, 806 (8th Cir. 2018)).

"Whether a witness is qualified to testify as an expert is normally within the discretion of the trial court." Moran v. Ford Motor Co., 476 F.2d 289, 291 (8th Cir. 1973). "A district court has great latitude in determining whether expert testimony meets the reliability requisites of Rule 702." Sprafka v. Med. Device Bus. Servs., Inc., 139 F.4th 656, 660 (8th Cir. 2025) (quoting In re Wholesale Grocery Prods. Antitrust Litig., 946 F.3d 995, 1000 (8th Cir. 2019)). His qualification, as Rule 702 states, may be "based upon his knowledge, skill, experience, training or education." Moran, 476 F.2d at 291; see Fed. R. Evid. 702. "[P]ractical experience as well as academic training and credentials may be the basis of qualification." Moran, 476 F.2d at 291 (citation omitted). "[F]or an expert witness to be qualified based on experience, that experience

10

must bear a close relationship to the expert's opinion." Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009) (citing Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 283–84 (8th Cir. 1995)). "Expert testimony is inadmissible where . . . it is excessively speculative or unsupported by sufficient facts." Barrett v. Rhodia, Inc., 606 F.3d 975, 981 (8th Cir. 2010) (citing Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056–57 (8th Cir. 2000)).

**III.    Discussion**

Azzuro takes aim at Howard's opinions "because he is not qualified as an expert by knowledge, experience, training, or education on issues relating to biological desulfurization systems as required by Rule 702." Doc. 98 at 10 (emphasis removed). Azzuro argues that Howard's testimony demonstrates an unawareness that renders any opinion he may have about a required oxygen level to be a "fundamentally unsupported conclusion based on pure speculation." Id. at 12.

Azzuro cites to American Automobile Insurance Co. v. Omega Flex, Inc. for its proposition that the Eighth Circuit has "repeatedly upheld the exclusion or reversed the admission of expert design testimony that went beyond the expert's expertise." 783 F.3d 720, 724 (8th Cir. 2015) (collecting cases); see Doc. 98 at 10. Azzuro stresses that Howard "has no experience with biological systems such as the Azzuro system." Doc. 98 at 10. It says Howard "has no personal experience testing, designing, or installing biological systems." Id. at 11. As to education, Azzuro refers the Court to Howard's degree in mechanical engineering, rather than chemical or biochemical engineering. Id. Azzuro states "Howard's opinions are based upon one scientific report, and that report was based on a 'laboratory test' he read 1-1/2 years ago." Id. Azzuro also notes distinctions in that report that render it incomparable and unhelpful. Id. It claims, "reading some publications or a book on a subject does not make a person a qualified

11

expert on the subject." Id. (emphasis removed) (citing Tosh v. Schwab, 743 N.W.2d 422, 429 (S.D. 2007)). Azzurro claims "Howard's only experience is with media-based systems, and biological systems are vastly different." Id. at 10–11.

Azzuro cites Dancy v. Hyster Co. for support. Id. at 10 (citing 127 F.3d 649, 651–52 (8th Cir. 1997)). In Dancy, Dr. Forbes, whose specialty was thermal science, had "never designed a forklift, a lift truck, or any similar machine." 127 F.3d at 651. Yet, at deposition, he "theorized that the lift truck should have had a guard to keep [the plaintiff's] leg within the lift truck's frame." Id. "Dr. Forbes had not tested this theory in any way, had not seen this type of device on a forklift or any other similar machine, and had not even designed the device he suggested would have prevented Plaintiff's injury." Id. Dr. Forbes later provided a supplemental report where he opined that a "permanently-located open-mesh guard on the right side of the lift would have prevented [the plaintiff's] injury," and that he was "confident that such guards can be designed." Id. (citation omitted).

The district court relied on factors from Daubert, which suggests that a trial court consider "(1) whether the concept has been tested, (2) whether the concept has been subject to peer review, (3) what the known rate of error is, and (4) whether the concept is generally accepted by the community." Id. at 652 (quoting Pestel v. Vermeer Mfg. Co., 64 F.3d 382, 384 (8th Cir. 1995)). It concluded that:

> Dr. Forbes's theory could be, but had not been, tested. In fact, Dr. Forbes had not even attempted to design the device he was suggesting was necessary to prevent the lift truck from being defective. Although he opined that the device he envisioned would work, he had no basis for reaching this conclusion. In fact, it appear[ed] that Dr. Forbes's views were being altered and refined based on questions raised during the deposition.

12

Id. (footnote omitted).  For these reasons, the district court excluded Dr. Forbes' testimony.  Id. at 651–52.  The Eighth Circuit affirmed under the abuse of discretion standard of review.  Id. at 652.

The City distinguishes Dancy because here, "Howard has not proposed a device or component that would have made the Azzuro system operate successfully."  Doc. 114 at 13.  Howard did state that it was his "expert engineering opinion that oxygen contents up to 10 percent in the raw biogas would be required to reduce the hydrogen sulfide from 5700 ppmv to less than 100 ppmv."  Doc. 104-3 at 35.  But the City argues Howard used "his experience and educated understanding of basic biological and chemistry principles and chemical processes at play in the biogas treatment industry, as well as the engineering principles and chemical processes necessary to remove hydrogen sulfide from biogas, to explain why the Azzuro system did not and could not work as designed."  Doc. 114 at 13–14.  And the City argues that although Azzuro "contends that biological systems are vastly different from media-based systems, [it] does not cite to any competing expert's opinion, legal authority, or fact in the record to support that conclusory statement."  Id. at 14 (citation modified).

The City argues this situation is more akin to that in North Star Mutual Insurance Co. v. CNH America LLC.  Doc. 114 at 14 (citing No. CIV. 11-4133-KES, 2013 WL 5156457 (D.S.D. Sept. 12, 2013)).  In North Star Mutual, a combine manufacturer moved to exclude the testimony of the plaintiff's engineer expert because he had "not designed component parts of heavy machinery for over five years, he lack[ed] a basic working knowledge of the operation of a combine, his design experience [was] limited to heavy trucks, not agricultural equipment, and [he] ha[d] never designed a combine or its component parts."  2013 WL 5156457, at *1–3.  The court held that the expert's "extensive education, training, and experience in engineering

13

principles [were] relevant to the inquiry at hand." Id. at *4. And the expert "demonstrated familiarity with the operation of combines." Id. The court held that Rule 702 and Daubert "do not require that an expert have design experience on the exact product in question." Id. (citing Doblar v. Unverferth Mfg. Co., 981 F. Supp. 1284, 1287 (D.S.D. 1997)). The court also was unpersuaded by the comparatively superior experience of the defendant's expert. Id. The court held that an expert "does not need to be the foremost expert on combines or have specifically designed the product at hand," as "such a requirement would eliminate most experts except those employed by CNH and its peers." Id.

The City argues although Howard "has not previously worked on a biological system like the Azzuro system, Howard has certainly demonstrated a sufficient understanding of the biogas industry as a whole, the design of biogas systems, and engineering principles and the chemical processes that must be considered in a biological hydrogen sulfide removal system in order to meet the qualification threshold under Rule 702 and Daubert." Doc. 114 at 15.

Azzuro argues that North Star Mutual cannot rescue Howard, because he does not have the educational credentials to assist the trier of fact and, unlike in North Star Mutual, Howard's "testimony establishes he lacks familiarity with Azzuro's system and other biological systems." Doc. 125 at 5 (emphasis removed). Azzuro argues that "Mr. Howard did not study Azzuro's biological system. He cannot describe Azzuro's biological system and does not even know how Azzuro's biological system operates." Doc. 98 at 12. The City argues "[w]hile Howard testified that he has not studied how the Azzuro system works, the factual ambiguity created by that testimony as compared to his other testimony and expert reports is not grounds for exclusion, but better left for cross-examination." Doc. 114 at 22 (citation modified).

14

The Court is persuaded by the City's arguments. In <u>Thomas v. FCA US LLC</u>, the court permitted a mechanical engineer / accident reconstructionist to testify as to the unreasonable dangerousness of "an inflatable knee blocker ["IKB"]," a type of airbag. 242 F. Supp. 3d 819, 825, 833 (S.D. Iowa 2017). It "was [the engineer's] first case dealing with an IKB," and he had "never been involved in the design of an air bag, IKB, or occupant restraint system for a passenger vehicle, and ha[d] never testified in a case where the goal was to address the design of an air bag in an automobile." <u>Id.</u> at 825. In <u>North Star Mutual</u>, discussed <u>supra</u>, the court permitted a designer of heavy trucks to opine on the design of a combine. And in <u>Jensen v. Radiologic Center, Inc.</u>, the court permitted a doctor who "dedicated his clinical practice to reading and interpreting chest and cardiac imaging not breast imaging" to opine on the standard of care for reading and interpreting breast imaging. No. 8:24CV129, 2026 WL 184555, at *9–10 (D. Neb. Jan. 23, 2026) (citation omitted). Each of these examples demonstrates that an expert's usefulness is not predicated on his omniscience. Where there exists some overlap between what the expert knows and what the jury needs, courts should follow a policy of liberal admission and allow that expert's knowledge to be "tested by the adversary process." <u>Academy Bank, N.A. v. AmGuard Ins. Co.</u>, 116 F.4th 768, 791 (8th Cir. 2024) (quoting <u>Johnson v. Mead Johnson & Co.</u>, 754 F.3d 557, 562 (8th Cir. 2014)). The issues Azzuro raises here are better left to the credibility determination of the jury.

The Court believes this is also the case with respect to Azzuro's argument that Howard's opinions lack a proper factual foundation. While Howard made the statements quoted above about his unfamiliarity with the Azzuro system, those statements are not automatically fatal to admissibility when the full record is considered. Howard's report and further testimony suggest he studied the Azzuro system and that, based upon this review, he does not believe it would

work. Specifically, Howard's report notes he visited Sioux Falls on October 18, 2023, to view "the installation site where the Azzuro system was installed." Doc. 104-3 at 60. He also reviewed thousands of pages pertaining to the Azzuro system that addressed "the selection of equipment, construction, installation, and startup attempts." Id. at 59. He also reviewed "submittal packages, operations and maintenance manuals, warranties, and other basic information supporting a typical equipment installation." Id. at 60.

Based on his review of the Azzuro system, Howard testified "[m]y opinion is that the Azzuro system would not have worked." Doc. 104-3 at 37. The rationale for his opinion is as follows:

> When you have a prototype system or a pilot plant, as the one here in Sioux Falls was because it had never been done before you have so many parameters that are required to evaluate and adjust and make improvements, larger flow rates, higher temperatures, different nutrient injections.
>
> There's a myriad of things that could allude to that would be reviewed and altered in order to establish improvements or giving the system an opportunity to operate.
>
> This was not the case here. They did not have the opportunity. Trying to start up a system that had never been developed before is really difficult to achieve.
>
> Q.    If there is evidence in the record that one percent oxygen was provided to the Azzuro system, and that it did not achieve the performance requirement, would that support your opinion?
>
> A.    It would.

Id.

"As a general rule, the factual basis of an expert's opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Children's Broad. Corp. v. Walt Disney Co., 357 F.3d 860, 865 (8th Cir. 2004) (citation omitted). "Only if the expert's opinion is so fundamentally

16

unsupported that it can offer no assistance to the jury must such testimony be excluded." Id. (citation omitted). Here, Howard testified he has not studied how the Azzuro system works. If the analysis were to stop there, his opinions may very well be excluded. But he also issued a report contradictorily listing all of the materials he studied to learn how the Azzuro system would work. Doc. 104-3 at 60. His report also demonstrates a basic understanding of how the Azzuro system was supposed to work. Id. at 61–63. He also testified that based on his review of everything he studied, the Azzuro system would not work. Given the full record, the veracity of the factual basis underlying Howard's opinions, namely whether he reviewed and understands the Azzuro system or not, are better left as a credibility determination for the jury to resolve. Given his concessions, a jury may not find his testimony persuasive. But in this Court's judgment, exclusion of his opinions is not appropriate.

Howard is a decades-long veteran of the biogas industry. Where he opines on oxygen requirements for hydrogen sulfide removal, he does so relying on concepts of "[b]asic chemistry." Doc. 104-7 at 10. Howard does not hold himself out as an expert on the particular growth media in the Azzuro system or biological solutions in general. See generally id. Rather, he admits some unfamiliarity with those systems and how they operate except in the broadest sense. Howard supplemented his knowledge by reading a study about biological systems, but he did not start on a clean slate because there are not different periodic tables of elements for fixed-bed media systems and biological systems.

Howard testified he has spent 40 years in the industry both designing and building systems "for biogas processing or a variety of different applications." Doc. 104-3 at 7. He testified to currently spending approximately 80 percent of his professional time working as a consulting engineer designing projects. Id. at 8. He believes in the last 20 years he has worked

17

on up to 40 biogas systems throughout the world, with at least one of these systems having a similar level of hydrogen sulfide to what was present in the City's Project giving rise to this case. Id. at 10–11.

Howard's experience working with biogas and his understanding of the chemistry involved with hydrogen sulfide removal will assist the trier of fact "on the issues of the design, specifications, operation and causes of the Azzuro biologic gas digestion system's inability to achieve performance level." Doc. 97 at 1–2. Where Azzuro believes gaps in Howard's understanding of biological systems render his testimony less helpful, it can so-persuade the jury using "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." In re Bair Hugger, 9 F.4th at 778 (quoting Daubert, 509 U.S. at 596).

## IV. Order

For the above reasons, and the record as it now exists before the Court, it is hereby

ORDERED that Defendant/Counterclaimant Azzuro, Inc.'s Motion to Exclude in Part Expert Testimony of Lowell E. Howard, Doc. 97, is denied.

DATED this 25th day of March, 2026.

BY THE COURT:

ERIC C. SCHULTE
UNITED STATES DISTRICT JUDGE