UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CITY OF SIOUX FALLS,<br><br>    Plaintiff,<br><br>vs.<br><br>AZZURO, INC.; SHORT-ELLIOTT-HENDRICKSON, INC.,<br><br>    Defendants,<br><br><br>SHORT-ELLIOTT-HENDRICKSON, INC.,<br><br>    Third-Party Plaintiff,<br><br>vs.<br><br>UNISON SOLUTIONS, INC.,<br><br>    Third-Party Defendant,<br><br><br>AZZURO, INC.,<br><br>    Counterclaimant,<br><br>vs.<br><br>CITY OF SIOUX FALLS,<br><br>    Counterclaim Defendant. | 4:22-CV-04052-ECS<br><br><br><br>OPINION AND ORDER DENYING SHORT ELLIOT HENDRICKSON INC.'S MOTION FOR SUMMARY JUDGMENT AS TO THE PLAINTIFF'S CLAIMS |

In 2015, the City of Sioux Falls (the "City") "commissioned the Sioux Falls Water Reclamation Facility Digester Gas Conditioning System Project (the 'Project') to add a new digester gas conditioning system to its water reclamation facility that would remove high concentrations of hydrogen sulfide to concentrations below 100 parts per million volume

(ppmv), and that would remove siloxane to concentrations below 100 parts per billion by volume (ppbv), which would then enable the City to operate its GE Jenbacher gas engine generator to create electricity for the benefit of the City." Doc. 1 ¶ 7. For reasons which are disputed by the various parties in this matter, the Project, particularly the Azzuro system meant to remove hydrogen sulfide, was unsuccessful. See generally id.

The City brought this litigation seeking damages against some parties involved with the Project. Id. Now before the Court is Defendant Short Elliot Hendrickson, Inc.'s Motion for Summary Judgment as to the Plaintiff's Claims, Doc. 103.

I.    **Facts**[1]

The following is a summary of facts in this complex case. The facts are recited in the light most favorable to the City as the nonmoving party.

In 2015, the City, a municipality incorporated in the State of South Dakota, commissioned the Project. Doc. 107 ¶ 1 (citing Doc. 1 ¶¶ 1, 7). Short Elliot Hendrickson, Inc. (SEH) is an engineering and architectural corporation with its principal place of business in St. Paul, Minnesota. Doc. 118 ¶ 1. The City contracted with SEH for SEH to provide services as the City's professional engineering representative for the Project and to give professional engineering consultation and advice to the City regarding the Project. Doc. 107 ¶ 2. The Project was to remove hydrogen sulfide from the gas emitted by the City's treatment plant so the gas could be used to produce electricity. Id. ¶ 3. With hydrogen sulfide in the gas, the repair and maintenance costs for the generators were alleged by the City to be more expensive. Id. ¶ 4. The Project was to replace the City's over 25-year-old gas conditioning system with a system that could provide treatment to decrease operation and maintenance costs. Id. ¶ 5. SEH

---

[1] For readability, quotation marks and most internal citations are omitted when quoting facts from the statements of undisputed material facts or their responses.

recommended to the City that it replace its gas scrubbing equipment with proven cost-effective equipment and technologies.  Doc. 118 ¶ 138.

The City hired SEH to look at alternatives.  Doc. 117 ¶ 9; Doc. 110 ¶ 9.  The City contends the SEH team, including the primary engineers working on the Project, did not have any experience with biological biogas conditioning systems.  Doc. 118 ¶¶ 130, 132.  In 2013, SEH provided the City with a Draft memorandum that evaluated several components for treating digester gas at the City of Sioux Falls, including a chemical treatment component.  Doc. 117 ¶ 6; see Doc. 113-5.  The City was interested in exploring biological processes for treating hydrogen sulfide.  Doc. 117 ¶ 8.

Prior to the City's Project, SEH had never heard of Azzuro and did not have any knowledge about the Azzuro Sulfatech system.  Doc. 118 ¶ 133.  As early as 2013, during the WRF Fog Receiving and Digester Complex Improvement Study, SEH and Azzuro began having discussions regarding the City's Project.  Id. ¶ 14.  In 2013, Bonno Koers was involved in those communications on behalf of Azzuro.  Id. ¶ 15.  At the time of those discussions in 2013, Dominique Alibeckoff was employed by Azzuro and was also involved in those communications on behalf of Azzuro.  Id. ¶ 16.  Patti Craddock and Dustin Maas were involved in those communications on behalf of SEH.  Id. ¶ 17.  On October 15, 2013, Azzuro sent a budget proposal for a biotrickling filter system to SEH for the City's anticipated Project.  Id. ¶ 18.

On February 12, 2015, SEH and the City entered into the Agreement Between City and Engineer for Professional Services to Conduct Final Design.  Id. ¶ 4.  Pursuant to that contract, SEH was contractually obligated to do the following, among other tasks:

    a.    Provide professional engineering services for the City in all phases of the Project.

    b.    Serve as the City's professional engineering representative for the Project.

c.    Give professional engineering consultation and advice to the City regarding the Project.

d.    Perform professional services, including customary engineering services.

e.    Coordinate and incorporate into the final design and construction administration services provided by others.

f.    All work shall be performed under direct supervision of a professional engineer licensed to practice in South Dakota.

g.    Complete plans, supplemental specifications, and special provisions certified by a licensed professional engineer.

h.    Assist the City in obtaining bids or negotiating proposals for each separate prime Contract for construction, materials, equipment, and services.

i.    Consult with and advise the City as to the acceptability of subcontractors and other persons and organizations proposed by the prime contractor(s) for those portions of work as to which such acceptability is required by the bidding documents.

j.    Assist the City in evaluating bids or proposals and in assembling and awarding contracts.

k.    Consult with and advise the City as requested by the City during the construction of the project.

l.    Review the results of tests and inspections and other data performed or submitted for the Project, but only for conformance with the design concept of the Project and compliance with the information given in the Contract Documents; determine the acceptability of substitute material and equipment proposed by Contractor(s); and receive and review (for general content as required by the Specifications) maintenance and operating instructions, schedules, guarantees, bonds, and certificates of compliance which are to be assembled by Contractor(s) in accordance with the Contract Documents.

m.    The Engineer shall not sublet or assign any part of the work under this Agreement without written authority from the City.

Id. ¶ 5.

4

In its Scope of Services under the Contract, SEH further agreed to the following, among other things:

a.  The primary goal of this project is the addition of a gas conditioning system for reduction of moisture, hydrogen sulfide, and siloxanes contained in the digester gas prior to the energy recovery system at the WRF.

b.  Maintain productive lines of communication with the City.

c.  Maintain quality functions.

d.  Develop a project management plan (PMP) necessary to convey the requirements of the project design to the project design team.

e.  Establish and maintain effective project communications.

f.  Coordinate the work of team members and communication between technical disciplines.

g.  Develop a quality management plan (QMP) as part of the PMP.

h.  Conduct an internal Concept and Criteria Review (C&CR) to discuss the project objectives, key issues, and approach. The C&CR is an internal process for senior staff review of developed concepts, criteria, and procedures.

i.  Review deliverables prior to submission to the City. A senior engineer from each applicable discipline will perform the reviews. The technical content, basis for design, and clarity of the deliverable will be reviewed.

j.  Provide biddable drawings and specifications for digester gas conditioning equipment and structures.

k.  This project includes the addition of a gas conditioning system for reduction of moisture, hydrogen sulfide, and siloxanes contained in the digester gas prior to the energy recovery system. The components of the system would be sized for the maximum gas production anticipated to be produced by four (4) primary digesters, which is estimated to be 450 cubic feet per minute (cfm). The gas conditioning system will be comprised of the following:

. . .

A packaged biological filtration system consisting of a trickling tower on a concrete slab-on-grade located outside the Digester Complex. Preliminary design will evaluate three systems to include (1) biological wet scrubber,

5

(2) random media biotrickling filter, and (3) structured media biotrickling filter.

l.  Prepare technical memorandum recommending a biofilter system for hydrogen sulfide treatment. Three system types including biological wet scrubber, randomly packed biotrickling filter, and structured media biotrickling filter will be evaluated. Monetary and non-monetary factors will be included in the evaluation. Non-monetary factors include maintenance intervals, down time required for maintenance, sensitivity to varying influent characteristics, and start-uptime required after the system has been taken out of service.

m.  Establish Design Criteria. Delineate the key project design criteria, including equipment and pipe sizing.

n.  Deliverables include a Technical Memoranda for gas conditioning equipment recommendations, a list of design criteria, design criteria, front-end specifications, design specifications, general design, process/mechanical design, structural design, and drawings.

Id. ¶ 6; see Doc. 96-1.

SEH was required to have open communication with the City and to have complete and transparent communication with the City about the Project. Doc. 118 ¶ 151.

In a letter to the City, SEH stated:

The team of Short Elliot Hendrickson Inc. (SEH®) and Kennedy/Jenks Consultants Inc. (KJ) completed the WRF FOG Receiving and Digester Complex Improvements Study for the City, documented in the final report submitted December 30, 2013. The City recognized the need to provide a comprehensive study of the WRF digester complex and energy recovery systems and a feedstock receiving program with co-digestion facilities. The study recommended a capital improvement program to achieve the following project vision:
Replace . . . gas scrubbing equipment and applicable appurtenances with proven, cost effective, equipment and technologies.

Id. ¶ 7 (citation modified); Doc. 132 ¶ 7; see Doc. 96-1 at 9.

On May 28, 2015, Maas of SEH contacted Koers of Azzuro regarding the Project. Doc. 118 ¶ 19. Referencing the October 2013 discussions between SEH and Azzuro, Maas re-initiated discussions with Azzuro about a biotrickling filter system for the City. Id. ¶ 20.

Third Party Defendant Unison Solutions, Inc. provided two options, Thiopaq and BioGas Clean for a gas conditioning system for the Project. Doc. 107 ¶ 17. SEH contacted Azzuro as a third option. Id. ¶ 19. Azzuro provided SEH with several different proposals for the project. Doc. 117 ¶ 20. On June 19, 2015, Azzuro sent an offer and drawing of its proposed biotrickling filter system to SEH. Doc. 118 ¶ 24. On June 22, 2015, Azzuro sent an Offer Package for a Digester Gas Conditioning Facility at a Sioux Falls WRF in South Dakota to SEH. Id. ¶ 25.

The proposals offered by Thiopaq, BioGas Clean, and Azzuro, as well as a comparison of the systems, were all presented to the City in SEH's July 15, 2015, Technical Memorandum— Gas Conditioning Equipment Evaluation and Recommendation. Doc. 107 ¶ 21; Doc. 118 ¶¶ 27– 28. SEH did not make any reference calls regarding Azzuro prior to presenting the Technical Memorandum to the City and recommending the Azzuro system to the City therein. Doc. 118 ¶ 136. The Azzuro proposal was addressed to SEH, whereas the Paques/THIOPAQ® and Varec Biogas proposals were directed to or referenced Unison. Id. ¶ 29; see Doc. 96-12 at 32, 44–45. SEH's Technical Memorandum represented that "Azzuro currently does not have a US Installation on a biogas system. As a result, an installation was not contacted to discuss the operation and performance of the system. Azzuro has two installations worldwide for biogas conditioning systems." Doc. 118 ¶ 31 (emphasis removed). The Technical Memorandum stated that the Azzuro system had the lowest equipment cost and the lowest estimated annual operation cost of the three types of packaged biological filtration systems. Id. ¶ 36. The City employees who were charged with deciding which technology to use for its hydrogen sulfide removal, testified they considered cost "the key factor" in choosing the Azzuro system over the other alternatives presented in the Technical Memorandum. Id. ¶ 39; see Doc. 113-4 at 48:15–18.

The Technical Memorandum stated that no air would need to be added to the biogas for the Azzuro system. Doc. 118 ¶ 40. The Technical Memorandum also stated that Azzuro claimed its system required no maintenance that would remove its system from operation. Id. ¶ 41. SEH did not verify Azzuro's representation regarding maintenance. Id. ¶ 42. The Technical Memorandum stated that it would take up to two weeks to start up the Azzuro system and achieve the < 100 ppmv performance requirement. Id. ¶ 43. The City claims SEH did not verify Azzuro's representation that it would take up to two weeks to start up the Azzuro system and achieve the < 100 ppmv performance requirement. Id. ¶ 44. The Technical Memorandum stated that the Azzuro system would reduce the hydrogen sulfide effluent to below 50 ppmv. Id. ¶ 45. The City claims SEH did not perform any analysis of Azzuro's Sulfatech system that is described in the Technical Memorandum to determine whether it would meet the performance requirements prior to including it in the Technical Memorandum. Id. ¶ 46. The City claims SEH did not verify Azzuro's calculations and representations about its system. Id. ¶ 69. As far as its biological or proprietary processes, the City further claims SEH did not know how the Azzuro system operated. Id. ¶ 137; Doc. 132 ¶ 137.

At the Pre-Design Review meeting held on July 15, 2015, Unison presented information about Paques/THIOPAQ® and Varec Biogas technologies, while SEH presented information about Azzuro. Doc. 118 ¶ 30. Between June 2015 and September 2015, the City, Unison, SEH, and Kennedy Jenks[2] had numerous discussions and meetings about the options for the hydrogen sulfide treatment portion of the Project. Doc. 107 ¶ 22. The City had multiple representatives in every call and meeting considering the information provided and the options for the Project. Id. ¶ 23.

---

[2] The parties have not explained in detail to the Court the precise role Kennedy Jenks played in the Project.

8

On July 29, 2015, Unison received an email from Jon Koch with the City of Muscatine, Iowa, providing an unfavorable review of Azzuro's technology and service. Doc. 118 ¶ 47. Koch stated:

> We would not recommend the Azzuro as we have not found our odor eliminated from the area. We notice that the pH of the water used drops to anticipated low levels in the summer but every winter goes [to a] pH of 7.0 indicating a die off of the biological media. . . . I have not heard from Azzuro in 2 years. We had some issues with the control system but no check up since then. We thought they may be out of business . . . But for all the problems we had starting this up and getting it going I would have thought they would stay in contact with us to see how it was running and they have not.

Id. ¶ 48 (ellipsis in original); see Doc. 96-17 at 1. That same day, Unison forwarded that unfavorable review to SEH. Doc. 118 ¶ 49. SEH never provided or discussed the City of Muscatine's unfavorable review of Azzuro with the City. Id. ¶ 50.

Azzuro presented numerous project references and other information directly to the City, Unison, and SEH. Doc. 107 ¶ 24. On August 3, 2015, SEH exchanged internal emails regarding a positive reference about Azzuro's other technology for odor control from Michael Rasmussen with Viskase. Doc. 118 ¶ 52. On August 6, 2015, Azzuro reached out to Alibeckoff requesting that Alibeckoff talk with SEH about the Azzuro technology at 3M in Elyria, Ohio. Id. ¶ 53. At that time, Alibeckoff worked with Sponcel but had worked with the Azzuro technology at the 3M Elyria facility. Id. ¶ 54. In the August 6, 2015 communications, Alibeckoff asked Azzuro if it had disclosed to SEH that Alibeckoff used to work/consult for Azzuro. Id. ¶ 55. SEH was referred to Alibeckoff because the 3M Elyria facility was represented to the City to be the closest U.S. installation in nature to the City's Project. Id. ¶ 56. The system at the 3M Elyria facility was a different type of system that treated gas for a different purpose and for carbon disulfide, with lower concentrations of hydrogen sulfide and higher air flows between 40,000 and 50,000

cfm. Id. ¶ 57. Alibeckoff was one of four Azzuro employees copied on the October 2013 email between SEH and Azzuro. Id. ¶ 58; Doc. 132 ¶ 58; see Doc. 96-3.

On September 2, 2015, SEH arranged for SEH, Unison, and the City to meet telephonically with Alibeckoff to discuss the Azzuro technology at the 3M Elyria facility. Doc. 118 ¶ 60. The parties had a lengthy call with Alibeckoff where they had the opportunity to ask questions about the Azzuro installation. Doc. 107 ¶ 28. Alibeckoff stated that he had been pleased overall with the Azzuro system equipment, operation, and performance. Doc. 118 ¶ 63; see Doc. 96-8 at 12. SEH and Kennedy Jenks prepared a document entitled "Record of Conversation" summarizing this September 2, 2015 phone conference. Doc. 96-8 at 11–13. Nothing in the Record of Conversation indicates that it was disclosed to the City (or to Unison) that Alibeckoff had previously worked/consulted for Azzuro or had been working for Azzuro at the time of the initial discussions between Azzuro and SEH about the Project in October 2013. Id.; Doc. 118 ¶ 61. SEH never disclosed to the City (or Unison) that Alibeckoff had previously worked/consulted for Azzuro or had been working for Azzuro at the time of the initial discussions between Azzuro and SEH about the Project in October 2013. Doc. 118 ¶ 62.

After the information was gathered, SEH asked the City and Unison about the "consensus" among the parties that they wanted to go with Azzuro. Doc. 107 ¶ 29. The City representatives indicated they wanted to move forward with Azzuro. Id. ¶ 30. In September 2015, it was decided that Azzuro would be the vendor whose proposal would be used for the basis of the contract and specifications for the City's Project. Id. ¶ 31. On September 3, 2015, Maas of SEH corresponded with Koers of Azzuro, discussing the City's gas testing, sizing of the system, and telling Azzuro "[w]e want to make sure we are properly sizing the system" and requesting that Azzuro "let us know if we should revise the average design condition." Doc. 118

10

¶ 65 (alteration in original); Doc. 132 ¶ 65; see Doc. 96-22. On September 16, 2025, Azzuro provided SEH updates to the June 22, 2015 proposal, stating that the updates were a follow-up to "our various telephone conversations." Doc. 96-23; Doc. 118 ¶ 66; Doc. 132 ¶ 66. On September 23, 2015, Azzuro sent SEH an updated Offer Package for the Project. Doc. 118 ¶ 67.

SEH sought input from Unison and Azzuro with respect to specifications to be used for the Project that were reviewed and commented on prior to the formal City contract being issued. Doc. 107 ¶ 36. The draft specifications for the Project were presented to SEH by Unison and Azzuro for SEH's use in generating the bid design and specifications for the Project. Id. ¶ 37.

On March 14, 2016, SEH provided Specification Section 43 32 59 – Digester Gas Conditioning Equipment to the City, which on one page, stated:

> 2. The Gas Conditioning System shall include the following Equipment/Sub-systems:
>
> a. Hydrogen Sulfide Removal System (AZZURO)

Doc. 118 ¶ 70; Doc. 132 ¶ 70; Doc. 96-26 at 2. Another page of the specification stated:

> **2.04 HYDROGEN SULFIDE REMOVAL SYSTEM**
>
> A. Acceptable Manufacturer
> 1. Azzuro
> 11574 E. Running Deer Trail
> Scottsdale, AZ 85262
> Tel: 602.903.3918
> 2. Approved Equal

Doc. 96-26 at 8 (citation modified); Doc. 118 ¶ 70; Doc. 132 ¶ 70.

The City argues that SEH did not have the expertise to draft the specifications relating to the hydrogen sulfide removal equipment, and instead SEH had Unison and Azzuro provide input for those specifications. Doc. 118 ¶ 71; Doc. 132 ¶ 71 (citing Doc. 104-6 at 150:7–15). Compliance with those specifications was required for any potential bidder to be awarded a

11

contract. Doc. 118 ¶ 146. SEH was required to review bids and proposals to confirm they complied with the bid specifications. Id. ¶ 145.

The City issued a Bid Request for Digester Gas Conditioning Equipment for the City of Sioux Falls South Dakota (Bid request No. 16-0077), which included the Digester Gas Conditioning Equipment Specification Section 43 32 59 that had been prepared by SEH (with input from Unison and Azzuro). Id. ¶ 72. That Bid Request No. 16-0077 included a hydrogen sulfide system discharge requirement of < 100 ppmv. Id. ¶ 73. The bid specification did not include a minimum or maximum amount of oxygen content for the biogas inlet conditions. Id. ¶ 74. It stated under inlet gas conditions, "Oxygen ($O_2$) 1%." Id. When asked at deposition, "[h]ow was the oxygen going to reach 1 percent if we know that the oxygen had never met that level," Dustin Maas of SEH stated, "it would be a typo. . . . It's incorrect" Id. ¶ 156; Doc. 61-1 at 154:14–18. At deposition, John Friel of SEH stated that he did not "know the significance of oxygen compared to hydrogen sulfide for the sizing of the system and the proprietary system." Doc. 118 ¶ 157; Doc. 113-3 at 94:7–9.

On April 6, 2016, Azzuro submitted a "Bid Package for Specification 16-0077, Section 43 32 59 for a Digester Gas conditioning Facility at a Sioux Falls WRF in South Dakota – M16EO865-Rev.1)" dated April 6, 2016, for the design and supply of an engineered Biogas Desulfurization System, to Unison for Unison to incorporate into its bid request. Doc. 118 ¶ 76. Azzuro represented its system to be "Azzuro's standard Sulfatech System," a proven biogas desulfurization system with a performance guarantee that it would reduce the hydrogen sulfide level in the City's biogas to < 100 ppmv in accordance with the Bid Specifications. Id. ¶ 89. Bonno Koers of Azzuro would later testify that he told SEH the Project "was the first [Azzuro] unit for a municipal wastewater treatment plant . . . in the [United States]." Id. ¶ 91; see Doc. 96-

15 at 37:8–22. Koers testified that there is no such thing as a "standard" Azzuro system. Doc. 118 ¶ 90; see Doc. 62-1 at 163:6—164:22. He also testified that the first Sulfatech system was piloted after 2016. Doc. 118 ¶ 90; Doc. 62-1 at 126:1—128:6.

On April 7, 2016, Unison submitted its proposal to the City, attaching and incorporating Azzuro's bid package. Doc. 107 ¶ 41. On April 11, 2016, SEH wrote to the City to "provide background information related to the equipment procurement to assist and support the approval and award of the bid received from Unison Solutions on April 7, 2016." Doc. 118 ¶ 82. According to the City, SEH's design for the Project (and Azzuro's design of its Sulfatech system incorporated into SEH's design) included no mechanism or process for either the monitoring of the oxygen levels in the influent biogas or for the injection of additional oxygen into the biogas. Id. ¶ 88. On April 14, 2016, the City issued a bid award recommendation recommending the award of the supply contract to Unison. Doc. 107 ¶ 42. The contract documents contained performance requirements for the systems, including the Azzuro system. Doc. 117 ¶ 43. The contract document stated:

> Failure of the Gas Conditioning System to meet the performance requirements listed in Paragraphs 2.03A.4 and 2.03A.5, given influent digester composition and characteristics listed in Paragraphs 2.03A.1, 2.03A.2, and 2.03A.3 shall be cause for replacement or repair of the Gas Conditioning System at the Manufacturer's expense.

Id. ¶ 44 (citation modified); see Doc. 71-12 at 38.

That performance guarantee was added as Addendum No. 2 to the Contract and dated April 4, 2016, which was before the Contract being bid and agreed upon by Unison and Azzuro. Doc. 107 ¶ 45.

The City contracted with Unison Solutions, Inc. for the supply of the equipment for the Project. Id. ¶ 10. Unison, in turn, contracted with Azzuro, Inc. for the biological hydrogen

13

sulfide removal system. Id. ¶ 11. Unison was directly responsible to the City for supplying all of the equipment to the City. Id. ¶ 13. A part of that equipment included the Azzuro system. Id. ¶ 14. Azzuro was a sub-supplier to Unison and provided a Sulfatech system for hydrogen sulfide removal. Id. ¶ 15; Doc. 117 ¶ 15.

On July 22, 2016, SEH submitted its proposal to the City for construction administration services. Doc. 118 ¶ 92. The proposal's project schedule provided for a final completion date of April 30, 2017. Id. ¶ 93; Doc. 132 ¶ 93; see Doc. 96-33 at 1, 5. On August 24, 2016, the City and SEH entered into an Agreement Between City and Engineer for Professional Services to Conduct Construction Administration for the Project. Doc. 118 ¶ 94. Pursuant to that construction administration contract, SEH was contractually obligated to do the following, among other tasks:

a. Provide professional engineering services for the City in all phases of the Project.

b. Serve as the City's professional engineering representative for the Project.

c. Give professional engineering consultation and advice to the City regarding the project.

d. Perform professional services, which include customary engineering services.

e. Become familiar with the construction contract documents and the construction site.

f. Consult with and advise the City and act as its representative. All of the City's instructions to Contractor(s) will be issued through the Engineer who will have authority to act on behalf of the City to the extent provided in the specifications except as otherwise provided in writing.

g. Provide a field representative (Representative) with sufficient background and training to conduct required on-site contract provisions. The Representative shall be present during all meaningful work and keep accurate records of all work observed. The Representative shall have in

14

possession and be thoroughly familiar with all construction plans, special provisions, and standard specifications.

h.    Observe the progress and quality of the executed work of Contractor(s) and determine if the work is proceeding in accordance with the Contract Documents.

i.    Notify Contractor(s) immediately of any work, material, or equipment that is determined not to be in compliance with the Contract Documents.

j.    [Endeavor to] [g]uard the City against defects and deficiencies in such work.

k.    [The contract allowed SEH to] [d]isapprove or reject work failing to conf[o]rm to the Contract Documents.

l.    Be responsible for the day-to-day quality control (inspection) aspects of the work, materials, and equipment constructed or installed with the project. Inspection work will require on-site observation of the installation. Field personnel shall be on site whenever a critical task is being completed.

m.    Review the results of tests and inspections and other data performed or submitted for the Project, but only for conformance with the design concept of the Project and compliance with the information given in the Contract Documents, determine the acceptability of substitute material and equipment proposed by Contractor(s); and receive and review (for general content as required by the Specifications) maintenance and operating instructions, schedules, guarantees, bonds, and certificates of compliance which are to be assembled by Contractor(s) in accordance with the Contract Documents.

n.    [J]udge the acceptability of the work [under the requirements of the Contract Documents] and make recommendations on all claims of the City and Contractor(s) relating to the acceptability of the work or the interpretation of the requirements of the Contract Documents pertaining to the execution and progress of the work.

o.    Prepare and/or keep reports on daily construction activity and field testing.

p.    Conduct a preliminary construction review to determine if the Project is substantially complete and a final site review to determine if the work has been completed in accordance with the Contract Documents. Based upon the reviews, the Engineer shall determine if each Contractor has fulfilled its contract obligations.

Id. ¶ 95; Doc. 132 ¶ 95; Doc. 113-2 at 128–43.

15

Pursuant to that construction administration contract, SEH was further contractually obligated to do the following, among other tasks:

a.    Review manufacturer O&M submittals and provide review comments back to Contractor.

b.    Review gas conditioning system operational testing data, provided by manufacturer, for compliance with specified performance requirements for initial functional test and email manufacturer regarding reviews.

c.    [Provide] review [of] performance test data, provided by manufacturer, 2 months and 6 months following beneficial use of the Gas Conditioning System and email manufacturer regarding reviews.

Doc. 118 ¶ 96; Doc. 132 ¶ 96; see Doc. 113-2 at 138–39.

Unison's system was fabricated and assembled before being delivered to the City. Doc. 107 ¶ 48. Azzuro's equipment was delivered directly to the City. Id. ¶ 49. The Bid Specifications provided that the hydrogen sulfide removal system shall be tested on ambient air at the manufacturer's facility and witnessed by the gas conditioning system manufacturer prior to shipment, and that the Owner and Engineer shall be allowed to witness the testing at the manufacturer's facility. Doc. 118 ¶ 99. No one from SEH witnessed or observed testing of the Azzuro system before it was delivered and installed. Id. ¶ 100. In an abstract submittal describing the Project, SEH stated the "review should include correspondence with operators of installed systems." Id. ¶ 135; Doc. 132 ¶ 135; Doc. 113-1 at 28. SEH did not visit the Azzuro facility or any Azzuro installation. Doc. 118 ¶ 134. AB Contracting was the general contractor for installing the Azzuro system. Doc. 107 ¶ 51. SEH went to the Sioux Falls site to observe the construction between five and ten times and for progress meetings during the construction phase of the Project. Doc. 118 ¶ 98. The Azzuro system was installed at the City's Water Reclamation Facility in the spring of 2017 by AB Contracting, in accordance with SEH's bid design and specifications. Id. ¶ 101.

16

In May 2017, Azzuro determined the Azzuro Sulfatech System was properly installed and ready for start-up, and therefore, Azzuro started the system up and operated it for several weeks. Id. ¶ 102. On July 25, 2017, SEH and HR Green recommended that the City accept the Final Completion of the Water Reclamation Facility – Digester Gas Conditioning as of July 14, 2017, and noted that "[t]he work was constructed to Final Completion in accordance with the plans, specifications, contract documents, and change orders governing this project." Doc. 61-1 at 215; Doc. 118 ¶ 106. The Azzuro system underperformed and did not meet the hydrogen sulfide system discharge requirement. Doc. 107 ¶ 53. The Azzuro system operated for over two months but never met the < 100 ppmv hydrogen sulfide performance requirement. Doc. 118 ¶¶ 108–09. The City sent Unison a Notice and Request for Immediate Update and Completion Plan on August 29, 2017. Id. ¶ 112. Therein, the City formally noted outstanding punch list items and required "[s]tartup and performance testing of the system . . . to occur on or before September 27, 2017." Id. ¶ 113; Doc. 132 ¶ 113; Doc. 96-35 at 1–2.

In September 2017, the City brought in Jim Postiglione, PE of HR Green to assist the parties in troubleshooting the Azzuro system because it was not reaching the performance requirement or performance guarantee, and Postiglione raised concerns about the biogas oxygen level and suggested that the Azzuro system may not be working because the oxygen level was too low. Doc. 118 ¶ 114. In October 2017, with Azzuro and SEH's agreement, Unison installed an ambient air injection point to supply additional oxygen to the biogas going into the Azzuro system. Id. ¶ 115. The Azzuro system was restarted under the direction of Azzuro on October 17, 2017, with the ambient air injection system in place to provide up to 1% oxygen. Id. ¶ 116. The Azzuro Sulfatech system was not able to achieve the performance requirement or performance guarantee of reducing the hydrogen sulfide levels in the City's biogas to < 100

ppmv with the air injection and an inlet oxygen level of one percent. Id. ¶ 117. Azzuro restarted and operated the Azzuro Sulfatech system for 7 consecutive weeks (October 17-December 8, 2017) without interruption and with an air injection system that allowed for the injection of oxygen up to 1%, and the Azzuro Sulfatech system did not achieve the performance requirement by the parties' agreed upon six-week deadline. Id. ¶ 118. While the performance improved slightly with the 1% oxygen injection, the Azzuro Sulfatech performance leveled out immediately with no further improvement and never reduced the hydrogen sulfide discharge to < 1,000 ppmv. Id. ¶¶ 119–20.

After eight months of troubleshooting and attempting to get the Azzuro Sulfatech system to work, Azzuro was unable to get the Azzuro Sulfatech system to achieve the performance requirement of reducing the hydrogen sulfide. Id. ¶ 123. The Azzuro Sulfatech system was shut down on December 8, 2017, and winterized thereafter because the system did not achieve the performance requirement by the parties' agreed upon six-week deadline for the second start-up attempt. Id. ¶ 124. Azzuro repeatedly admitted to the City that it did not know why its system was not working as designed. Id. ¶ 125.

Azzuro stated it was "working on a plan that [would] provide [the City] with a Thiopaq like solution" as a replacement. Doc. 117 ¶ 54; see Doc. 59-15 at 1. The City never okayed Azzuro to move forward with the "Thiopaq-like" system. Doc. 107 ¶ 55. When the City would ask Azzuro questions about its proposed "Thiopaq-concept" replacement, the City claims it would take Azzuro several weeks to respond and Azzuro failed to answer the questions to the City's satisfaction so that it could determine whether the proposed replacement system would work. Doc. 118 ¶ 127. The City had significant concern that Azzuro did not have the expertise necessary to design and build a system similar to a "Thiopaq-concept" and that proceeding with

18

Azzuro's proposed replacement plan would be a pilot program for Azzuro, which was too risky for the City. Id. Azzuro repeatedly requested that the City allow it to restart the Azzuro Sulfatech system again, an option unacceptable to the City. Id. Patti Craddock of SEH testified that she agreed with the City's position to explore a replacement system because the City was not getting the responses that they needed from Azzuro. Id. ¶ 129.

## II.    Facts Related to SEH's <u>Daubert</u> Argument

As part of this litigation, the City identified Lowell E. Howard, PE, who was deposed on March 27, 2025, as its expert as to the standard of care applicable to SEH's services. Doc. 107 ¶ 58. Derek S. Webb, PE, MBA, who was deposed on April 16, 2025, was offered by SEH as its outside retained expert as to the standard of care applicable to SEH's services and that SEH complied with the standard of care. Id. ¶ 59. SEH also identified non-retained experts, John Friel, PE, Patti Craddock, PE, Dustin Maas, PE, and Susan Danzl, PE, to testify that SEH complied with the applicable professional standard of care. Id. ¶ 60.

The testimony from Howard's deposition that forms the basis for SEH's <u>Daubert</u> argument, <u>see</u> id. ¶¶ 61–76, follows, with bold typeface from the transcript omitted. The Court includes testimony both before and after that cited in SEH's memorandum to provide context.

Q.    Have you ever been involved with a project in what you would consider the same capacity that SEH was involved with this project for the City of Sioux Falls?

A.    I would say there are many times that I was involved in those kinds of roles, but strictly as an outside consultant for the type of -- I would have been a consultant to SEH is what I'm trying to imply, rather than a member of SEH.

The SEHs of the world would come to me and say, "Can you help us with reviewing some of these portions of our specifications and giving us some insights as to whether we need to upgrade them, or could you write a particular section?" Or whatever.

There are a lot of things I've done over the years that gave me the opportunity to participate with those kinds of companies.

Q.    Did you ever work with SEH on any project?

A.    No, never have.

Q.    Did you ever work with Kennedy Jenks on any project?

A.    Yes.

Q.    Which projects?

A.    I can't remember. I just remember having something to do with them.

Q.    But as far as -- so you would be a subconsultant to the bigger engineering firms, like SEH, Jacobs, and all of them. Right?

A.    Yes. That's correct.

Q.    You've never been in the position of SEH or Jacobs or CH2M Hill on those projects? Is that fair?

A.    That's absolutely true.

Doc. 104-3 at 37:5—38:11.

Q.    So why did you form West Coast Energy Systems?

A.    I wanted to separate the manufacturing from the consulting.

Q.    So the projects that ESC did, you were operating -- ESC was operating in a similar capacity to what Azzuro operated in for the Sioux Falls project. Right?

A.    Yes.

Q.    Designing, manufacturing, supplying equipment for the biogas industry?

A.    That's correct.

Q.    So West Coast Energy Systems is more consulting engineer type work?

A.    That's fair.

20

Q. Has West Coast Energy Systems designed, manufactured, supplied any systems for the biogas treatment industry?

MR. LANDON: Objection. Form of the question. You can answer. I just worry that the three were tied together.

A. No.

BY MR. WHEELER:
Q. West Coast Energy Systems is just providing design and consulting engineering services to clients?

A. That's correct.

Q. And that would be more like the role that SEH performed on the City of Sioux Falls project. Right?

A. I would have to say no.

Q. And why not?

A. Well, SEH is an organization that offers overall project design and specification writing for clients, similar to other large consulting firms, CH2M Hill, Kennedy Jenks, Jacobs, all of those people who I've worked with. They are more of a design-build organization.

Where myself, I was just -- we didn't write specifications. We typically bid on projects and performed, installed, and even operated those systems with annual maintenance contracts, that sort of thing.

Q. Okay. Let me make sure we're on the same page. I'm asking about West Coast Energy Systems --

A. Oh, okay. I'm sorry.

Q. -- as a consulting engineer, more similar to the role that SEH played on this project for the City of Sioux Falls. Would you still disagree with that?

A. I would still disagree with that. Yes.

I can't see that there's a parallel there between the two companies.

Id. at 35:6—37:4.

Q. My question is have you ever operated under a contract that you would consider to be similar to the contract that SEH had with the City in that role?

A.    No.

Id. at 51:19–22.

Q.    Have you ever designed or manufactured a biological system like the one at issue here?

A.    No.

Q.    Have you ever worked on a biological desulfurization system like the one at issue here?

A.    Not that I can remember.

Q.    Have you ever consulted any clients regarding the use of a biological system like the one at issue here?

A.    Not that I can remember.

Id. at 124:15–24.

Q.    And how do you know the standard of care that SEH was supposed to comply with for its services on this project?

A.    In all the years of my experience with the various consulting engineering firms, and, again, I've mentioned them before, Carollo, Jacobs, CH2M Hill, I've worked on many of those projects, and the specifications that were written by those consulting engineering firms to procure equipment, similar to what Azzuro bid on in this particular project and Unison bid on in this particular project, were similar to what SEH created for this project.

The fact that they did not enforce those specifications is highly unusual to me, because in all the projects that I've been involved with, those consulting engineers that I just mentioned crossed every "T" and dotted every "I" and insisted on adherence to every paragraph and sentence of every specification section that they ever created for these kinds of projects.

Q.    And that's based on your observation of how the Jacobs and the CH2M Hills handled their projects?

A.    Yes.

Q.    You didn't actually serve in the role of those companies in enforcing those specifications?

A.    No, I did not.

Id. at 59:9–60:9.

Q.    Can you identify for me any projects where you observed the Jacobs or other engineering firms, in a similar role to what SEH played on the City of Sioux Falls project, having to make determinations as to companies who were involved in providing biological and chemical processes for the removal of high levels of hydrogen sulfide for biogas?

A.    All of them.

Q.    What does that mean? What projects?

A.    Every project that I've worked on in the last 30, 40 years, the consulting engineering firm, whether it be, as you so point out, as the Carollos or the CH2M Hills, have gone through the process of vetting the bidders on a particular project to meet their specifications.

      I have not had any that did not meet that requirement you just suggested.

Q.    I understand that. But I'm asking specifically with respect to technology similar to what Azzuro provided on this project for the biological and chemical process for removing high levels of hydrogen sulfide from biogas, and that's how you described it.

      What projects have you seen or observed where the big engineering firms were vetting that process?

A.    I don't recall any.

Id. at 61:13—62:12.

Q.    Do you have any official accreditations in your role as an engineer?

A.    No.

Id. at 39:10–12.

Q.    Just briefly. I've got your CV in my hand here. Your degree is in mechanical engineering?

A.    That's correct.

Q.    What about any degrees in chemical engineering?

23

A. None.

Q. Biochemical engineering?

A. None.

Id. at 127:1–7.

Q. One of the things that you say in your report is that, "I am an expert in the biogas industry."

Do you see that?

A. I do.

Q. Has any entity, organization, outside company, that type of thing, ever acknowledged you as an expert in the biogas industry?

A. I don't recall anybody describing or documenting that I am an expert in the biogas industry. I've played the role.

Like recently with Jacobs Engineering, they hired me as a consultant to do a plant review for them. They came to me because I was an expert in biogas.

I don't know that any of our documentation says, "We're retaining Mr. Howard as an expert in biogas."

I was a professional engineer rather than a biogas expert, by definition.

Q. But when we see you say, "I'm an expert in the biogas industry," that's just your own statement based on your history and experience and all that kind of stuff. Right?

A. Yes.

Q. No other entity has said and written that, "Mr. Howard is an expert in the biogas industry."

Is that fair?

A. Possibly. I don't know if it's fair or not.

Q. You haven't seen anything that says that?

A. Not to my recollection.

<u>Id.</u> at 39:13—40:16.

Q. If there is a living system, does that system need to develop or establish itself before it can hit, I guess, performance parameters?

A. Well, of the documents I read, it appears as if Azzuro was suggesting anywhere up to two to four weeks.

Q. In what documents did you see that?

A. I do not recall.

Q. But you would agree that it takes some amount of time for the biology in this case on this system to develop?

A. That's true.

Q. But that's based on the documents you've read. Not based on any outside or personal knowledge that you have through your years of working in this industry?

A. That's correct.

<u>Id.</u> at 149:12—150:2.

Q. And you recall that Adam Klaas was actually the one who talked with the Muscatine folks. Right?

A. I don't recall that.

Q. You don't recall one way or the other, or you don't believe that it was him that was tasked with that?

A. I don't recall one way or the other. It may have been Adam Klaas. I don't know. It was one of the 85,000 documents that I skimmed.

<u>Id.</u> at 105:17–25.

Q. Sure. Did you rely upon any industry standards, written publications, that kind of thing, outside standards in determining that SEH's conduct fell below the standard of care on this project?

A. No.

Q.      Are you familiar with any written standards, industry standards, that type of thing, that would tell you what the standard of care would be for SEH on this project?

A.      No.

Id. at 60:15–24.

Q.      What is the difference between the Azzuro system, the Thiopaq clean system and the -- I mean the Thiopaq system and the Biogasclean system?

A.      I do not have an understanding of their systems.

Id. at 144:4–7.

Q.      Do you recall seeing in the documents and depositions where the initial idea for using a biological system to treat the hydrogen sulfide originated?

A.      I do not.

Q.      So you don't know whether it started with SEH or the City or Unison or someone else?

A.      No.

Q.      Does it matter to you?

A.      No.

Q.      Would it matter to you if SEH had initially recommended more conventional means for treating the hydrogen sulfide, and it was the City's request that SEH look at the biological processes?

A.      No.

Q.      Why not?

A.      Again, this was a relationship between the City and SEH, and I have no idea of what concepts or cost parameters or operation and maintenance costs or any of those kinds of things evolved out of the conversations prior or during or after the contract between SEH and the City.

So that's impossible for me to comment on that.

Id. at 112:4—113:1.

## III.    Discussion

### A.    Summary Judgment Standard

"Summary judgment is proper only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Allan v. Minn. Dep't of Hum. Servs., 127 F.4th 717, 720 (8th Cir. 2025) (quoting Avenoso v. Reliance Standard Life Ins. Co., 19 F.4th 1020, 1024 (8th Cir. 2021)). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citation modified). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Celotex Corp., 477 U.S. at 324). At the summary judgment stage, the Court must view evidence "in the light most favorable" to the nonmoving party. Tolan v. Cotton, 572 U.S. 650, 657 (2014) (per curiam). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). But "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Torgerson, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

27

**B.      SEH's Motion for Summary Judgment**

**1.      Exclusion of Lowell Howard's Testimony as to the Standard of Care**

SEH's first argument centers on the City's expert, Lowell Howard, who SEH considers unqualified to testify as to SEH's requisite standard of care. Doc. 105 at 8–18. SEH argues that the City's claims against SEH are all based in negligence. Id. at 8. And it argues that only an expert can establish the professional standard of care SEH allegedly fell below. Id. at 8–9. But Howard's testimony, SEH argues, is unreliable for that purpose because it "is simply the product of his own speculation," and irrelevant to this matter because Howard lacks the requisite "specialized scientific knowledge" and cannot opine "specifically to the relationship between the City and SEH." Id. at 14–17. And without an expert, SEH argues the City's claims all fail as a matter of law. Id. at 8.

The City responds that (1) "SEH has not filed a motion in limine/Daubert motion," so the "evidentiary issue is not properly before this Court"; (2) "Howard easily meets Rule 702's threshold of admissibility"; (3) expert testimony is unnecessary to prove its claims; and (4) the City's claims are supported not only by Howard's testimony, but also by its hybrid witnesses and SEH's retained expert. Doc. 116 at 7–28.

As to the City's first argument, the Court is unaware of, and the City does not cite to, any case suggesting the Court may not consider SEH's Daubert argument as part of SEH's motion for summary judgment. At this stage, it is the Court's duty to "ensure that the nonmoving party has at least a scintilla of evidence in support of its position." Morgan v. UPS, 380 F.3d 459, 468 (8th Cir. 2004). Where the existence of that scintilla depends on the reliability of the expert offering it, a Rule 702/Daubert argument fits comfortably within the summary judgment framework. The law grants a district court wide latitude in deciding "*how* to determine reliability." Kumho Tire

28

Co. v. Carmichael, 526 U.S. 137, 142 (1999).  That latitude extends to deciding "whether or when special briefing or other proceedings are needed to investigate reliability."  Id. at 152.  Some courts require Daubert-dependent summary judgment arguments to "be made as part of that party's summary-judgment motion and not in a separate Daubert motion."  Crushshon v. PHH Mortg. Corp., No. 23-CV-0149 (PJS/TNL), 2025 WL 881452, at *1 (D. Minn. Mar. 6, 2025).  Another common convention is for separate motions in limine to accompany a motion for summary judgment.  32 Moore's Federal Practice § 23.353 (3d ed. 2026).  But a deviation from that convention, or the "failure to correctly characterize [the] motion should not necessarily preclude its consideration or otherwise impact its disposition."  Id.  The City is aware of SEH's Rule 702/Daubert arguments.  The parties have had the opportunity to brief their positions.  The Court considers the argument ripe for determination as it relates to this stage in the litigation.

"In a diversity case, questions about the admissibility of evidence are governed by the Federal Rules of Evidence."  Valadez v. Watkins Motor Lines, Inc., 758 F.3d 975, 980 (8th Cir. 2014) (citing Bradshaw v. FFE Transp. Servs., Inc., 715 F.3d 1104, 1107 (8th Cir. 2013)).  "For a state law claim, a federal court may look to state law to determine witness competency in a civil action, Fed. R. Evid. 601, but it must use federal law for admissibility of expert testimony."  Shipp v. Murphy, 9 F.4th 694, 701 (8th Cir. 2021) (citing Fox v. Dannenberg, 906 F.2d 1253, 1255 (8th Cir. 1990)).

In South Dakota, "[e]very person is competent to be a witness unless otherwise provided in [its rules of evidence]."  SDCL § 19-19-601.  The Court locates no rule further implicating Lowell Howard's competency.  For matters of expert qualification, South Dakota relies on its Rule of Evidence 702, analogous to Federal Rule of Evidence 702, which along with the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc. governs the

29

admissibility of expert testimony in federal court. Allstate Indem. Co. v. Dixon, 932 F.3d 696, 701 (8th Cir. 2019) (citing 509 U.S. 579 (1993)). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Eighth Circuit has winnowed down that rule into three criteria of admissibility: "(1) 'the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant'; (2) 'the expert must be qualified to assist the finder of fact'; and (3) 'the testimony must be reliable or trustworthy in an evidentiary sense.'" Crabar/GBF, Inc. v. Wright, 142 F.4th 576, 587 (8th Cir. 2025) (quoting In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig., 9 F.4th 768, 777 (8th Cir. 2021)). "The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001) (citing Daubert, 509 U.S. at 592).

"Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." Fed. R. Evid. 401 (citation modified). An expert's specialized knowledge assists the trier of fact when his "testimony advances the trier of fact's understanding to any degree." United States v. Gutierrez-Ramirez, 930 F.3d 963, 968 (8th Cir. 2019) (per curiam) (quoting United States v. King, 898 F.3d 797, 806 (8th Cir. 2018)).

30

"Whether a witness is qualified to testify as an expert is normally within the discretion of the trial court." Moran v. Ford Motor Co., 476 F.2d 289, 291 (8th Cir. 1973). His qualification, as Rule 702 states, may be "based upon his knowledge, skill, experience, training or education." Id.; see Fed. R. Evid. 702. "[P]ractical experience as well as academic training and credentials may be the basis of qualification." Moran, 476 F.2d at 291 (citation omitted). "[F]or an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion." Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009) (citing Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 283–84 (8th Cir. 1995)).

"A district court has great latitude in determining whether expert testimony meets the reliability requisites of Rule 702." Sprafka v. Med. Device Bus. Servs., Inc., 139 F.4th 656, 660 (8th Cir. 2025) (quoting In re Wholesale Grocery Prods. Antitrust Litig., 946 F.3d 995, 1000 (8th Cir. 2019)). "Expert testimony is inadmissible where . . . it is excessively speculative or unsupported by sufficient facts." Barrett v. Rhodia, Inc., 606 F.3d 975, 981 (8th Cir. 2010) (citing Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056–57 (8th Cir. 2000)).

While the conclusions of the City's breach of contract claim are that SEH "failed to repair or replace the Azzuro system," and "breached [its] contractual agreement[ ] to provide the City" with a system that meets certain performance requirements, the claim is premised on SEH's contractual agreement to "provide professional engineering services for the City in all phases of the Project, to serve as the City's professional engineering representative for the Project, and to give professional engineering consultation and advice to the City regarding the Project." Doc. 1 ¶¶ 45–46, 50–51. And so, SEH argues the claim requires the establishment of a professional standard of care and proof that SEH did not meet that standard. The Court agrees.

31

"Expert testimony is needed to establish the standard of care of a professional unless the area is within the common knowledge and comprehension of the ordinary laymen." Mid-W. Elec., Inc. v. DeWild Grant Reckert & Assocs. Co., 500 N.W.2d 250, 255 (S.D. 1993) (citation omitted). The City inherently invokes a professional standard of care when it cites SEH's promise to provide professional engineering services. The Court does not believe it is within the province of the layman to understand what it means to render professional engineering services without the assistance of expert testimony. See RTI, LLC v. Pro Eng'g, Inc., 28 N.W.3d 167, 179 (S.D. 2025). While the City appeals to the simplicity of the issues such that an expert is unnecessary, its argument is betrayed by the first of its numerous alleged "breaches of the design contract,"—"SEH's failure to select gas conditioning equipment that could accomplish the primary purpose of the Project." Doc. 116 at 8. The Court has scoured the entire design contract, Doc. 96-1, and there is no such contractual provision. Presumedly, then, the City is arguing that such selection of equipment was an obvious component of the "professional engineering services" contemplated by the contract. Id. at 1. But a layman could only agree with that conclusion and decide whether SEH *failed* to *select* equipment that *could* accomplish the primary purpose, if assisted by an expert establishing the engineer's professional standard of care.

The same is true for the City's negligence claim, which cites "SEH's engineering services on the Project" as falling "below the standard of care" because the Azzuro system did not meet specified requirements. Doc. 1 ¶ 96. Whether that result dictates a conclusion of negligence is beyond the knowledge of a layman and must be established through expert testimony. The City distills its argument through the lens of dozens of facts supposedly understandable by a layman, such as "South Dakota law requires SEH and its engineers to confine their professional services

32

to the profession and technical field in which they are licensed and competently qualified," Doc. 116 at 14, the inference being SEH was not competently qualified. But a layman cannot know whether an engineer is competently qualified for a particular project without an expert to assist in that analysis.

The City's comparison to Bland v. Davison County is unhelpful. Id. at 13 (citing 566 N.W.2d 452 (S.D. 1997)). In that case, the South Dakota Supreme Court remarked that "[a]nyone who has owned and maintained a sidewalk, driveway or even driven a car in South Dakota during the winter would be able to form their own conclusion as to whether a reasonable standard of care requires that an icy road be sanded." 566 N.W.2d at 462. The competence of professional engineers, in contrast, is not a shared South Dakotan experience.

The City's citation to Mid-Western Electric is closer. See Doc. 116 at 13. In that case, concerning an electrical contractor, the court noted that it was "within the understanding of the ordinary layman that failure to review plans and specifications or failure to submit a required form noting variance from specifications may fall below a professional standard." 500 N.W.2d at 255. Some of the City's alleged facts, too, nod to binary decisions where a layman might agree SEH made the wrong choice. E.g., Doc. 116 at 14 ("SEH admits it made no effort to contact or vet the purported 'two worldwide installations' of Azzuro biogas conditioning systems and did nothing to verify that they even existed."). But not all of the City's accusations are so facile. Many implicate the very design of a system meant to reduce hydrogen sulfide from effluent. Doc. 1 ¶¶ 94–100; See, e.g., Doc. 116 at 16–17. For these complex considerations, South Dakota favors expert testimony to establish a standard of care. See Doc. 131 at 3–4 (citing Luther v. City of Winner, 674 N.W.2d 339, 346 (S.D. 2004) (expert necessary for claim attacking engineer's design of sidewalk)); see also RTI, LLC, 28 N.W.3d at 182–83 (expert necessary for

33

claim attacking engineer's design of HVAC system).  Here, too, the Court concludes the jury will need expert assistance to establish the standard of care for the City's negligence claim.  This testimony will have the added benefit of assisting the jury's understanding of competence and reasonable care when it turns to the City's negligent misrepresentation claim.  See Fisher v. Kahler, 641 N.W.2d 122, 126–27 (S.D. 2002) (citing Restatement (Second) of Torts § 552).

The Court further believes the City's expert, Lowell Howard, can assist the trier of fact in establishing the requisite standard of care.  The standard of care for "all professions" in South Dakota is to "have that degree of learning and skill ordinarily possessed by [engineers] of good standing engaged in the same type of practice in the same or similar locality."  In re Yemmanur, 447 N.W.2d 525, 528 n.3 (S.D. 1989) (quoting Lenius v. King, 294 N.W.2d 912, 913 (S.D. 1980)).  Howard is an engineer and decades-long veteran in the biogas industry.  He has experience working on biogas projects with, and consulting for, large engineering firms such as SEH.  Howard has written specifications for such firms and consulted for such firms to help them understand specifications.  Working alongside these companies, not simply as a detached observer, Howard has garnered through his 40 years of experience an understanding of the standard of care large engineering firms normally exercise when working on projects such as here.  In the Court's judgment, Howard clears the hurdles of Rule 702 and Daubert.

After considering Howard's reports, opinions, and testimony, and the entire record, SEH does not succeed on its theory for summary judgment.  Questions of material fact remain in dispute on the City's allegations of negligence for not properly performing engineering services.  Likewise, questions of material fact remain on whether contract provisions were breached.  Finally, questions of material fact remain on the City's claim of negligent misrepresentation.  The Azzuro system did not work as intended.  SEH contracted with the City to provide professional

34

engineering services for the Project, including providing consultation and advice, and recommending a biofilter system for hydrogen sulfide treatment. The City argues SEH received an unfavorable review of the Azzuro system from another municipality and did not pass it on to the City. Further, the City argues Alibeckoff was never disclosed as being a former Azzuro employee when he was utilized as a reference to vouch for the Azzuro system. After viewing all of the parties' submissions, and considering the evidence in the light most favorable to the City, the Court believes genuine issues of material fact remain on all of the City's claims against SEH.

Because the Court finds Howard's testimony admissible to establish the requisite standard of care, the Court does not consider the City's arguments for and SEH's arguments against the testimony of the City's hybrid witnesses at this time. To the extent any party wishes to exclude the specific testimony of any such witness, it may attempt to do so with a motion in limine before trial. To the extent SEH argues Howard's inability to opine on the oxygen requirements of the Azzuro system, Doc. 105 at 14–16, this Court has rejected that position. See City of Sioux Falls v. Azzuro, Inc., No. 4:22-CV-04052-ECS, 2026 WL 821640 (D.S.D. Mar. 25, 2026).

### 2. The City's Failure to Mitigate Damages

SEH alternatively argues that it "is entitled to partial summary judgment as to the majority of the damages being claimed [because] [t]he City has completely failed to mitigate its damages." Doc. 105 at 18–19. The City responds that its initial attempt to enforce Azzuro's performance guarantee demonstrated reasonable efforts to mitigate. Doc. 116 at 29–33.

SEH argues that by not exercising its contractual right to have Azzuro provide a replacement system, the City failed to mitigate and should be prevented from recovering the

damages associated with procuring a replacement system. Doc. 105 at 18–21. It notes the contractual language with Unison that stated:

> Failure of the Gas Conditioning System to meet the performance requirements listed in Paragraphs 2.03A.4 and 2.03A.5, given influent digester composition and characteristics listed in Paragraphs 2.03A.1, 2.03A.2, and 2.03A.3 shall be cause for replacement or repair of the Gas Conditioning System at the Manufacturer's expense.

Id. at 19 (citation modified).

It notes that the City "acknowledged the right and provided notice to Unison (Azzuro) of that right." Id. It states, "Azzuro tried to work with the City to repair the system, and when that failed, Azzuro offered to provide the City with a Thiopaq-like system." Id. The City states that "Azzuro failed to present a replacement plan that was acceptable to the City." Doc. 116 at 30. It states that when it asked Azzuro "numerous, detailed questions about its proposed replacement plan . . . it would take Azzuro several weeks to respond to those questions and, even when it did respond, Azzuro failed to answer those questions to the City's satisfaction so that the City could determine whether or not Azzuro's proposed replacement would actually work." Id. The City states this behavior gave it "significant concern that Azzuro did not have the expertise necessary to design and build a system similar to a 'Thiopaq-concept' and that proceeding with Azzuro's proposed replacement plan would be another pilot program for Azzuro, which was too risky for the City." Id. at 30–31.

In this diversity matter, South Dakota "law and decisions guide the allowable damages." Gasperini v. Ctr. for Humans., Inc., 518 U.S. 415, 437 (1996). Under South Dakota law, and "as a general principle of damages, a plaintiff must do all that is reasonable to minimize damages after a tort or breach of contract has occurred." Weiland v. Bumann, 18 N.W.3d 148, 161 (S.D. 2025) (citation modified). The law imposes on a plaintiff "the active duty of making reasonable

36

exertion to render the injury as light as possible." Id. (citation omitted). "If, by his negligence or willfulness, he allows the damages to be unnecessarily enhanced, the increased loss, that which was avoidable by the performance of his duty, falls upon him." Id. (citation omitted). "The burden of proving that damages would have been lessened by the exercise of reasonable diligence on the part of the claimant is on the party that caused the damages." Id. (citation omitted). "Reasonableness of one's conduct is generally a question of fact to be determined by the trier of facts." Feistner v. Swenson, 368 N.W.2d 621, 624 (S.D. 1985) (citations omitted). On the question of mitigation of damages, judgment as a matter of law is inappropriate where "sufficient evidence exists so that reasonable minds could differ." Weiland, 18 N.W.3d at 158, 167 (citation omitted).

Here, reasonable minds could differ on the reasonability of the City's efforts to mitigate its damages. As a result, questions of material fact remain in dispute. The Court must allow the questions to be resolved by a jury.

## IV.    Order

For the above reasons, and the record as it now exists before the Court, it is hereby

ORDERED that Short Elliot Hendrickson, Inc.'s Motion for Summary Judgment as to Plaintiff's Claims, Doc. 103, is denied.

DATED this 31st day of March, 2026.

BY THE COURT:

ERIC C. SCHULTE
UNITED STATES DISTRICT JUDGE

37